H2H3STES                          Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                v.                          15 CR 287 (LTS)

5    SEAN STEWART,

6                     Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         February 17, 2017
9                                        2:00 p.m.

10
     Before:
11
                     HON. LAURA TAYLOR SWAIN,
12
                                         District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     SARAH EDDY
17   BROOKE E. CUCINELLA
          Assistant United States Attorneys
18
     FEDERAL DEFENDERS OF NEW YORK
19        Attorneys for Defendant
     MARTIN S. COHEN
20

21   ALSO PRESENT:  Special Agent Eric Burns, FBI

22

23

24

25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

H2H3STES                           Sentence

1          THE DEPUTY CLERK:  United States of America v.

2     Stewart.

3          THE COURT:  Counsel.

4          MS. EDDY:  Good afternoon, your Honor.  Sarah Eddy and

5     Brooke Cucinella for the government.  And with us at counsel

6     table is Special Agent Eric Burns.

7          MS. CUCINELLA:  Good afternoon, your Honor.

8          THE COURT:  Good afternoon.

9          MR. COHEN:  Good afternoon, your Honor.  Martin Cohen

10    from the Federal Defenders on behalf of Sean Stewart.

11         THE COURT:  Good afternoon, Mr. Cohen.  Good

12    afternoon, Mr. Stewart.

13         THE DEFENDANT:  Good afternoon.

14         THE COURT:  And good afternoon to the family members

15    and friends who are here.  Thank you all for coming to court.

16    And greetings to the other spectators who are here in court

17    today.

18         We are here today for sentencing.  I've received and

19    reviewed the presentence investigation report, which is dated

20    January 24, 2017, including the recommendation and addendum, as

21    well as defense counsel's February 6, 2017 submission, which

22    was accompanied by four letters of support, and the

23    government's February 10, 2017 submission.  I have received as

24    well the defense further reply submission dated February 16,

25    2017, and the government's February 16, 2017, sur-reply.

1          Are there any other written submissions that the

2     parties intend me to have considered in connection with the

3     sentencing?

4          MR. COHEN:  No, your Honor.

5          MS. EDDY:  No, thank you.

6          THE COURT:  Thank you.  Ms. Eddy, would you please

7     make a statement regarding the government's view of the victim

8     identification situation and status of any notifications in

9     that regard.

10         MS. EDDY:  Yes, your Honor.  Victims have been

11    notified, and as I think we noted in our sentencing submission,

12    the government is in consultation with victims concerning

13    potential restitution.  As the Court I'm sure is aware, there

14    is a 90-day period following sentencing during which

15    restitution can be set.  The government proposes that by a week

16    from today we will advise the Court if in fact we are seeking

17    restitution on behalf of any of the victims.

18         THE COURT:  Does the defense have an objection to that

19    structure?

20         MR. COHEN:  No, your Honor.

21         THE COURT:  Mr. Cohen, have you read the presentence

22    report and discussed it with Mr. Stewart?

23         MR. COHEN:  I have, your Honor.  We have no objections

24    to the presentence report, other than the ones that were made

25    to the probation officer.

1              THE COURT:  Thank you.  And Mr. Stewart, have you

2     yourself reviewed the presentence report?

3              THE DEFENDANT:  Yes, I have, your Honor.

4              THE COURT:  Have you discussed it with your attorneys?

5              THE DEFENDANT:  I have, your Honor, yes.

6              THE COURT:  All right.  Mr. Cohen, did you wish to

7     speak further to the defense objection to probation's use of

8     the 1.6 million -- $1.16 million gain amount in the guideline

9     calculation in the PSR?

10             MR. COHEN:  Very briefly, your Honor.  We've set it

11    forth in our letter to the Court.  Our position is that it was

12    not reasonably foreseeable to Sean Stewart that his father

13    would engage Richard Cunniffe to either trade for him -- to

14    trade for him in the manner that Cunniffe traded, whereby

15    Cunniffe ended up making a million dollars based on the

16    information that he gleaned from Robert, of which Robert

17    Stewart got $150,000.

18             We think that the appropriate benchmark since the

19    Court can approximate gain is to look at the trading that

20    Robert Stewart did on his own, which was the initial Kendle

21    trade where he got roughly $8,000.  And we think of that as the

22    type of trading that could have been reasonably foreseeable to

23    Mr. Stewart that his father would engage in that.  The loss

24    amount should be $40,000.

25             That's our argument, your Honor.

```
 1              THE COURT:  Thank you.  Did you wish to speak further
 2   to your objection to the proposed enhancement for obstruction
 3   of justice?
 4              MR. COHEN:  So, your Honor, as we set forth in our
 5   letter --
 6              THE COURT:  Actually, this might make it a little
 7   easier.  The Court does not consider the particular assertions
 8   that are cited in that letter material to the Court's
 9   determination as to whether the obstruction of justice
10   enhancement should apply.  So, we don't need a Fatico hearing
11   on those assertions.  If you want to make a more general
12   argument.
13              MR. COHEN:  Your Honor, I don't believe that the fact
14   that Mr. Stewart testified on his own behalf and that the jury
15   convicted him means that Mr. Stewart obstructed justice.  The
16   issue with the Court was Mr. Stewart's intent.  He admitted to
17   sharing information with his father and he was describing his
18   state of mind at the time.
19              The jury convicted Mr. Stewart, but we don't know on
20   what basis the jury rendered its decision.  As the Court knows,
21   one of the legal arguments that the government stressed in its
22   rebuttal summation was conscious avoidance.  The jury may
23   easily have concluded that Mr. Stewart should have known what
24   his father was doing based on having learned about the Kendle
25   trades, and that, therefore, he must have intentionally done
```

1    it, which is not inconsistent at all with Mr. Stewart's

2    testimony.

3            So, we don't think that the Court should take the

4    jury's verdict as a finding that Mr. Stewart obstructed justice

5    in this case.  Thank you.

6            THE COURT:  And did you wish to say anything about the

7    proposed enhancement for use of the position of trust?

8            MR. COHEN:  I just note, your Honor, that the

9    probation officer didn't include it in the presentence report,

10   in their recommendation, and we didn't comment on it there.  So

11   we take no position other than to side with the probation

12   office.

13           THE COURT:  Thank you.  Ms. Eddy, do you wish to

14   respond to the arguments?

15           MS. EDDY:  Yes, your Honor.  Addressing first the

16   proper loss range.  The guidelines calculation of 63 to 78

17   months is pegged to a gain range of 550,000 to 1.5 million.  I

18   think everyone agrees that the total profits from these five

19   deals, trading in advance of these five deals was about 1.16

20   million.

21           These profits were plainly foreseeable to Sean

22   Stewart.  He may not have known that Richard Cunniffe in

23   particular was his father's trading partner, we think the

24   evidence establishes very clearly that he knew Robert Stewart

25   had to be using somebody to help him to trade.  And moreover,

H2H3STES                          Sentence

1    these are tips on five separate mergers and acquisitions.  It

2    was plainly foreseeable that at least this amount of profit,

3    1.16 million, would be generated from monetizing those tips.

4    So, that's on the loss calculation.

5              With respect to the obstruction enhancement, we

6    certainly believe it applies.  Mr. Stewart perjured himself at

7    trial on a matter plainly material to the case, his own state

8    of mind.  He testified falsely that he didn't believe his

9    father would trade on the tips that he was giving him.  And he

10   testified further that he in good faith believed that his dad

11   would not trade.  He testified about this promise that was

12   made.  The jury had to have rejected that testimony in order to

13   convict him.

14             So, and I think that in this regard, it's not correct

15   that the jury could have convicted Mr. Stewart just based on

16   its conclusion that he should have known that his father would

17   trade.  It had to have found that he deliberately turned his

18   mind away from that trading under a conscious avoidance theory

19   and he did not act in good faith.

20             So that's why those two enhancements apply.  And we

21   believe that the failure by the probation office to apply the

22   abuse of trust enhancement was simply an oversight.

23             THE COURT:  Thank you.  Did the government have any

24   other issues with respect to the report that you wanted to

25   raise?

1          MS. EDDY:  With respect to -- I'm sorry, I didn't

2     hear.

3          THE COURT:  The presentence report.

4          MS. EDDY:  No, your Honor.

5          THE COURT:  As to restitution, you're asking that

6     pursuant to 3664(d)(5) we set a restitution hearing date 90

7     days out and you're undertaking to give notice within a week as

8     to whether restitution will be sought.

9          MS. EDDY:  That's correct, your Honor.

10         THE COURT:  Ms. Ng, may I have a restitution hearing

11    date, please.  Something a little shorter than 90 days.

12         THE DEPUTY CLERK:  Thursday, May 18, 2017, at

13    2:30 p.m.

14         THE COURT:  So we'll set May 18 at 2:30 as the

15    restitution hearing date and we'll look forward to the

16    communication within a week.

17         What's the government's position as to forfeiture?

18         MS. EDDY:  The government is not seeking forfeiture,

19    your Honor.

20         THE COURT:  Very well then.  Since I have no evidence

21    from which I can determine that there is a forfeiture

22    obligation required, there will not be a forfeiture component

23    of the sentence.

24         I will now rule on the three disputed guidelines

25    issues.  First, with respect to gains in connection with the

offense, the defense has objected to the computation of gain

that puts the relevant gain in a bracket between 550,000 and

one and a half million dollars, resulting in a 14-level

increase in the offense level calculation for guidelines

purposes.

         Did I get those numbers wrong?  I'm sorry, I thought I

saw you indicating that I did.

         The defendant contends that it was not reasonably

foreseeable to him that his father would engage Richard

Cunniffe to make trades because, among other things, the

defendant had only ever communicated with Mr. Cunniffe for at

most a minute or two.  And defendant proffers $40,000 as an

appropriate benchmark for the gain computation, or, as a

fallback, a maximum of $150,000, approximating the amount of

gains his father actually made.

         The commentary to Section 2B1.4 of the guidelines

concerning insider trading defines the relevant gain as the

total increase in value received through trading and securities

by the defendant and persons acting in concert with the

defendant or to whom the defendant provided insider

information.

         The relevant conduct provision of the guidelines

indicates that the defendant is responsible for the acts of

co-conspirators that were reasonably foreseeable to the

defendant.  See Section 1B1.3(a)(1)(B) of the guidelines, and

1    also the Second Circuit's decision in United States v. Royer,

2    549 F.3d 886, 905 (2d. Cir. 2008), holding that the loss

3    resulting from acts of co-defendants can be attributed to the

4    defendant for sentencing purposes if such acts were reasonably

5    foreseeable.

6              Here, the credible trial evidence demonstrated that

7    Mr. Stewart tipped his father Robert on the first Kendle deal

8    with the expectation that his father would trade on the inside

9    information.  Robert then in fact traded on that information,

10   and after his name appeared on a FINRA list, defendant at first

11   did not identify the name in followup.  There was elaborate

12   lying to the JPMorgan lawyers about the involvement of Robert

13   with the transaction.  Ultimately, neither FINRA nor JPMorgan

14   took action against Mr. Stewart.

15             Even after that inquiry, Mr. Stewart continued to tip

16   his father concerning upcoming mergers, and Robert continued to

17   trade based on the insider information, but under

18   Mr. Cunniffe's name.

19             The credible evidence showed that Mr. Sean Stewart

20   kept tipping his father in the expectation that his father

21   would benefit.  And given the fact that he continued to tip his

22   father under those circumstances, with the expectation that his

23   father would trade, but that he never again saw his father's

24   name on a FINRA list, it would have been reasonably foreseeable

25   to him that his father was trading using someone else's name

and account, and that such other persons would also be trading

for their own account on the basis of the valuable insider

information provided by Mr. Sean Stewart.

        Furthermore, in this case, given the magnitude of the

mergers as to which Mr. Stewart tipped inside information and

the number of mergers involved, it should have been reasonably

foreseeable to him that exploitation of such tips would lead to

profits exceeding a half a million dollars.

        Accordingly, the Court finds that the 14-point

enhancement under Sections 2B 1.1(b)(1)(H) and 2B1.4(b)(1) of

the guidelines is justified in light of the reasonable

foreseeability to the defendant of the overall gains of Robert

Stewart and others who would trade based on the tips conveyed

by Robert.

        As to the enhancement for the obstruction of justice,

under 3C1.1 of the guidelines, as explained by the Second

Circuit in United States v. Peña, 751 F.3d 101 (2d. Cir. 2014),

an obstruction of justice enhancement for false sworn testimony

is appropriate where the Court finds that the defendant

willfully and materially committed perjury, which is defined as

the intentional giving of false testimony as to a material

matter.

        Here, the jury clearly found beyond a reasonable doubt

that Sean Stewart lied when he denied tipping his father in the

expectation that his father would trade on the information.

1    This testimony went to a core element of the legal requirements

2    for a criminal culpability.  Mr. Stewart was keenly aware of

3    the materiality of the issue, and testified as he did in a

4    willful attempt to avoid conviction.

5           The Court finds that Mr. Stewart willfully and

6    materially perjured himself at the trial when, among other

7    things, he denied that he gave material, non-public information

8    to his father with the expectation that his father would trade

9    based on that information.

10          Accordingly, the additional two-point enhancement for

11   obstruction of justice is warranted.

12          Finally, as to the enhancement for abuse of a position

13   of trust, under Section 3B1.3 of the guidelines, a two-level

14   enhancement is warranted if the defendant abused a position of

15   public or private trust or used a special skill in a manner

16   that significantly facilitated the commission or concealment of

17   the offense.

18          Here, as Mr. Stewart admitted at trial, he repeatedly

19   breached his duties of trust and confidence owed to his clients

20   and employers when he disclosed material, non-public

21   information about the Kendle and other mergers to his father.

22   Accordingly, the two-level enhancement is warranted.

23          I will therefore direct the probation department to

24   make the following changes to the presentence report:  As to

25   paragraph 159, the adjustment for role in the offense should be

1    two instead of zero, reflecting a two-point enhancement under

2    guideline section 3B1.1(3) for abuse of a position of trust.

3            In paragraph 160, the obstruction of justice

4    enhancement should be two instead of zero reflecting the

5    two-point enhancement under section 3C1.1 of the guidelines.

6            The total offense level, therefore, should be 26

7    instead of 22.  And that change has to go in paragraph 164.

8            In paragraph 203, the total offense level should be

9    changed from 22 to 26, and the guideline imprisonment range

10   reflected as 63 to 78 months of imprisonment.

11           Are there any other changes in the PSR that I should

12   make that I haven't cataloged here?

13           MR. COHEN:  I don't believe so, your Honor.  I think

14   that our objections as stated preserve that objection, but to

15   the extent they don't, we object to the Court's determination

16   of the loss amount and the obstruction of justice enhancements.

17   Thank you.

18           THE COURT:  So at this point I would invite counsel to

19   speak further to sentencing issues.  Mr. Cohen.

20           MR. COHEN:  Thank you very much, your Honor.

21           I wanted to start by letting the Court know who is

22   here on Mr. Stewart's behalf.  They include Mr. Stewart's

23   mother, Claudia Stewart, his brother Ryan and Ryan's wife,

24   Marissa, as well as Mr. Stewart's wife Elizabeth Stewart.  All

25   of whom or most of whom have written to the Court.

H2H3STES                        Sentence

1              Nothing in our submission to the Court or in my

2       remarks today should be taken as a suggestion that insider

3       trading is not a very serious offense.

4              At the same time, it is not required for the Court to

5       impose extensive incarceration just to signal the fact that it

6       is a serious offense, and I want to focus the Court on the

7       reasons for incarcerating people and the purposes of

8       sentencing.

9              The Court has reviewed our submission carefully I

10      know, and we believe that the appropriate sentence is a

11      non-incarcerative sentence.  My sense, though, is that the

12      Court is going to impose some term of incarceration.  If I'm

13      wrong, the Court will correct me later on.  But I want to focus

14      the Court on why a term of a year and a day will be sufficient

15      in these circumstances.

16             This case, I believe, is unusual for a lot of

17      different reasons, but if the Court focuses on the nature of

18      this offense, taking for the purposes of the argument the some

19      of the government's theory, the government's theory was that

20      Sean Stewart tipped his father because his father was

21      struggling economically and Mr. Stewart made a very misguided

22      and terrible decision to try and help him by providing inside

23      information.  Serious offense for sure, but it's not of a kind

24      that warrants the type of extensive incarceration that the

25      government is seeking here.

I take the Court's point in terms of what the
guidelines are and what is reasonably foreseeable.  But, it is
important that the facts of this case is very unusual.  You
have Mr. Stewart tipping his father, his father then tipping
someone that Mr. Stewart doesn't know.  That third party made
90 percent of the profits in this case, over or close to a
million dollars, which drives much of the guideline range.
Mr. Stewart received essentially nothing.  His father received
by the government's estimation $150,000.  Again, it's serious
and we're not saying it is not, but it is not of a kind that
warrants excessive or extensive incarceration.

In doing so, Mr. Stewart has destroyed his life.  This
is someone who has worked extraordinarily hard, worked very
hard for these same companies whose trust he betrayed.  Worked
very hard for his family, for himself.

I think it came across at trial, I hope it came across
from our letter, that this was more than Mr. Stewart's job in
many ways.  This was a core of his identity, was doing the work
that he was doing, as well as along with his relationship to
his family.

And by committing this offense, he's blown all of that
up.  His fault for sure, but that doesn't mean that the Court
can't take that into account, and can't look at where
Mr. Stewart is now in terms of fashioning an appropriate
sentence here.

1             Mr. Stewart does not need to be specifically deterred.

2   This prosecution has been an absolutely searing experience for

3   him, and he'll have a lifetime of trying to make amends for his

4   actions.

5             I do want to focus the Court a bit on the idea of

6   general deterrence, which the government sometimes focuses on

7   in terms of asking for additional incarceration.  It is a

8   somewhat abstract construct.  Nobody knows for certain what

9   length of time is required for purposes of general deterrence.

10  But there is no empirical evidence in support of the

11  government's position that extensive incarceration is required.

12  Indeed, the evidence is to the contrary, which is that it is a

13  certainty of prosecution, rather than the length of prison,

14  that deters others.

15            In my letter to the Court yesterday, I quoted from

16  Judge Rakoff's decisions in Gupta where he notes that common

17  sense suggests that general deterrence in these type of cases

18  can be satisfied by a somewhat modest sentence, because the

19  people who it addresses are generally thought to be more

20  rational actors.

21            Sean Stewart's case in particular, your Honor, was

22  almost -- if the government wanted to find sort of an object

23  lesson on this particular point, which is what a person says to

24  those people who he's closest to about the work that he's

25  doing, they couldn't have found a better vehicle.  The case was

1   extensively covered in the newspapers.  I can represent to the

2   Court, anecdotal of course, but we were told by many folks that

3   this was in all of the financial firms, the law firms where

4   people are engaged in mergers and acquisitions, the investment

5   bankers, the traders, everybody was watching this case.  And

6   not just because it was a first post-Newman case, but

7   specifically, because this case involved somebody who shared

8   confidential information with somebody who they loved and that

9   person traded on it and his defense was that he didn't

10   anticipate that that person would trade.

11          This prosecution alone in our view provides sufficient

12   general deterrence.  But if the Court finds, as I expect it

13   will, that some additional incarceration is required, it should

14   be a modest term of incarceration, and a year in prison will be

15   sufficient.

16          The most compelling reason for incarcerating someone

17   for a significant length of time is to incapacitate that

18   person, and there is no need that Mr. Stewart should be

19   incarcerated in order to incapacitate him.  Indeed, the

20   contrary is true.  Mr. Stewart has a lot to offer his family

21   and his community, all of whom will benefit from him being out

22   in the community with his family, with his son, with his

23   mother.

24          Really, I think what the government is after is

25   punishment.  They want Sean Stewart to be punished.  But, the

H2H3STES                     Sentence

 1     Court can achieve that goal, can well achieve that goal without

 2     imposing a very long prison term.

 3          The government tends to ask Courts to disregard

 4     collateral consequences of a person's conduct.  There is no

 5     question these consequences are Mr. Stewart's fault.  It

 6     doesn't mean, though, that the Court can't consider the fact

 7     that Mr. Stewart will almost certainly never work again in the

 8     career that he's worked so hard to get himself to.  Almost

 9     certainly will never work again in the finance industry.  Very

10     unclear what position he will be able to get with these

11     convictions on his record.  And these are lifelong

12     disabilities.  His ability to earn a living will be forever

13     diminished.  There's all of the shame and stigma that goes

14     along with it.

15          So, I think it's wrong to say that the Court need just

16     put these things aside because they're collateral in some way

17     to a sentence.

18          This prosecution, your Honor, was particularly

19     punitive, not through any decision of Mr. Stewart, but it was

20     our decision, his legal team, that we needed to explore in

21     great detail the relationship between Sean and Robert Stewart.

22     This trial, in open court, we shared extraordinarily intimate

23     details, many of which weren't flattering to Mr. Stewart about

24     his marriage, about his relationship with his parents, brutal

25     exchanges between Sean and Robert Stewart.  We did this because

1    we thought it was essential to show what that relationship was.

2    But there are few criminal trials where somebody is exposed to

3    the public the way that Mr. Stewart was.  And that in itself,

4    your Honor, was quite punishing.

5           If the Court imposes a sentence of a year and a day,

6    Mr. Stewart will be removed from his family.  He'll be removed

7    from his incredibly important role as being a supporter of his

8    son.  He'll think of punishment in terms of the time away from

9    his young son.

10          The government is right in saying, to an extent, in

11   saying that the fact that Mr. Stewart has a close family or a

12   loving family is not extraordinary.  That many defendants have

13   very close relationships with those that they love and

14   responsibilities towards them.

15          At the same time, your Honor, the 3553(a) factors

16   don't talk about extraordinary.  They talk about looking at a

17   person's background and their characteristics and the

18   circumstances of their life.  And if there is a sentence that

19   the Court can impose that will return Mr. Stewart to his son

20   sooner rather than later, the Court should impose that and can

21   take that into consideration.

22          The Court could, for example, increase, if it thought

23   it was necessary, the punishment by adding a term of home

24   detention on top of a brief term or modest term of

25   incarceration, which would further punish Mr. Stewart, but

1   return him to his family.

2              We don't have a crystal ball in terms of being able to

3   see the future, but hard pressed to see why the future would be

4   better for anyone, for this Court, for society more generally,

5   for the financial markets, if Mr. Stewart was incarcerated for

6   longer than a year and a day, than not.  The marginal increase

7   in terms of any of those things does not warrant additional

8   incarceration.

9              The Court I know has read our letter.  Before the

10  Court is a young man who does have some extraordinarily good

11  qualities and the ability and the wherewithal to use those

12  qualities to help others, as he has in the past and as he will

13  in the future.

14             He's going to be starting from scratch when he is

15  released from prison.  We urge the Court to make that sooner,

16  rather than later.  A year and a day is in line with other

17  sentences that courts have given.

18             Obviously, every case is different and there are a lot

19  of different nuances.  I just want to very briefly point out

20  the government put in a suggestion that the closest analogous

21  case was the Riley case which Ms. Eddy was a prosecutor on.  I

22  would point out in that case, the defendant tipped his close

23  friend who was an advisor to hedge funds and mutual funds.

24  Those funds made $36 million in profit.  The person who got the

25  tip got over a million dollars in bonuses.

1          I do think the focus here should be on Mr. Stewart,

2     that are always different things in the cases, but I did want

3     to make sure that the Court was aware of that in connection

4     with that specific case.

5          The Court has letters from Mr. Stewart's family, has a

6     sense for how the closeness of that family, despite this case

7     and the things that Mr. Stewart has done.  For these reasons

8     and those set forth in the my letter, I urge the Court to

9     sentence Mr. Stewart to a term of probation.  But if the Court

10    finds that some incarceration is required, that that

11    incarceration be a term of one year and one day in prison.

12          Thank you, your Honor.

13          THE COURT:  Before you sit down, I have a question for

14    you.

15          MR. COHEN:  Of course.

16          THE COURT:  And obviously it's up to you whether and

17    how you respond to it.  But I noticed in the presentence report

18    in the financial section that the current income and

19    expenditures are far out of balance, and there is a fair amount

20    being spent for housing, and the explanation of income doesn't

21    match up and there is also some high debt.

22          So, to be honest with you, I have a concern that this

23    is a person who's continuing to live beyond his means and not

24    being realistic about the nature and impact of what happened in

25    the past and its implications for the future.  So if there is a

```
1    way for you to help me understand that in a different light,

2    I'd want to give you the opportunity to do that.

3            MR. COHEN:  Thank you, your Honor.  Just give me a

4    second.

5            So, your Honor, I think Mr. Stewart has been helped

6    out by family members to a large extent.  In addition, he and

7    his wife decided that -- they don't live together as we set

8    forth in our letter.  Mr. Stewart has been the key caretaker,

9    daily caretaker for their son, and so they decided that during

10   this period that he would to minimize the chaos for William,

11   that he would stay in that place.  But both apparently

12   Mrs. Stewart is going to be moving, Mr. Stewart obviously will

13   be leaving that apartment.  The main expense is the rent of his

14   apartment.

15           As we noted as well, Mr. Stewart was recently hired to

16   work this spring as a coach of a girls crew team at a private

17   school, which will assist with those expenses, and certainly

18   shows somebody who is working very hard to minimize their

19   expenses and make what they can.  As the Court can imagine, it

20   was difficult for Mr. Stewart to find work.

21           So I take the Court's point in terms of the imbalance.

22   I don't think it is at all a reflection of somebody who hasn't

23   taken this case extraordinarily seriously.

24           THE COURT:  Thank you.

25           MR. COHEN:  You're welcome.
```

1          THE COURT:  Ms. Eddy.

2          MS. EDDY:  Thanks, your Honor.  The Court has pretty

3     extensive briefing from the parties, so I'm going to try to

4     keep this brief.  The government believes that a guideline

5     sentence is warranted here.  And I'd like to begin with the

6     nature and the circumstances of the offense.

7          The defendant tipped his father about five separate

8     mergers and acquisitions over roughly a four-year period.  And

9     he did so in gross breach of the trust placed in him, not just

10    by his employers, but by his clients.

11         He got almost got caught early on in 2011 when the

12    Kendle FINRA list circulated with his father's name on it, but

13    that did not stop him.  Instead, he cooked up an elaborate lie,

14    he got himself off the hook, and he kept tipping his father.

15    He kept egging his father on to exploit those tips for profit.

16    He emphasized to his father that these were essentially sure

17    bets handed up on a silver platter.  So this was protracted and

18    brazen conduct, propped up by lies.  It's not a situation where

19    we've got a blip or an aberration in someone's record.

20         This crime was to Sean Stewart essentially a costless

21    way for him to benefit his father.

22         So we think the nature and the circumstances of the

23    offense weigh heavily in favor of a guideline sentence here.

24         Turning to the history and the characteristics of the

25    defendant, this, too, weighs heavily in favor of a substantial

1   prison term within the guidelines.  Mr. Stewart's history and

2   characteristics are reflected in the protracted nature of this

3   crime and the calculated lies that he cooked up to continue the

4   crime and cover his tracks.  They're reflected in his false

5   testimony to the Court and the jury.  They're reflected in his

6   decision during the pretrial period to spend the bond security

7   that he had promised to keep inviolate.

8           So, with the seriousness of the conduct that's at the

9   heart of the offense, and the defendant's lies and his other

10  bad conduct, both during the commission of the offense and

11  afterward, a guideline sentence is warranted.

12          I do want to address some of the goals of sentencing,

13  particularly the ones that Mr. Cohen has touched upon.

14          First, with respect to general deterrence, white

15  collar criminals often view crime in a sophisticated manner.

16  They measure the risk against the potential reward.  And

17  insider trading is pernicious in part because the rewards are

18  so sure and so instant.  Unless the consequences of taking that

19  kind of risk, breaking the law in that way, are very heavy,

20  then general deterrence just won't be furthered.

21          With respect to specific deterrence, this again is a

22  defendant who nearly got caught, but that did not stop him.  In

23  fact, he kept chiding his father to keep on exploiting these

24  tips, even after the SEC had called Bob Stewart about the

25  Kendle trading.  And as we noted, although the defendant does

1   not currently have employment in the financial sector, he

2   reports to probation that he is actively trying to find a job,

3   he's in talks with a private equity firm and a private

4   financial services firm.

5           And just a finally a small point regarding this

6   question of comparable cases.  The David Riley case, we do

7   think it is comparable in some respects.  Mr. Cohen has pointed

8   out that the loss amount there was in the tens of millions of

9   dollars.  That's certainly true.  Though the government

10  conceded and the Court found there that that amount was not

11  actually the correct amount to use for guidelines purposes

12  there because it was so out of proportion with what the

13  defendant anticipated reasonably would occur.

14          So, this case we think really is one that merits a

15  guideline sentence between 63 and 78 months.

16          THE COURT:  Thank you.  Mr. Stewart, would you like --

17  I'm sorry.  Ms. Cucinella, would you like to speak?

18          MS. CUCINELLA:  No.

19          THE COURT:  Okay.  I thought --

20          MS. CUCINELLA:  I was just moving my chair, sorry.

21          THE COURT:  Mr. Stewart, would you like to speak for

22  yourself?

23          THE DEFENDANT:  Yes, your Honor.

24          Your Honor, I want to begin by stating clearly that I

25  understand it is my own actions that have led to me being here

H2H3STES                          Sentence

1    today.  My two former firms, I had a duty and a responsibility

2    to my employers and to my clients to keep certain information

3    confidential.  I breached the trust and confidence that was

4    placed in me.  My actions have contributed to furthering the

5    mistrust the public has in the financial markets, its

6    institutions, and the government.

7          Speaking with my family about work violated the

8    principles I very much cherished, respected, and was expected

9    to maintain.  So did failing to be honest with my first

10   employer about the fact that I had breached the trust placed in

11   me by sharing this information.

12         In my heart and in my mind, though, I know that I did

13   not commit a crime.  That is what I believe to be true.

14   However, I know that I made very serious mistakes, and that's

15   no one's fault but my own.

16         I want to talk to you today about what these mistakes

17   have cost me and my family.  In order to do that, I have to

18   start in the summer of 2002 when I was fortunate enough to

19   intern in the investment banking division at one of the largest

20   banks in the world.  At the time, few full-time jobs were being

21   offered to interns, but after a summer of hard work, I received

22   an offer for a permanent position to return after I graduated

23   from school the following year.

24         The most enjoyable and memorable part of the entire

25   summer was rushing home within hours of finding out and telling

my mom, who was so proud that she began to tear up.  I remember

and cherish that even more than the accomplishment itself, just

sharing it with my family.  I can't tell you if it was because

I was driven by the need for affection, or simply the joy it

gave me to make those I loved and trusted proud, but that is

the man that I am.

        Landing that first big job was just the beginning of a

dream life and a career.  From an early age, I looked up to

commuters and those who worked in the big city.  I worked as

hard as possible to be part of that life.

        Over the last 10 years, I've had the good fortune and

opportunity to work with some of the most interesting and

innovative companies in the world.  At two wonderful firms I

was lucky to work with some of the brightest, most driven

people around.  Former colleagues who are mentors, mentees, and

many of them close friends.

        For better or for worse, my profession was my life.

It was how I defined and measured success.  I had a wife I

loved, a wonderful son, a caring family, and a career that had

given me success, meaning, and fulfillment that words can't

describe.

        That living dream is now completely shattered.

Because of my decisions, I have lost everything.  My dream, my

identity, the pride I had for my success and career is gone.

Colleagues and friends with whom I traveled around the world no

longer acknowledge my existence.  Clients with whom I shared

some of the most personal and important moments will no longer

speak to me.  I have become a pariah in a world that I so

cherished, admired and respected.  I have to live with that and

bear that burden and try to reconcile how I could have been so

careless to have jeopardized a life that meant so much to me.

I am hopeful that someday I can work to repair some of those

relationships, but for now, they are destroyed.  And I can't

imagine that things will ever be the same.

          My actions in the subsequent events have completely

shattered my family.  A family that was so close and loving and

was the bedrock and foundation of my life.  The once very close

relationship I had with my father is absolutely destroyed.  I

don't know if it will ever be repaired.  I will try to measure

him by the love and sacrifice he has given our family.

          My mom, who gave up her career and has spent her

entire life raising me and my brother and caring for others,

showing us unconditional support and love, has been utterly

devastated by my actions.  I know better than anyone how much

pride my mom has in my success and how it's a reflection of her

sacrifice and commitment.  The impact this has had on her

physical and mental health cannot be measured.

          I have to live with that.  Not a moment goes by when I

don't anguish in these facts.

          My ability to support my caring and loving brother for

1   whom I have served as a mentor and role model my entire life

2   has been seriously weakened, as has my ability to serve as a

3   godfather to his oldest son and uncle to his two other

4   beautiful children.  Ryan has always looked up to me for

5   guidance and inspiration.  I don't think he will ever look at

6   me in the same way again.

7           Finally, my actions have irreparably damaged Elizabeth

8   and our young son William.  The public nature of my actions,

9   including the question about our wedding, one of the happiest

10  days of our lives, has been extremely embarrassing for

11  Elizabeth.

12          Furthermore, William, the sweetest, most precious son

13  parents could ask for, is going to grow up knowing that this

14  happened.  Words can't describe the bond and love that we

15  share.  William is a reflection of his mom and dad:  Sensitive,

16  fun-loving, innocent, and kind.  I can't begin to contemplate

17  what impact this will have on him.  It haunts me every single

18  day.

19          Dealing with the events over the last two years I've

20  often come back to a quote shared with me by a pastor.  God

21  places the heaviest burden on those who can carry its weight.

22  My actions have left me damaged, humiliated, and forever

23  changed.  I hope and pray that I have the strength to persevere

24  and carry on, but every day since my arrest I struggle with the

25  feeling that I have been completely and utterly broken and that

1    everything that I hold dear -- my career, many of my

2    friendships and my family -- are forever shattered.

3           Judge Swain, I stand before you today ashamed,

4    humiliated, and embarrassed.  I stand here filled with

5    contrition.  I regret my actions and will continue to do so

6    every single day for the rest of my life.  All I hope for is

7    the opportunity to continue to be a loving father and a good

8    person, and to try to move forward making better choices and

9    having a positive impact on those around me with the

10   hard-gained wisdom and experience that this entire process has

11   bestowed upon me.  Thank you, your Honor.

12          THE COURT:  Thank you, Mr. Stewart.  Ms. Ng, will you

13   give Mr. Stewart a cup of water.

14          I'd ask everyone sit quietly for a few minutes while I

15   reflect on what I've heard and read, and the final decision

16   which I will then announce and explain.

17          (Pause)

18          THE COURT:  Thank you for your patience.

19          I adopt the factual recitation set forth in the

20   presentence report with the guideline computation adjustments

21   that we've discussed on the record.  This Court has discretion

22   taking into account the applicable statutory provisions in

23   exercising its power under Section 3553(a) of Title 18 to

24   determine the particular sentence to be imposed in each

25   particular case.

1          That statute requires the Court to consider a number

2     of specific factors and sentencing goals, including the nature

3     and circumstances of the offense, the defendant's history and

4     characteristics, the need for the sentence imposed to reflect

5     the seriousness of the offense, promote respect for the law,

6     and to provide just punishment, deterrence, protection of the

7     public, and attention to other correctional issues.

8          The Court must consider the types of sentences that

9     are available, and the provisions of the sentencing guidelines,

10    as well as the need to avoid unwarranted sentencing disparities

11    among defendants with similar records who have been found

12    guilty of similar conduct.  Where restitution is an issue, the

13    Court must also consider the need to provide restitution to

14    victims.

15         The Court is required by law to impose a sentence that

16    is sufficient, but not greater than necessary, to comply with

17    the statutory sentencing purposes.

18         As to the sentencing guidelines, I conclude, for the

19    reasons stated earlier, that the applicable guideline offense

20    level is 26, and that the applicable criminal history category

21    is I, for the reasons that are detailed in the presentence

22    report.

23         Accordingly, the advisory guideline range for a

24    custodian sentence is from 63 to 78 months of imprisonment.  I

25    have used the November 2016 edition of the guidelines manual in

H2H3STES                         Sentence

making these determinations.

I've considered the question of whether there is an appropriate basis for a departure from this advisory range within the guidelines system, and I find no grounds warranting a departure within the guidelines system.

So, I have gone on to consider carefully the full range of statutory sentencing factors and goals under Section 3553(a), and all of the facts that have been put before me in light of those factors and goals. I will speak to certain of the factors.

First, the nature and circumstances of the offense. Mr. Stewart was convicted in August 2017 after a jury trial of all of the charges in a nine-count indictment related to insider trading, and the securities of five publicly traded health care companies. On at least five separate occasions, and over the span of several years, Mr. Stewart tipped his father with insider information concerning upcoming public company transactions, anticipating that his father, Robert Stewart, would use that information to trade securities for profit.

He passed this information on to his father, knowing that it was both valuable and highly confidential, and in spite of his awareness that his employers forbade such breaches of trust and confidentiality. He knew that he potentially faced severe consequences if caught, and he repeatedly gave

1    information to his father anyway.

2          The first of the tips related to the acquisition of

3    Kendle International, Inc., in which Mr. Stewart represented

4    Kendle in negotiations toward the acquisition.  Based on his

5    tip regarding the acquisition, Robert Stewart purchased Kendle

6    shares and made approximately $9,290 in profits, some of which

7    were used to pay expenses relating to Mr. Sean Stewart's

8    July 2011 wedding.

9          Upon inquiry by lawyers at the defendant's former

10   employer concerning his father's name on the FINRA list of

11   Kendle traders, Mr. Stewart lied about having passed along the

12   insider information.  Neither his employer nor FINRA took any

13   additional action against him.

14         After that inquiry, Mr. Stewart continued to pass

15   insider information to his father on four other deals,

16   expecting that his father would trade on the information.  His

17   father, in order to avoid being identified, passed the

18   information to an associate of his, Richard Cunniffe, and

19   Cunniffe made trades in his account for himself and on behalf

20   of Robert based on the inside information passed along by Sean

21   Stewart.  As a result, Robert and Cunniffe reaped approximately

22   $1.16 million in ill-gotten gains from the scheme.

23         Although, as we have already discussed, those

24   substantial gains were reasonably foreseeable to the defendant,

25   the Court recognizes that it is likely that Mr. Sean Stewart

did not have actual knowledge of the precise magnitude of the

gains, and also recognizes that Mr. Sean Stewart himself did

not receive the bulk of the profits personally.

However, the conduct here was serious and prolonged.

Mr. Sean Stewart occupied a position of trust and confidence

with respect to his employers, his clients, and the public,

which he repeatedly breached.

When he was confronted with the Kendle FINRA inquiry,

he concocted an elaborate lie to avoid suffering any

consequences.  But more egregiously, even after near exposure

by the Kendle FINRA inquiry, Mr. Stewart, rather than stopping

his illegal conduct, continued to tip his father with insider

information for several more years, demonstrating a disregard,

and lack of respect, for the law.

Turning to his history and characteristics.

Mr. Stewart had, by his own account, a great upbringing with

loving and supportive parents.  He is smart, hard working, and

talented in both sports and academic activities.  He was his

high school valedictorian and he went on to graduate from Yale

University.  This was an impressive start that gave him much in

terms of opportunities for success and for positive

contributions to his family and his community.

He threw himself into work and the successful push for

advancement at JPMorgan, which he joined as an analyst in 2003,

and where he had risen to the rank of vice president in mergers

1   and acquisitions by the time he left the firm in 2011 to join

2   Perella Weinberg Partners as a managing director.

3            As we all know, his career in investment banking has

4   ended and it did not end well.  That was defendant's fault.

5   For even as he strove to excel in performing his job, he

6   betrayed the core trust that these institutions and their

7   clients had placed in him by disclosing highly confidential

8   information about upcoming merger and acquisition transactions

9   involving public companies with his father who traded on it.

10  He also apparently shared such information with his wife, who

11  is not accused of any involvement in illegal trading.  This

12  conduct appears to have been motivated by a desire to give his

13  father, who spent extravagantly on family activities,

14  additional resources.  And also from a general attitude that

15  even very serious rules that apply to everyone in his line of

16  work did not apply to him in the same way.

17           He earned high salaries himself, which he appears to

18  have dissipated quickly and not to have used to subsidize the

19  family activities organized by his parents, passing on valuable

20  inside information instead.

21           He chose personal convenience, appearances, and family

22  benefit, over fulfilling his contractual and ethical duties to

23  his employers and his clients.

24           He lied elaborately about his relationship with his

25  father and his father's Kendle trading activity when the FINRA

1    investigation caught up with him, and then went on to commit

2    and conceal repeated breaches of trust.

3            His sense of entitlement and license to put his own

4    priorities before legal obligations led him to violate the

5    conditions of his bail, even after he was indicted in this

6    case.  He took and spent, without ever seeking the approval of

7    the Court, and apparently without telling his lawyer, the

8    proceeds of a $250,000 account that had been pledged as

9    security for his pretrial release.  He has paid a consequent

10   heavy price for this breach of the Court's trust.

11           He appears to continue to live beyond his means in an

12   expensive apartment that his disclosed cash flow cannot

13   support, has significant credit card debt, and has spent down

14   his retirement savings account.  And the Court does credit the

15   representation that this is intended to be a temporary

16   arrangement, but it is still significant that the arrangements

17   were undertaken in this way.

18           His personal history and characteristics are by no

19   means all negative, however.  As noted already, he has shown

20   himself to be smart, dedicated, and capable of great success.

21   He is clearly a bright spot in the hearts of his parents, and

22   he has been an important mentor and friend to his brother.  His

23   priest speaks carefully of his own experience with their parish

24   and of his knowledge of the family as a whole.

25           Mr. Stewart has a four-and-a-half-year-old child.  His

1   wife, with whom he is in the process of a divorce, speaks very

2   positively of Mr. Stewart's relationship with their son and the

3   important role that Mr. Stewart plays in his son's life and in

4   the life of his son's school.  She is also candid about the

5   degree to which Mr. Stewart's active participation in his son's

6   care facilitates her own attention to the demands of her own

7   high-powered legal career and to the mitigation of childcare

8   costs.  A custodial sentence will have a seriously disruptive

9   impact on Mr. Stewart's relationship with his child and on the

10  life balance arrangements this estranged couple has been able

11  to work out over these past few difficult years.

12          That is tragic, but it is not unusual when a key

13  family member makes deliberate decisions to commit serious

14  violations of the law, and must face the consequences.  Those

15  consequences often have profound emotional impacts, and force

16  severe changes in the nature and quality of day-to-day life for

17  other family members who must adjust their own lives to fill in

18  to take care of children and other vulnerable family members.

19  It is part of the cost to families and to society of criminal

20  behavior.

21          Over all, Mr. Stewart's personal history and

22  characteristics show this Court a man who is clearly quite

23  capable of being a positive contributor to his community and

24  his society, if he chooses to do so, and if he decides to

25  manage his self-interest in a less antisocial manner.

1          The career path that was so dear to him is now

2     foreclosed to him, and he will have to reassess his skills,

3     readjust his self-image, and rebuild his life.

4          The Court believes that he is truly remorseful that he

5     has brought himself to this day, and that he is capable of

6     making a positive and productive life, including as a loving

7     parent, going forward after he has paid the price that is the

8     consequence of his serious criminal behavior.

9          The Court finds that the needs for punishment of his

10    outrageous conduct and for specific deterrence in this case

11    justify a significant custodial sentence.  The need to promote

12    respect for the law in this case is also high, especially in

13    consideration of the fact that Mr. Stewart has still been

14    actively seeking to be reemployed in the financial services

15    sector.

16         The Court also considers the need for general

17    deterrence of insider trading crimes, which are hard to detect,

18    and are often committed by sophisticated individuals in

19    positions of trust.  And in particular, the need for general

20    deterrence with respect to the financial services industry in

21    which the public trust has been eroding in relation years.

22         The Court also considers the need to avoid unwarranted

23    sentencing disparities.  The defense urges the Court to

24    consider the sentence imposed on Robert, Mr. Stewart's father,

25    as a benchmark in consideration of the sentence to be imposed

in this case.  Robert was sentenced pursuant to a plea

agreement, and importantly, at his sentencing, the Court

credited the representations that Robert was the sole caretaker

for Mrs. Stewart, who was reportedly in need of urgent and

serious medical and personal care.  But for that consideration,

the Court stated at Robert's sentencing that Robert's

deliberate and prolonged fraudulent conduct would warrant a

custodial term of significant length.

        Those unusual circumstances present at Robert's

sentencing do not exist here, and therefore, a sentence of a

significant custodial length would not constitute an

unwarranted disparity from Robert's sentence.

        The Court also finds, for the reasons outlined in the

government's initial and sur-reply submissions, that a

significant custodial sentence would not represent an

unreasonable disparity compared with the sentences imposed on

other defendants who have committed similar crimes under

similar circumstances.

        The Court nonetheless finds that the 63 to 78 month

custodial sentence recommended by the guidelines for

Mr. Stewart exceeds the sentence that is sufficient, but not

greater than necessary, to address the statutory purposes of

sentencing.

        Mr. Stewart has already spent more than a year living

under significantly restrictive conditions, and protection of

1    the public from further criminal activity on his part is a

2    relatively negligible consideration, given that he is not

3    likely to have future opportunities for access to inside

4    information regarding public company transactions.  And in any

5    event, he should not be eager to take advantage of any that

6    does come his way, given what has happened.

7          The key Section 3553(a) sentencing considerations in

8    this case are, therefore, punishment of Mr. Stewart's very

9    serious criminal conduct, promotion of respect for the law by

10   Mr. Stewart and others, and general deterrence.  These

11   considerations demand a custodial sentence of significant

12   length, and the Court rejects as insufficient the defense

13   suggestions of a non-custodial sentence and of a sentence of a

14   year and a day.

15         The government's suggestion of a within guidelines

16   sentence is excessive, however.  The guideline range, while

17   calculated appropriately, is driven significantly by the amount

18   of gains acquired by Mr. Cunniffe, whom Mr. Stewart met only

19   once, and about whose involvement in the scheme he appears to

20   have no specific information, and the gains appear to have been

21   acquired to a significant degree through the leveraging of

22   Mr. Cunniffe's own assets.  The guideline range is thus

23   somewhat serendipitous in relation to Mr. Stewart's personal

24   culpability.  It overstates the amount of custodial time

25   necessary to punish Mr. Stewart, who also suffers punishment

1    through increasing strain and complication of his family

2    relationships, separation from his son, and guilt and

3    resentment complicating his relationships with others regarding

4    the changes that will be necessary in the care and arrangements

5    for his son, his inability to return to the career that he

6    loved, and the need to repair disrupted family relationships

7    and build a new professional life upon reentry.

8         He has also been forced to confront publicly in the

9    context of this trial the reality and the impact on others of

10   his conduct.  He will have to reinvent himself and recalibrate

11   his expectations and commitments to the reality of his

12   post-conviction and post-incarceration life.

13        In light of all of these facts and considerations, the

14   Court finds that a moderate variance from the advisory

15   guideline range is necessary to formulate a sentence that is

16   reasonable within the meaning of the law, sufficient, and no

17   greater than necessary to address the statutory purposes of

18   sentencing.  I will now state the sentence that I intend to

19   impose.

20        Mr. Stewart and Mr. Cohen, would you please stand.

21        Mr. Stewart, it is the judgment of this Court that you

22   are to serve 36 months of imprisonment on each of your nine

23   counts of conviction to run concurrently, and to be followed by

24   three years of supervised release on each count.

25        The standard conditions of supervision one through 13

1    as detailed in the sentencing guidelines manual will apply.

2    These will be written out specifically in the judgment that I

3    sign.  The probation department will explain them to you in

4    detail at the appropriate time, and I'm certain that Mr. Cohen

5    will have something to say to you about them as well.

6            You will also be subject to the following mandatory

7    conditions:

8            You must not commit another federal, state or local

9    crime.  You must not illegally possess a controlled substance.

10   You must not possess a firearm or destructive device.  You must

11   cooperate in the collection of DNA as directed by the

12   authorities.

13           I will suspend the normal mandatory drug testing

14   condition based on the probation office's determination, which

15   I'm very happy to be able to adopt, that you pose a low risk of

16   future substance abuse.

17           You must also meet the following special conditions:

18   You must provide the probation officer with access to any

19   requested financial information.  To the extent there is a

20   restitution obligation and installment payment obligations, you

21   must not incur new credit charges or open additional lines of

22   credit without the approval of the probation officer, unless

23   you are in compliance with the installment payment schedule.

24           You must comply with the conditions of home detention

25   for a period of one year, that is 12 months.  During this time,

H2H3STES                      Sentence

you must remain at your place of residence during curfew times

prescribed by your probation officer with a view to permitting

you to attend to childcare, searching for a job, and working.

You must maintain a telephone at your place of residence

without call forwarding, a modem, caller ID, call waiting, or

portable cordless telephones for this period.

        At the direction of your probation officer, you must

wear an electronic monitoring device and follow electronic

monitoring procedures specified by your probation officer.

        The home detention will commence on a date to be

determined by the probation officer, and you must pay the costs

of home detention on a self-payment or co-payment basis as

directed by the probation officer.

        You must perform 200 hours of community service over

the period of supervision as directed by the probation officer.

        You must report to the nearest probation office within

72 hours of release from custody, and you will be supervised by

your district of residence.

        The determination of a restitution obligation will be

deferred to a restitution hearing scheduled to be held on

May 18, 2017, at 2:30 in the afternoon.  And by a week from

today, which will be February 24, the government is to write a

letter indicating whether it intends to seek restitution.

        I will also require, Mr. Stewart, that you pay a fine

in the amount of $7,500.  This obligation recognizes

1    appropriately the gravity of your offense.

2            While you are serving your prison term, if you are

3    engaged in a bureau of prisons non-UNICOR or UNICOR grade 5

4    work program, you must pay $25 per quarter toward the criminal

5    financial penalties.  However, if you participate in the bureau

6    of prisons UNICOR program as a grade 1 through 4, you must pay

7    50 percent of your monthly UNICOR earnings toward the criminal

8    financial penalties consistent with the bureau of prisons

9    regulations at 28 CFR Section 545.11.

10           During your period of supervised release, you will

11   make payments toward any remaining restitution and fine

12   obligations by paying 10 percent of your gross monthly earned

13   income toward those obligations as directed by the probation

14   department, to commence within 30 days after judgment is

15   entered.  The collection of amounts remaining unpaid after you

16   have completed supervised release will be administered by the

17   United States attorney's office's collection unit.  The

18   government may use judgment collection mechanisms available

19   under applicable law with respect to any remainder outstanding

20   after the supervised release period has terminated, but the

21   government is encouraged to engage in post-supervision period

22   collection activities in a manner that is not inconsistent with

23   the defendant's ability to provide reasonably for his own needs

24   and those of his dependents.

25           I will waive the accrual of interest on the fine,

1    pursuant to Section 3612(f) of Title 18, in light of your

2    overall financial condition and family obligations.

3              I will also order that you pay to the United States

4    the mandatory special assessment in the total amount of $900,

5    which is $100 for each of your felony counts of conviction, and

6    that is payable immediately.

7              You must inform the probation department of any change

8    in financial circumstances and notify the United States

9    attorney for this district within 30 days of any change of

10   mailing or residence address that occurs while any part of the

11   restitution or special assessment remains unpaid.

12             I believe that this sentence, taken as a whole, is

13   reasonable within the meaning of the law, sufficient,

14   appropriate, and no greater than necessary to satisfy the

15   statutory purposes of sentencing, which include punishment and

16   deterrence.

17             Does either counsel know of any legal reason why the

18   sentence should not be imposed as stated?

19             MS. EDDY:  No, your Honor.

20             MR. COHEN:  No, your Honor.

21             THE COURT:  The sentence as stated is imposed.

22   Mr. Cohen, do you wish to ask for any particular

23   recommendations to the bureau of prisons?

24             MR. COHEN:  Judge, I have a separate request that I

25   wanted to make initially, which is that the Court allow

H2H3STES                        Sentence

1   Mr. Stewart to remain out on bail pending appeal.

2            THE COURT:  Let me advise him of his appeal rights

3   first so we don't lose sight of that.

4            MR. COHEN:  Sure.

5            THE COURT:  Mr. Stewart, I must say something

6   important to you about appeal rights.  You have the right to

7   appeal your conviction and your sentence.  If you are unable to

8   pay the cost of an appeal, you may apply for leave to appeal in

9   forma pauperis.

10           At your request, the clerk of court will file a notice

11  of appeal for you.  Any notice of appeal must be filed within

12  14 days of the judgment of conviction.  So, make sure to speak

13  with Mr. Cohen about this.

14           You can be seated again.  And Mr. Cohen, you can

15  continue.

16           MR. COHEN:  Thank you very much, your Honor.  As the

17  Court knows, under Title 18, United States Code, Section

18  3143(b)(1)(B), the standard for bail pending appeal is that a

19  defendant is entitled to bail if he is not likely to flee or

20  pose a danger to public safety, and the appeal is not for the

21  purposes of delay, and raises a substantial question of law or

22  fact likely to result in reversal or an order for a new trial.

23           Here, there is no question in connection with risk of

24  flight or danger to the community, so the sole question for the

25  Court is whether there is a substantial question of law or

1    fact.

2              The cases are clear, your Honor, that the standard is

3    whether if the appellate court decides in favor of the

4    defendant it's likely to result in reversal or an order for a

5    new trial.  In other words, the Court need not find that it

6    erred.  If that was the standard, no one would ever get bail

7    pending appeal.

8              The seminal case is U.S. v. Randell, 761 F.2d 122

9    (1985).  In that case, the Second Circuit explained that before

10   the Bail Reform Act, there was a presumption in favor of bail

11   pending appeal.  The Bail Reform Act reversed that presumption,

12   because it was trying to read out frivolous appeals or appeals

13   that were solely for the purpose of delay, but it's not for the

14   purpose or for the willingness of the trial court to agree that

15   it expected to be reversed on appeal.

16             So, again, the question is if it is a non-frivolous

17   question, debatable questions that, if granted by or agreed to

18   by the Second Circuit, would result in a reversal of an order

19   for a new trial.  There is a case --

20             THE COURT:  So your representation is the standard is

21   that as long as the argument is not frivolous, that there

22   should be a stay pending appeal?

23             MR. COHEN:  As long as the argument is debatable.

24   There is a case on point.  I can hand it up to the Court from

25   Judge Koeltl.

1          THE COURT:  What is the cite?

2          MR. COHEN:  It's U.S. v. Rittweger.  2005 WL 3200901,

3  I direct the Court to where I placed the flag.  In this case,

4  your Honor, this case involved two defendants who had moved for

5  severance, and Judge Koeltl had found that there was no grounds

6  for severance.  Judge Koeltl writes "By finding that there is a

7  substantial issue for appeal for the defendant, the Court does

8  not find that the issue will ultimately succeed or that it has

9  merit.  For all the reasons explained in the Court's prior

10 opinion, the Court has concluded that joinder was proper in

11 this case and it fits comfortably within the standards set

12 forth by the Court of Appeals.  But as the Court of Appeals

13 noted in Randell, release pending appeal is not conditioned

14 upon a district court's finding that its own judgment is likely

15 to be reversed on appeal.  Rather, the defendants need only

16 show that if a substantial question is determined favorably to

17 the defendants on appeal, that decision is likely to result in

18 reversal or an order for a new trial on all counts on which

19 imprisonment has been imposed."

20          And here, your Honor, there are a number of

21 substantial questions which include the admission of the

22 so-called silver platter statement, the exclusion of Robert

23 Stewart's post-arrest statement regarding the silver platter

24 statement and regarding other hearsay statements that were

25 admitted, whether Robert Stewart properly invoked his Fifth

1   Amendment rights, and whether the government should have been

2   compelled to immunize Mr. Stewart.

3           We're not here to rehash those issues, which have been

4   aired thoroughly, both in the trial and in the post-trial

5   motions.

6           THE COURT:  Let me ask you this.

7           MR. COHEN:  Yes, your Honor.

8           THE COURT:  Would even a decision in Mr. Stewart's

9   favor on those issues --

10          MR. COHEN:  Yes.

11          THE COURT:  -- result in an order of reversal or an

12   order for a new trial on all of the counts on which

13   imprisonment has been imposed?

14          MR. COHEN:  Your Honor, we believe that it would,

15   because all of the counts involve the central question of what

16   Mr. Stewart's intent was.  And all of these issues go to the

17   same question.  We believe that Mr. Stewart was deprived of a

18   fair trial because the jury only heard one side of the hearsay

19   statements of Robert Stewart, and we were precluded from either

20   calling Mr. Stewart or having admissible hearsay which

21   contradicted those statements.  So all of them are of a piece,

22   and they all go to the central issue in the case.  As the Court

23   knows, those were the highlights of the government's case

24   against Mr. Stewart.  So, in our view, if the Court of Appeals

25   agreed on any of those issues, it would be impossible to think

H2H3STES                          Sentence

 1   that it would be harmless error, and that a new trial would

 2   result.

 3            So, for that reason, your Honor, we would request that

 4   the Court allow Mr. Stewart to remain out on bail pending

 5   appeal.  Thank you.

 6            THE COURT:  Thank you.  Ms. Eddy.

 7            MS. EDDY:  Your Honor, this is not a case in which the

 8   standard has been met for bail pending appeal.  Mr. Cohen has

 9   essentially read out the requirement that a substantial

10   question of law or fact be presented here by equating that with

11   non-frivolous.  It's not the same.

12            The substantial question has to be presented and the

13   the issues that Mr. Cohen has previewed will be raised on

14   appeal.  The admission of the silver platter statement and

15   other statements made on recordings of Robert Stewart, the

16   question whether Mr. Stewart -- Robert Stewart validly invoked

17   his Fifth Amendment rights, all of those are questions that

18   were resolved definitively in the government's favor by the

19   Court.  They're not substantial questions that are likely to

20   result in reversal if they are presented on appeal.

21            THE COURT:  The request for a stay pending appeal is

22   denied because I find that those questions are not substantial

23   within the meaning of the standard.

24            MR. COHEN:  Thank you, your Honor.

25            THE COURT:  I will, however, afford Mr. Stewart the

H2H3STES                        Sentence

1    opportunity for a delayed surrender.

2            MR. COHEN:  Thank you, your Honor.  That is our second

3    request.  So, just for the record, we object to the Court's

4    denial of bail pending appeal.

5            In connection with the delay of surrender date, as we

6    indicated in our -- normally the voluntary surrender date is

7    usually roughly 60 days, 45 to 60 days.

8            THE COURT:  My intention was to direct him to report

9    to the designated facility on May 25 with the idea that that

10   would take him past the Easter holidays and to the end of the

11   child's school year, and also give the ability to wind up the

12   apartment.

13           MR. COHEN:  I appreciate that, your Honor.  I would

14   just ask that the Court add an additional -- it is a little

15   less than two weeks, until June 6.  The reason for that, your

16   Honor, is that Mr. Stewart has gotten this job, your Honor, and

17   the Hewitt season, which is he's going to be the coach of their

18   crew team, ends on May 25 itself.  So we would just ask for a

19   slightly delayed surrender date of June 6, which is a little

20   less than two weeks after that.

21           THE COURT:  All right.

22           MR. COHEN:  Thank you, your Honor.  I do have two

23   requests with designation.

24           THE COURT:  Just one second.  I just need to check.

25   Go on.

H2H3STES                          Sentence

1          MR. COHEN:  Thank you very much, your Honor.  I have

2    two requests with respect to the recommendation of the bureau

3    of prisons.  The first is the recommendation that the bureau of

4    prisons designate Mr. Stewart to the FCI Otisville Satellite

5    Camp.

6          THE COURT:  And I assume that is for maintenance of

7    family ties?

8          MR. COHEN:  That's correct, your Honor.

9          THE COURT:  I will make that recommendation.

10          MR. COHEN:  Thank you.  And the second recommendation

11    we would ask the Court to recommend to the bureau of prisons

12    that Mr. Stewart be allowed to spend the maximum amount of time

13    in a halfway house.

14          THE COURT:  I will make that recommendation as well.

15          MR. COHEN:  Thank you very much, your Honor.  No other

16    requests.

17          THE COURT:  There are no underlying indictments here,

18    are there, that have to be dismissed?

19          MS. EDDY:  No, your Honor.

20          THE COURT:  So did the government wish to be heard on

21    anything before my concluding remarks?

22          MS. EDDY:  Nothing from the government, your Honor.

23          THE COURT:  All right.  It's been a long afternoon.

24          Everyone, Mr. Stewart, has acknowledged that the crime

25    of which you've been convicted is serious.  The length of the

1    sentence that you received today reflects that.  And you

2    yourself have acknowledged that you made a series of very, very

3    poor choices.  And so, I urge you going forward to think hard

4    about the potential consequences of your actions before you

5    take them so that everything you do in your life going forward,

6    while you await the sentence, while you serve it, and every day

7    thereafter, will be the result of good, healthy, and honorable

8    choices that reflect the honor that you should have for

9    yourself as a human being, that I'm sure that you do, and that

10   you have for your family and that you have for your community.

11          You are clearly, as I said a couple of times, very

12   intelligent, very accomplished, you achieved significant and

13   extraordinary personal success.  And so, it is up to you now to

14   take your current circumstances and apply to them your talents,

15   your energy, your desire, in the light and lens of your love

16   for your family, and make a strong new respectable life.

17          From reading the letters I've received, I know that

18   you are very much loved.  And it is up to you to be the kind of

19   father of whom your son can always be proud.  You can't undo

20   the past, but you have absolute control over every day going

21   forward.  And so, find ways to be an encouragement and good

22   example for him and for all of those who love you, even while

23   you are in prison.  And I know that they will do everything

24   they can to encourage you.

25          I wish you and your family strength and courage in

1    this time, which will continue to be a very difficult.

2           When you are released, you'll have the guidance and

3    support of the probation department in reestablishing your

4    day-to-day life.  It is not easy to live under supervision, but

5    it is a court-ordered requirement, so you have no choice.  But,

6    more important than that, my colleagues in probation are really

7    committed to helping people succeed and have resources that can

8    be useful in that regard.  So, I urge you to take the

9    supervision requirements and the reporting requirements as

10   building blocks in your new strong life.

11          I also have to caution you that you have to comply

12   strictly with all of the conditions that I have set for your

13   supervised release.  If you are brought back before me for

14   violating any of them, I may sentence you to another term of

15   imprisonment, so please don't ever put me in a position of

16   having to make a decision like that.

17          I know that you can succeed, and I thank you and your

18   family for listening, and I thank you all for doing all that

19   you can to encourage and uphold each other.

20          I will direct that a corrected copy of the presentence

21   report be prepared for the bureau of prisons and the sentencing

22   commission.  All other copies of the report must remain

23   appropriately confidential.  If an appeal is taken, counsel on

24   appeal are to be permitted access to the report.

25          I thank counsel for their work throughout this case.

H2H3STES                          Sentence

1             Is there anything further that we need to take up

2     together this afternoon?

3             MR. COHEN:  Nothing from Mr. Stewart, your Honor.

4             MS. EDDY:  Nothing from the government, your Honor.

5             THE COURT:  Ms. Ng, are you preparing a paper that

6     Mr. Stewart has to take to the probation department?

7             THE DEPUTY CLERK:  Yes.

8             THE COURT:  All right.  Mr. Stewart, Ms. Ng will be

9     giving you a summary and I'll need you to go to the probation

10    department after we've adjourned, that's on the sixth floor, to

11    commence the paperwork and I'm sure that Mr. Cohen will tell

12    you exactly where you need to go.

13            So, keep well, all.  And we are adjourned.

14            MR. COHEN:  Thank you.

15                              o0o

16

17

18

19

20

21

22

23

24

25