UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

SEAN STEWART,

Defendant.

1:15-cr-00287-JSR

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SEAN STEWART'S MOTION *IN LIMINE* TO PRECLUDE INTRODUCTION OF ROBERT STEWART'S DOUBLE HEARSAY STATEMENT

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP

Steven M. Witzel
Lawrence Gerschwer
R. David Gallo
Leigh G. Rome
One New York Plaza
New York, New York 10004-1980
(212) 859-8000

*Attorneys for Defendant Sean Stewart*

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

ARGUMENT ................................................................................................................. 7

I.   THE DOUBLE HEARSAY STATEMENT IS NOT ADMISSIBLE UNDER RULE 801(d)(2)(E) AND SHOULD BE EXCLUDED ................................................... 7

    A.   The Government Cannot Prove That a Conspiracy Existed That Included Robert and Sean ................................................................................................ 8

    B.   The Government Cannot Prove That the "Silver Platter" Statement Robert Made to Cunniffe Was Made During the Course of or in Furtherance of a Conspiracy Between Robert and Sean ......................................................... 11

II.   THE DOUBLE HEARSAY STATEMENT IS NOT ADMISSIBLE UNDER RULE 804(B)(3) AND SHOULD BE EXCLUDED ................................................... 17

    A.   A Reasonable Person in Robert's Position Would Not View Robert's Statement as Contrary to His Interests, Invalidating a Claim, or Exposing Him to Liability Because the Statement Was Made to Cunniffe ................................. 18

    B.   A Reasonable Person in Robert's Position Would Not View Robert's Statement as Contrary to His Interests, Invalidating a Claim, or Exposing Him to Liability Because the Statement Was Exculpatory ................................... 18

    C.   The Corroborating Circumstances Do Not Indicate the Statement's Trustworthiness ............................................................................................... 19

III.   THE DINER TAPE IS INADMISSIBLE BECAUSE IT IS MORE PREJUDICIAL THAN PROBATIVE ........................................................................................... 20

CONCLUSION ........................................................................................................... 23

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bourjaily v. United States*,
   483 U.S. 171 (1987)......................................................................................................7

*Hill v. Novartis Pharm. Corp.*,
   944 F. Supp. 2d 943 (E.D. Cal. 2013)........................................................................7

*United States v. Al-Moayad*,
   545 F.3d 139 (2d Cir. 2008)........................................................................................8

*United States v. Bryant*,
   480 F.2d 785 (2d Cir. 1973)......................................................................................22

*United States v. Curley*,
   639 F.3d 50 (2d Cir. 2011)........................................................................................20

*United States v. Desena*,
   260 F.3d 150 (2d Cir. 2001)................................................................................12, 13

*United States v. Gigante*,
   166 F.3d 75 (2d Cir. 1999)..................................................................................12, 13

*United States v. Gupta*,
   747 F.3d 111 (2d Cir. 2014)......................................................................7, 12, 19, 20

*United States v. Herring*,
   754 F. App'x 67 (2d Cir. 2019) ...........................................................................17, 19

*United States v. James*,
   712 F.3d 79 (2d Cir. 2013)..........................................................................................7

*United States v. Johnson*,
   No. S5 16 Cr. 281, 2019 U.S. Dist. LEXIS 26097 (S.D.N.Y. Feb. 16, 2019)...................11, 14

*United States v. Knohl*,
   379 F.2d 427 (2d Cir. 1967)......................................................................................21

*United States v. Lieberman*,
   637 F.2d 95 (2d Cir. 1980)...................................................................................13, 14

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999)......................................................................................19

*United States v. Maldonado-Rivera,*
    922 F.2d 934 (2d Cir. 1990)............................................................................12

*United States v. Mankani,*
    738 F.2d 538 (2d Cir. 1984)............................................................................10

*United States v. Morrison,*
    153 F.3d 34 (2d Cir. 1998)..............................................................................21

*United States v. Ojudun,*
    915 F.3d 875 (2d Cir. 2019)............................................................................19

*United States v. Payne,*
    591 F.3d 46 (2d Cir. 2010)..............................................................................11

*United States v. Persing,*
    436 F. App'x 13 (2d Cir. 2011) ......................................................................17

*United States v. Rivera,*
    22 F.3d 430 (2d Cir. 1994).......................................................................12, 13

*United States v. Saneaux,*
    365 F. Supp. 2d 493 (S.D.N.Y. 2005)....................................................11, 15, 22

*United States v. SKW Medals & Alloys, Inc.,*
    195 F.3d 83 (2d Cir. 1999)..............................................................................12

*United States v. Stewart,*
    907 F.3d 677 (2d Cir. 2018)................................................................... *passim*

*United States v. Tellier,*
    83 F.3d 578 (2d Cir. 1996)................................................................................8

*United States v. Ulbricht,*
    858 F.3d 71 (2d Cir. 2017)..............................................................................17

*United States v. White,*
    No. 17 Cr. 611, 2018 U.S. Dist. LEXIS 163258 (S.D.N.Y., Sept. 24, 2018)...................18, 19

*United States v. Zayac,*
    765 F.3d 112 (2d Cir. 2014)............................................................................22

*Williamson v. United States,*
    512 U.S. 594 (1994)................................................................................17, 18

**Rules**

Federal Rule of Criminal Procedure 29 .............................................................6

Federal Rule of Criminal Procedure 33 ........................................................................................6

Federal Rule of Evidence 403 ...................................................................................3, 20, 22

Federal Rule of Evidence 801 .................................................................................... *passim*

Federal Rule of Evidence 804 ..........................................................................3, 16, 17, 18, 19

## PRELIMINARY STATEMENT

The government alleges that Sean Stewart shared material, non-public information acquired during the course of his employment with his father, Robert Stewart, so that Robert and others could trade on that information.  There is no dispute that Sean did in fact share material, non-public information acquired during the course of his employment with Robert Stewart.  Specifically, Sean mentioned the names of companies involved in potential deals.  There is also no dispute that Robert and his cronies conspired to, and did, trade on that information.  It will be for the trier of fact to determine whether Sean intended for his father to keep this information confidential, or whether Sean intended for his father to break the law.  On this key issue, there is a dearth of evidence that Sean was a knowing and intentional participant in an insider trading scheme, in which Sean executed no trades, and made no money, and in which his father's trading partners were undisputedly strangers to Sean.  As the Second Circuit noted of Sean's 2016 trial, "Sean's intent was the central point of contention between the parties. On that issue, the government's evidence was at its weakest."  *United States v. Stewart*, 907 F.3d 677, 691 (2d Cir. 2018).  Instead, the government introduced an abundance of evidence on undisputed facts.  Yet "evidence relating to other elements of the crimes alleged does not make the evidence of *intent* any stronger."  *Id.* (emphasis in original).

And so, after more than eight years of investigation, the cornerstone of the government's case on Sean's intent consists of one solitary statement:  A vague, double hearsay, uncorroborated statement, attributed to Sean by his father, in a rambling and "embellished" conversation with a government cooperator years after Sean allegedly said it, which makes no sense when logically unpacked, and as such is also inherently untrustworthy.  There is no basis to admit this double hearsay statement.  Sean Stewart therefore respectfully moves *in limine* to

preclude the government from offering into evidence Robert Stewart's recorded statement to

cooperator Richard Cunniffe that:

> STEWART: I mean I still remember being [**indiscernible**] years ago.  Sean would always say, ah I can't believe you [**indiscernible**].  Said I can't believe it.  I handed you this on a silver platter and you didn't invest in this, and you know.  I said, Sean, did you ever get a call from the SEC, like I'm gonna actually do this [**indiscernible**], and he says [**indiscernible**].  I mean [Laughter].  Yeah, that [**indiscernible**].  But, you know, [**indiscernible**] talk to the IRS. . . it's so over-, overwhelming.  Ex. G[1] (March 24, 2015 Transcript) at 8:14-23.[2]

The government relies on this statement (which it calls the "silver platter" statement) as

evidence of Sean's knowing and intentional participation in the conspiracy, even though on its

face, what Sean allegedly said to Robert was that Robert *didn't* invest, and Robert then *denied* to

Sean that he ever betrayed Sean's trust by misappropriating information and actually trading

("[L]ike I'm gonna actually do this [**indiscernible**]."). *Id.* at 8:19-20.  Indeed, according to the

Second Circuit, "[t]he government's case largely hinged on the so-called 'silver platter

statement.'"  *Stewart*, 907 F.3d at 680.  It was "quite literally the first thing mentioned in the

government's opening statement to the jury, and it was the very last thing discussed in the

government's rebuttal summation.  In its closing arguments, the government referred to the silver

platter statement as 'devastating' no fewer than three times. . ."  *Id.* at 689.  But regardless of

how convoluted the government's interpretation of the statement may be, it is inadmissible.

---

[1]  All exhibits cited herein are attached to the accompanying Declaration of Steven M. Witzel in Support of Defendant's Motion in Limine to Preclude Introduction of Robert Stewart's Double Hearsay Statement.

[2]  Sean Stewart quotes GX 1200-T (Ex. G) for purposes of this motion but does not concede the accuracy of the government's transcript and reserves the right to offer his own transcript at trial if the recording is admitted.  Furthermore, given the poor audio quality and its centrality to the defendant's argument, we also encourage the court to listen to the audio tape.  If requested, defendant will provide a copy to chambers in the format most convenient for the court.

The government has previously asserted that this double hearsay statement is admissible either as a co-conspirator statement under Fed. R. Evid. 801 or a statement against penal interest under Fed. R. Evid. 804.  Neither rule applies.  And even if there were a legitimate evidentiary basis under which to admit the recording, it should be excluded pursuant to Fed. R. Evid. 403 as far more unfairly prejudicial than probative.

## STATEMENT OF FACTS

As the Second Circuit recognized, "[t]his is an unusual insider trading case, in that defendant-appellant Sean Stewart does not contest that he provided material, nonpublic information to his father, Robert Stewart." *Stewart*, 907 F.3d at 680.  The following facts are undisputed:

- Sean Stewart was previously employed by JP Morgan and Perella Weinberg Partners as an investment banker specializing in healthcare deals.

- Sean Stewart communicated with his parents extensively.  When discussing his work, he at times mentioned the names of companies involved in deals to his mother, father (certified public accountant), and spouse (lawyer).

- Robert used the information he learned from Sean to tip at least two colleagues, Richard Cunniffe and Mark Boccia, neither of whom knew Sean.

- Robert and those colleagues traded in the securities of at least five public healthcare companies—Kendle International Inc. ("Kendle"), Kinetic Concepts, Inc., Gen-Probe Inc., Lincare Holdings, Inc., and CareFusion Corp.—based on information that Robert had learned about from Sean.  Not every individual traded on every deal, and Robert and those colleagues did not always profit on the deals on which they traded, including when a number of call options expired and were worthless.[3]

- Robert and Cunniffe both admitted their own culpability to FBI agents.

- On May 14, 2015, the morning that he was arrested, after being given appropriate warnings, Robert told FBI agents at least a dozen times that Sean never knew about his insider trading, and was clueless about it, or words to that effect.  *See, e.g.*, Ex. B (FBI

---

[3]  The fact that the trading did not reflect the information that Sean had on numerous occasions will be addressed in the forthcoming defense expert report, *see* ECF No. 303.

Videotape Transcript) at 2:16-21; 3:22-23; 4:9-11, 20-23; 14:24-15:1; 15:14-17; 19:1-2, 15-16; 20:11; 21:13-16; 22:16; 27:24-28:6; 32:8-15.[4]

- Robert swore under penalty of perjury, "I did not discuss with Sean Stewart my trading in Kendle International Inc., before the trade was made. . . . I did not discuss with Sean Stewart my involvement in trades made in Kinetic Concepts, Inc., Gen-Probe Inc., Lincare Holdings, Inc., and Carefusion Corp., prior to my arrest in May 2015.  I did not tell Sean Stewart about my trading agreement with Richard Cunniffe prior to my arrest in May 2015."[5]  *See* Ex. C (Affidavit of Robert Stewart).

On March 11, 2015, FBI agents arrived at Richard Cunniffe's home and questioned him about his trading and relationships with Robert and Sean Stewart.  Ex. D (FBI 302 (Mar. 23, 2015)).  Cunniffe told FBI agents that he had never met Sean Stewart, and that Robert Stewart never told him that Sean Stewart was his source of deal information.  *Id*.  The next day, Cunniffe reiterated to the same FBI agent that he did not remember Robert specifically telling him that Robert's son was working on deals that they traded on, and that he did not know Sean Stewart.  Ex. E (FBI 302 (Mar. 16, 2015)).

Approximately two weeks later, on March 24, 2015, Cunniffe met Robert at Andrew's Coffee Shop, a Manhattan diner.  Ex. F (FBI 302 (Apr. 7, 2015)).  The conversation lasted from

---

[4]  The government and defense have jointly provided a draft transcript of Robert Stewart's post-arrest interview with the FBI (Ex. B).  The defense also encourages the court to watch the videotape, and if requested, will provide a copy to chambers in the format most convenient for the court.

[5]  FINRA sent Sean's employer a routine inquiry after the Kendle deal, and Robert's name appeared on FINRA's list of people who traded prior to the deal closing.  JP Morgan sent an internal email to those aware of the deal, and although Sean did not specifically remember reviewing the list (Ex. A at 1233:20-21), his initial response was that he did not recognize any names.  JP Morgan then asked Sean to look again, and Sean notified JP Morgan immediately that he recognized his father's name.  Having previously made plans to meet that night, Sean raised the FINRA list with Robert, who denied trading based on anything to do with Sean, saying that he'd learned about Kendle being a possible acquisition target from public information.  *Id.* at 1235:10-13.  Sean discussed the issue with JP Morgan compliance, and was not forthcoming that he could have mentioned Kendle when discussing work with Robert.  *Id.* at 1236:11-14.  To Sean's credit, he testified that he had doubts about his father's veracity.  *E.g.*, *id.* at 1235:14-15.  Robert told the FBI and this Court that Sean was not aware of his Kendle trading until reviewing the FINRA inquiry, and that Sean was never aware of any other trading by Robert or others.

1:35 p.m. until 2:33 p.m. *Id.*  As part of his cooperation with the FBI, Cunniffe wore recording equipment provided by the FBI to the diner.  The quality of the recorded audio is extremely poor—there is extensive background noise, and the conversation is frequently incomprehensible.  The government retained an outside vendor to try to enhance the audio quality, and also created a second, FBI-enhanced version of the recording, which they have previously represented is audible with headphones.  The government's audio files are identified as three separate segments, and the government prepared a transcript of the third segment. *See* Ex. G.  Unintelligible portions of the conversation are identified as "indiscernible" in the transcript, regardless of whether the unintelligible portion consists of one or many words.  In total, there are 55 "indiscernible" exchanges noted in the government's transcript, which covers a period of tape that is only 12 minutes and 9 seconds long. *Id.*

Most of the taped discussion that is audible on the third segment appears to have no bearing on the government's insider trading case (*e.g.*, Cunniffe's guitar performance history).  The discussion on other segments is similarly irrelevant (*e.g.*, "Titanium Dave's" bachelor party in Atlantic City).  At one point, Robert begins simultaneously recounting a call he received from the SEC in which he was questioned about a deal on which he traded (Robert does not name the stock), and a time when the IRS supposedly picked him up at home and interviewed him while he was in his pajamas.  Robert then turns to describing a transaction as follows:

> STEWART: [**Indiscernible**], 5,000 dollar transaction.  What are they gonna do?  And then nothing happened.  I don't know what they're doing now.  I figure it's a 3 year statute, you know, 4 years, 5 year whatever it it's way way over that.  But it pretty much put a fear in me in that [**indiscernible**].
>
> CUNNIFFE: Would scare the shit out of me [**indiscernible**] that's for sure.
>
> STEWART: Yeah. I mean I still, I still remember being [**indiscernible**] years ago.  Sean would always say, ah I can't believe you [**indiscernible**].  Said can't believe it.  I handed you this on a silver platter and you didn't invest in this, and you know.  I said,

Sean, did you ever get a call from the SEC, like I'm gonna actually do this [**indiscernible**], and he says [**indiscernible**]. I mean [Laughter]. Yeah, that [**indiscernible**].  But, you know, [**indiscernible**] talk to the IRS. . . it's so over-, overwhelming.  I see people were [**indiscernible**].  One guy handed me his tax return to do, and at that time, to raise this kind of money, he took all this money out of IRAs and he gave me all sorts of deductions.  And I look at him, and I'm like, you have no money, you still gave [**indiscernible**] $12,000.  You then gave $35,000 in non-tax money, you know, all this crazy stuff, and yet he still [**indiscernible**], you know.  I said to him you're just inviting trouble.

CUNNIFFE: [Coughs]

STEWART: Anyway, I don't want to hold you up.

CUNNIFFE: [**Indiscernible**] I was trying to remember – I don't know if I told you about [**indiscernible**].

Ex. G at 8:6-9:10.  Cunniffe then changes the subject and asks no questions about Robert's monologue.

　Prior to Sean's 2016 trial, the parties engaged in extensive litigation on the "silver platter" statement.[6]  The "silver platter" statement was ultimately introduced at trial, and was not corroborated.  Sean expressly denied ever having said "anything like that" to Robert. Ex. A (Trial Transcript Excerpts) at 1328:2-4.

---

[6]  First, Sean moved *in limine* to preclude introduction of the statement.  *Stewart*, 907 F.3d at 683.  The district court denied Sean's motion, "reasoning that Robert's relaying of the statement to Cunniffe was against Robert's penal interest."  *Id.*  Second, Sean moved to introduce Robert's post-arrest statements to the FBI in order to impeach the credibility of the "silver platter" statement.  *Id.*  The district court again denied Sean's motion.  *Id.* at 684.  Third, Sean subpoenaed Robert to testify.  *Id.*  Robert invoked his Fifth Amendment right against self-incrimination, and the district court conducted an *in camera* proceeding with only Robert and his counsel before upholding Robert's invocation of the Fifth Amendment.  *Id.*  Fourth, Sean sought to have Robert immunized so that he could testify without the risk of self-incrimination.  *Id.*  The district court also denied this request.  *Id.*  Sean further addressed being denied Robert's testimony in his post-trial motion pursuant to Fed. R. Crim. P. 29 and 33 (ECF No. 217), and of course on appeal to the Second Circuit.

## ARGUMENT

## I.     THE DOUBLE HEARSAY STATEMENT IS NOT ADMISSIBLE UNDER RULE 801(d)(2)(E) AND SHOULD BE EXCLUDED

An out-of-court statement introduced for the truth of the matter asserted is only

admissible under the co-conspirator exception where it is "made by the party's coconspirator

during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).  It is necessary for the

offering party to prove: 1) that a conspiracy existed; 2) that the conspiracy's members included

the declarant, and the party against whom the statement is offered; and 3) that the statement was

made both (a) during the course of and (b) in furtherance of that conspiracy.  *United States v.*

*Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) (citing *United States v. Maldonado-Rivera*, 922 F.2d

934 (2d Cir. 1990)); *United States v. James*, 712 F.3d 79, 105 (2d Cir. 2013) (same).  If the

government offers Robert's statement, it will be the government's burden to prove that it was

made in furtherance of the conspiracy by a preponderance of the evidence.  *Bourjaily v. United*

*States*, 483 U.S. 171, 176 (1987).[7]

Because Robert purported to convey to Cunniffe the contents of a conversation that

Robert supposedly had with Sean, this "of course, makes the statement not only hearsay but

double hearsay."  *Hill v. Novartis Pharm. Corp.*, 944 F. Supp. 2d 943, 951-52 (E. D. Cal. 2013)

(granting motion to exclude).  Under this circumstance, "the co-conspirator exception looks not

to whether the declarant (Robert) made the statement to one who conspired with him

(Cunniffe)—which the district court appeared to treat as the test—but rather whether the

---

[7]  In dicta, the Second Circuit noted that it "therefore need not reach the question whether the silver platter statement was admissible under a hearsay exception," *Stewart*, 907 F.3d at 691, but that while the district court did not rule in the 2016 trial that the "silver platter" statement was admissible under 801(d)(2)(E), it would have affirmed that ruling. *Id.* The Second Circuit expressed no view on how it would have ruled if the district court chose not to admit the "silver platter" statement under Rule 801(d)(2)(E), and that question was not briefed before the Court.

declarant (Robert) conspired with the defendant against whom the statement is offered (Sean), and that the statement was made during the course of their conspiracy and in furtherance of its objective." *Stewart,* 907 F.3d at 691 n.7 (citation omitted).  Because the government cannot meet its burden to prove by a preponderance of the evidence both that there was a conspiracy between Robert and Sean, and that Robert's statement to Cunniffe was in furtherance of a conspiracy between Robert and Sean, the statement should be excluded.

          A.     The Government Cannot Prove That a Conspiracy Existed That Included Robert and Sean

The first prong of Fed. R. Evid. 801 requires the government to prove that a conspiracy existed between Robert and Sean.  Because hearsay statements are "presumptively unreliable . . . there must be some independent corroborating evidence of the defendant's participation." *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996).  Where there is no other evidence that the defendant was involved in a conspiracy with the declarant, offered evidence is not admissible under Rule 801.  *See, e.g.*, *United States v. Al-Moayad*, 545 F.3d 139 (2d. Cir. 2008) (No independent evidence showed that defendant was involved in a conspiracy with Hamas representative, despite ties to Hamas).

Similarly, in *United States v. Guadagni*, the Honorable Jack B. Weinstein ruled that a recorded conversation was inadmissible under Fed. R. Evid. 801 because the court was not satisfied that a conspiracy existed prior to the recorded conversation by a preponderance of the evidence.  No. CR 81 00270, 1982 U.S. Dist. LEXIS 16458, at *3-4 (E.D.N.Y. Dec. 28, 1982).  The recording showed "only that [the defendant] was willing to consider criminal conduct involving arson, but not that he had at that early date entered into a specific agreement or conspiracy" even though the defendant "asked various questions concerning the extent of the damage that was to be inflicted and the layout and features of the store."  *Id.* at *2-4.  Here, there

is even less evidence that a conspiracy to commit insider trading was ever formed between Robert and Sean, and certainly no independent corroborating evidence of what Sean allegedly said in the "silver platter" statement.[8]

Sean agrees that he discussed confidential information with his father—he so testified, and his father told the FBI as much.  But as Robert Stewart repeatedly explained to FBI agents, "I never told him any of this stuff was going on"; "he has no clue"; "he's clueless with that".  *See* Ex. B at 14:24-15:1; 30:22; 32:14-15.  Robert's statements are credible—they were made during the same conversation in which Robert willingly admitted his own culpability and specifics of his conspiracy with Cunniffe, which the government credited.  Furthermore, when twice asked about the "silver platter" statement by the FBI, Robert neither repeated the phrase in recounting the conversation, nor did he ratify the government's interpretation.  Instead, he said: "I think I was just saying that to Rick because Sean said, oh, you know, ahh, all these deals, you know, you—if you were trading you could make like millions of dollars.  And I said, you know, Sean, no one's going to trade and make millions of dollars on this stuff.  **That wasn't his intention**"; and "I think he might've said, you know, uh, you know, I said I was working on this deal.  Gee, if you had invested, you would've made millions of dollars.  And I said, Sean, you know, people — you know — . . . . [g]et arrested for making millions and millions of dollars on confidential information."  Ex. B at 3:4-11; 28:19-29:4 (emphasis added).  And Robert's statements are not contradicted by any other evidence—the government's cooperator, who by his own admission did not know Sean and never spoke to Sean about the alleged conspiracy, certainly does not provide an alternative view.  Ex. A at 926:16-17; 732:19-21.  Indeed, examples of Sean's lack of

---

[8]  The Second Circuit's summary comment that a conspiracy existed between Robert and Sean with the objective that Robert trade is plainly dicta.  *Stewart*, 907 F.3d at 691.

involvement permeate the government's previously offered evidence, including Robert's and Cunniffe's trading records indicating that Sean did not share detailed information of which he was aware, and evidence of Sean's personal finances.  Conversely, there is a plethora of evidence implicating Robert and Cunniffe in a conspiracy—use of "golf" codes in emails to mask their criminal insider trading, exchange of money, trading records, Cunniffe's testimony, and Robert's admissions to the FBI.

The interactions between Sean and Robert—father and son—constitute "explanations of human activity without criminal connotation."  *United States v. Mankani*, 738 F.2d 538, 547 (2d Cir. 1984).  Extensive communications with his father does not "lead[] to any fair inference implicating [Sean] in the conspiracy."  *Id.*  To "give weight" to evidence of frequent communications between Sean and his father, "it would be necessary to adopt something close to the concept of guilt by association."  *Id.*  "[T]here is no evidence that [Sean] conversed with [Robert] about the criminal venture"; the evidence is to the contrary.  *Id.*; Ex. B (FBI Videotape Transcript); Ex. C (Affidavit of Robert Stewart).  Nothing corroborates Sean's alleged participation in any conspiracy, and the "silver platter" statement on its face indicates that there was no conspiracy between Robert and Sean—Robert is denying that he traded illegally when he says "like I'm gonna actually do this."  Ex. G at 8:19-20.  Sean's actions are "at least as consistent with innocence as with guilt" and therefore, the government cannot prove a conspiracy between Sean and Robert.  Without evidence of Sean's participation in a conspiracy with Robert, the "silver platter" statement cannot be admitted under Rule 801(d)(2)(E).  *Mankani*, 738 F.2d at 547.

10

B.      The Government Cannot Prove That the "Silver Platter" Statement Robert
        Made to Cunniffe Was Made During the Course of or in Furtherance of a
        Conspiracy Between Robert and Sean

Under Rule 801(d)(2)(E), in addition to proving a conspiracy between Robert and Sean

existed, the government must also prove, first, that the hearsay statements were "made *during the*

*course of* a conspiracy.  This is best described as a temporal requirement.  That is to say the

statements cannot be made after the cessation of the conspiracy or before its formation."  *United*

*States v. Saneaux*, 365 F. Supp. 2d 493, 499 (S.D.N.Y. 2005) (emphasis in original) (citation

omitted).  "Generally, a statement is not made in the course of a conspiracy when it is made after

the main objective of the conspiracy has been accomplished."  *United States v. Johnson*, No. S5

16 Cr. 281, 2019 U.S. Dist. LEXIS 26097, at *26 (S.D.N.Y. Feb. 16, 2019) (citing *United States*

*v. Arrington*, 867 F.2d 122, 130 (2d Cir. 1989).  Here, the government must demonstrate that the

Robert-Cunniffe conversation took place during a Robert-Sean conspiracy.  The government has

not alleged that Sean shared any confidential information with Robert contemporaneously with

the diner conversation in late March 2015, although Sean continued to work on healthcare deals

at Perella Weinberg.  Assuming for argument's sake that there was once a conspiracy between

Robert and Sean, the charged conduct had "run its course" before Robert entered the diner to

meet Cunniffe in March 2015.  *See United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010). More

than 5 months had passed since Cunniffe last traded on a company alleged in the indictment.

Second, the statement must actually have been made.  Indeed, Robert's statement is

logically inconsistent with the timing of the events he describes.  Robert tells Cunniffe that he

said to Sean "did you ever get a call from the SEC, like I'm gonna actually do this."  Ex. G at

8:18-20.  Robert supposedly reassured Sean at the time of the "silver platter" statement that of

course he wouldn't invest—the fact that the SEC had previously called Robert about his trading

was enough to scare Robert from ever doing so.  Otherwise, why would Robert ask Sean

11

rhetorically if he'd gotten a call from the SEC?  As such, therefore, Robert had to have gotten a call from the SEC prior to the supposed "silver platter" conversation with Sean.  The SEC contacted Robert about his Kendle trading in 2013.[9]  Ex. A at 215:12-13.  Accordingly, this call logically could only have taken place between May 2013 (SEC call to Robert) and March 2015 (cooperator recording of Robert).  However, Sean testified that he first learned Robert had received a call from the SEC in May 2013 "at some point after [Sean] was arrested" in May 2015 and that before his arrest, Sean had never learned that Robert had received a call from the SEC. Ex. A at 1307:24-08:4.  Crediting Sean's testimony, it is logically impossible that the "silver platter" conversation ever unfolded as Robert described to Cunniffe at the diner.

Third, the government is likewise unable to demonstrate that the "silver platter" statement that Robert made to Cunniffe was made in furtherance of an alleged conspiracy between Robert and Sean.  The statement must "be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity."  *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (internal quotation marks and citation omitted); *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990) (same); *United States v. Rivera*, 22 F.3d 430, 435-36 (2d Cir. 1994) (same).  "To be in furtherance of the conspiracy, a statement must be more than 'a merely narrative description by one co-conspirator of the acts of another.'" *United States v. SKW Medals & Alloys, Inc.*, 195 F.3d 83, 88 (2d Cir. 1999) (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989); *United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001) (same); *United States v. Gupta*, 747 F.3d 111, 123-24 (2d Cir. 2014) (same).  "The requirement that the statements have been in furtherance of the

---

[9]  As the government has previously argued, "[W]e think we'll demonstrate beyond any reasonable doubt, that the call [Robert]'s referring to is the May 2013 call from the SEC that he received about the Kendle trading."  Ex. A at 9:2-5.

conspiracy is designed both to assure their reliability and to be consistent with the presumption

that the coconspirator would have authorized them.  The requirement is not satisfied by a

conversation . . . which amounted to no more than idle chatter."  *United States v. Lieberman*, 637

F.2d 95, 103 (2d Cir. 1980) (citations omitted).  A "casual conversation about past events" is also

insufficient.  *Id.* at 102.

Robert's statement to Cunniffe about something Sean once allegedly said did not and

would not prompt Cunniffe (or any rational listener) to respond in a way that promoted or

facilitated the carrying out of a criminal activity in furtherance of a Robert-Sean conspiracy.

Cunniffe didn't even respond to the statement.  He let Robert continue to ramble, and then

changed the topic.  Ex. G at 8:14-9:10.  It is hard to see how the statement on its face could even

be intended as a call to action, as opposed to a merely narrative description.  The statement is

precisely the type of idle chatter that is excluded under Rule 801(d)(2)(E).  *Lieberman*, 637 F.2d

at 102.  When dealing with "merely joking references to a past event", "it is difficult to construe

casual storytelling . . . more than two years after the event, as anything but 'mere idle chatter'"

and therefore it is inadmissible under Rule 801(d)(2)(E).  *Desena*, 260 F.3d 150, 158 (2d Cir.

2001).  Robert was joking around in a diner.  He and Cunniffe laughed as Robert recounted past

events, including the alleged conversation with Sean at some unknown period of time.

Again, even assuming the statement was ever made and not an invented product of

Robert's bonhomie, the statement is one in which Robert denies participating in a conspiracy

with Sean to trade on information learned from Sean.  According to the government, what Robert

said was "I mean I still remember being [**indiscernible**] years ago.  Sean would always say, ah I

can't believe you [**indiscernible**] . . ."  Ex. G at 8:14-16.  This vague recollection of what Sean

said "years ago" (preceded by something "indiscernible" which could have been even a further

qualifier) is not a statement that is "'in furtherance of' a specific criminal purpose" as it must be to be admissible. *Gigante*, 166 F.3d at 82-83. *See also Rivera*, 22 F.3d at 436 (rejecting the government's Rule 801(d)(2)(E) argument that "statements elicited to facilitate the planning of a robbery of a stash house allegedly owned by [defendant] were in furtherance of the conspiracy of which [defendant] was a member.").

An exclusively backward looking statement does not further anything. Earlier this year, in *United States v. Johnson*, the government offered a statement from a witness who overheard a conversation between a defendant and other gang members while incarcerated. 2019 U.S. Dist. LEXIS 26097, at *26, 33. In response to teasing about him not having "put in work" with the gang, defendant stated that he had participated in a shooting. *Id.* The court ruled that this statement was inadmissible under Fed. R. Evid. 801(d)(2)(E). *Id.* The court reasoned first, that "where statements have been admitted pursuant to Rule 801(d)(2)(E) on an 'update' theory, the statements related directly to ongoing illegal conduct by co-conspirators" and second, that "statements admitted on a 'building trust or reassurance' theory have generally related to ongoing or future criminal conduct." *Id.* at *34 (citations omitted). Because the "statements do not relate to either (1) current developments or problems that the gang is facing; or (2) ongoing or future criminal conduct", they were not admissible. *Id.* at *35. Similarly, Robert's statement does not relate to any current development or problem with Robert's alleged scheme with Sean, nor does it relate to ongoing or future criminal conduct. Robert's communication with Cunniffe did nothing to further a conspiracy between Sean and Robert.

The statement was "entirely retrospective", and statements that are entirely retrospective cannot be in furtherance of a conspiracy. *Lieberman*, 637 F.2d at 102. Much like *United States v. Lieberman*, the statement "smacks of nothing more than casual conversation about past events.

It is difficult to envision how it would have furthered the conspiracy." *Id.* Robert's statement to Cunniffe in no way updated him on the status of any alleged conspiracy that Robert and Sean were involved in—how could they, when the "update" was that Robert told Sean some years ago that he ***hadn't traded*** on information Sean allegedly provided in the past?

The government has previously argued that the "silver platter" statement furthered a conspiracy between Robert, Sean *and* Cunniffe because it was "intended to preserve trust and cohesiveness among the co-conspirators", and gave "Mr. Cunniffe comfort." ECF No. 101, p.18; Ex. A at 11:17. However, at the time of the statement, Cunniffe could not be a part of a conspiracy with anyone—"[n]either a confidential informant working with law enforcement nor an undercover law enforcement agent can be regarded in law as a member of a criminal conspiracy." *Saneaux*, 365 F. Supp. 2d at 500 n.6. The principle about cooperators articulated in *Saneaux* alone should dispose of the government's "in furtherance" argument on the law, but the government's previous arguments also plainly ignore the facts and common sense. During the diner conversation, for the first time Robert tells Cunniffe that Sean does not know that Robert is trading on the information Sean supposedly shared. From Cunniffe's perspective, before the "silver platter" statement, all was well in the conspiracy: he was personally determining the trading strategy (Ex. A at 726:7-15) and he kept 80-90% of the trading proceeds (*Id.* at 957:11-13). Cunniffe testified numerous times that he did not want to know how Robert identified the deals to trade on—he wanted deniability. Ex. A at 624:17-18; 662:12-19; 1006:24-07:2. Now, Cunniffe is being told for the first time that Robert is discussing SEC investigatory calls about the trading, and denying to Sean that he was trading on Sean's information (calls that Cunniffe testified he wasn't aware of occurring until the diner conversation, Ex. A at 785:7-10). Rather than preserving "trust and cohesiveness", Robert's statements introduced a whole new level of

uncertainty and potential chaos.  ECF No. 101, p.18.  This was not reassurance.  It was anti-reassurance.

Rather than giving Cunniffe "comfort", any rational conspirator would be in shock. Before he started cooperating, Cunniffe didn't want to know details and believed Robert had a good source, presumably one that was sharing in proceeds with Robert and having specific back and forth communications about companies.  Cunniffe's prior testimony is clear that at some point in the conspiracy he was aware that Robert was "getting his information from Sean."  Ex. A at 764:13-16.  Now, for the first time, Cunniffe is told that while he took comfort that Robert was getting information from Sean, Sean was being lied to and taken advantage of, and Sean did not know Robert was trading, and therefore plainly was not getting any of the proceeds.  This was an extremely dangerous development.  If the insider trading was discovered by Sean, he could possibly go to the regulators and expose them, or perhaps he could ask for a share of the proceeds.  Moreover, the usual "we're all in this together" comfort of most conspiracies as a bulwark if and when law enforcement comes knocking had been snatched away.  The source was now clearly revealed to be an unwitting family member with a sterling career on Wall Street, with a lot to lose if the Robert-Cunniffe insider trading saw the light of day.  The rational response of any co-conspirator to hearing this "silver platter" news would be to run for the hills, and put a stop to their trading and involvement, and pray that this did not get on the screen of law enforcement.

In sum, the statement to Cunniffe in no way furthered a conspiracy between Robert and Sean and therefore is inadmissible under Fed. R. Evid. 801(d)(2)(E).

## II.   THE DOUBLE HEARSAY STATEMENT IS NOT ADMISSIBLE UNDER RULE 804(B)(3) AND SHOULD BE EXCLUDED

The hearsay exception for statements against penal interest, Fed. R. Evid. 804(b)(3), only permits an out-of-court statement to be admitted provided: 1) "that the declarant be 'unavailable'"[10], 2) "that a 'reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability,'" and  3) "that the statement 'is supported by corroborating circumstances that clearly indicate its trustworthiness.'" *United States v. Persing*, 436 F. App'x 13, 21 n.7 (2d Cir. 2011) (citing Fed. R. Evid. 804(b)(3)); *United States v. Ulbricht*, 858 F.3d 71, 122 (2d Cir. 2017).  "The statements themselves must be self-inculpatory; it is not enough that they are 'made within a broader narrative that is generally self-inculpatory.'"  *Persing*, 436 F. App'x at 21 n.7 (citing *Williamson v. United States*, 512 U.S. 594, 600-01 (1994)); *United States v. Herring*, 754 F. App'x 67, 68 (2d Cir. 2019) (courts must "parse out and exclude" non-self-inculpatory statements).  The rule was intended to be a "narrow" exception as "out-of-court statements are subject to particular hazards." *Williamson v. United States*, 512 U.S. 594, 598 (1994).  The Second Circuit's opinion cast doubt on whether Robert's statement to Cunniffe allegedly recounting Robert's statement to Sean could be a statement against Robert's penal interest. *Stewart*, 907 F.3d at 691.  Indeed, it is not clear how a statement could be admitted under the basis that it was against Robert's penal interest when he is denying insider trading to Sean.

---

[10]  Robert Stewart has previously invoked his Fifth Amendment privilege when subpoenaed to give testimony in this matter.  *See United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) ("There is no dispute that [declarant] was unavailable to testify because he planned to invoke his Fifth Amendment privilege.").

A.   A Reasonable Person in Robert's Position Would Not View Robert's Statement as Contrary to His Interests, Invalidating a Claim, or Exposing Him to Liability Because the Statement Was Made to Cunniffe

Robert made the "silver platter" statement to Cunniffe, a person he had personally recruited to participate in an insider trading scheme.  Robert would not have thought he was exposing himself to any danger by making *any* statements to Cunniffe given their relationship. Cunniffe already knew the full extent of Robert's bad acts from their insider trading scheme. There is no evidence that Robert was aware that Cunniffe was cooperating with the government at the time of the diner conversation, nor that the status of the conspiracy between Robert and Cunniffe had changed.  Therefore, a reasonable person in Robert's position would have had no reason to view any statement that he made to Cunniffe that day as against his interest.

B.   A Reasonable Person in Robert's Position Would Not View Robert's Statement as Contrary to His Interests, Invalidating a Claim, or Exposing Him to Liability Because the Statement Was Exculpatory

"[T]he key to the Rule 804(b)(3) inquiry is whether the statement is sufficiently 'self-inculpatory,' which the district court must evaluate on a 'case-by-case basis.'" *United States v. White*, No. 17 Cr. 611, 2018 U.S. Dist. LEXIS 163258, at *9 (S.D.N.Y., Sept. 24, 2018) (citations omitted).  The Rule "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson*, 512 at 601-02.  Robert's statement to Cunniffe—to the extent that it is not "indiscernible"—is *exculpatory*:

"Sean would always say, ah I can't believe you [**indiscernible**].  Said I can't believe it.  I handed you this on a silver platter and you didn't invest in this, and you know.  I said, Sean, did you ever get a call from the SEC, like I'm gonna actually do this [**indiscernible**], and he says [**indiscernible**]." Ex. G at 8:15-20.

The statement says nothing about whether or not Robert did anything that would expose him to liability.  In fact, it says the opposite: Rather than admitting something against his

interest, Robert is recounting a time when he (according to him) *knowingly refused* information

that he was supposedly given "on a silver platter." He even reassured Sean that he did not trade

on the information ("like I'm gonna actually do this . . .."). Ex. G at 8:19-20. Robert's tale of a

time that he declined to trade illegally—or falsely denied having done so—does not satisfy Rule

804(b)(3); it does "little to subject [the declarant] himself to criminal liability." *Williamson*, 512

U.S. at 605. Moreover, Robert also indicates that in his mind, the statute of limitations he is

discussing moments before making the "silver platter" statement was "way way over." Ex. G at

8:8-10. "A reasonable person in [Robert's] shoes would not believe that he faced a risk of

criminal punishment" assuming the statement was actually made. *White*, 2018 U.S. Dist. LEXIS

163258, at *11 (Declarant would not believe he faced a risk of criminal punishment for a perjury

that occurred more than 8 years ago, so the statement could not have been against his penal

interest).

C.    The Corroborating Circumstances Do Not Indicate the Statement's
      Trustworthiness

To admit a statement against penal interest under Fed. R. Evid. 804(b)(3), the court must

also be satisfied that the circumstances under which the statement was made indicate "the

declarant's trustworthiness and the truth of the statement." *United States v. Lumpkin*, 192 F.3d

280, 287 (2d Cir. 1999). "'[T]he inference of trustworthiness from the proffered 'corroborating

circumstances' must be strong, not merely allowable.'" *Gupta*, 747 F.3d at 127 (citing *United

States v. Salvador*, 820 F.3d 558, 561 (2d Cir. 1987)). "[E]ven where the court has properly

found that a particular statement is against the declarant's own penal interest within the meaning

of Rule 804(b)(3)(A), the court must then determine whether there are 'corroborating

circumstances that clearly indicate,' Fed. R. Evid. 804(b)(3)(B), 'both the declarant's

trustworthiness and the truth of the statement.'" *United States v. Ojudun*, 915 F.3d 875, 887 (2d

19

Cir. 2019) (citation omitted).  "For those conditions to be satisfied, 'the inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable.'"  *Id.* (citing *United States v. Salvador*, 820, F.2d 558, 561 (2d Cir. 1987)).

In *United States v. Herring*, the Second Circuit ruled "that Herring failed to meet his burden to show that the statements were sufficiently corroborated by circumstances indicating that they were true." 754 F. App'x 67, 68 (2d Cir. 2019).  There was "no evidence in the record corroborating" the statement.  *Id.*  The government faces the same problem here—there is no corroborating evidence of Robert's statement to Cunniffe indicating that the statement is true. The government cannot say when the conversation took place, where it took place, or what Sean supposedly handed his father on a silver platter.  The circumstances of the conversation are also not indicative of trustworthiness.  The conversation is a rambling hour-long conversation that includes other hyperbolic descriptions (*e.g.*, Robert Stewart was picked up by the IRS at his house and interviewed while in his "pajamas"). And, as discussed *supra* Section I.B., the timeline is illogical and not believable.  Even Cunniffe though that Robert was exaggerating.  Ex. A at 992:4-11 ("I thought he was having some fun embellishing a little bit in terms I don't think the IRS is going to come in with guns blazing, but I think he was just telling the story as two friends would talk.").  This is not a fact pattern that provides a "strong" inference of trustworthiness from "the proffered corroborating circumstances."  *Gupta*, 747 F.3d at 127 (citing *United States v. Salvador*, 820 F.3d 558, 561 (2d Cir. 1987)).

## III.    THE DINER TAPE IS INADMISSIBLE BECAUSE IT IS MORE PREJUDICIAL THAN PROBATIVE

Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence."  Accordingly, even if there was a basis to admit the

"silver platter" statement, it must not have its probative value substantially outweighed by its

prejudicial effect.  "Evidence is unfairly prejudicial when 'it tends to have some adverse effect

upon a defendant beyond tending to prove the fact or issue that justifies its admission into

evidence.'"  *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (citation omitted).  In the

case of a recorded conversation or wiretap, long-standing Second Circuit precedent recognizes

that courts must exercise caution in admitting recordings because "recorded evidence is likely to

have a strong impression upon a jury."  *United States v. Morrison*, 153 F.3d 34, 56 (2d Cir.

1998) (citing *United States v. Ruggiero*, 928 F.3d 1289, 1303 (2d Cir. 1991)); *United States v.

Knohl*, 379 F.2d 427, 440 (2d Cir. 1967).

The potential for prejudice here if the "silver platter" statement is admitted is obvious:  as

discussed *supra*, "The silver platter statement was quite literally the first thing mentioned in the

government's opening statement to the jury, and it was the very last thing discussed in the

government's rebuttal summation.  In its closing arguments, the government referred to the silver

platter statement as "devastating" no fewer than three times. . ."  *Stewart*, 907 F.3d at 689.  Yet

the statement "consists of posturing and bluster of little intrinsic probative force but with great

potential for overvaluation by a jury. . . [T]he probative value of the conversations is

substantially outweighed by the dangers of unfair prejudice and confusion of issues."  *Guadagni*,

1982 U.S. Dist. LEXIS 16458, at *8 (citation omitted).

The main issue for the jury to decide is whether or not Sean intended for his father to

insider trade.  The Second Circuit clearly acknowledged as much: "The key question facing the

jury was whether to believe Sean when he denied that he knew that his father would trade on the

information that Sean had provided."  *Stewart*, 907 F.3d at 680.  The defense submits that the

diner tape would be the government's *only* evidence permitting an inference that Sean knew and intended to participate in a conspiracy.  It remains an inference because the statement is so opaque and the recording is so inaudible and filled with "indiscernible" exchanges that all that can be made of the "silver platter" statement is competing inferences.  When balancing the recording's potential probative value with its prejudicial effect, it is clear that all the government can offer the jury is a leap of faith, to fill in the missing gaps in evidence of knowledge and intent.

Moreover, it allows the government to also fill in the content of the "indiscernibles" and assume that they are incriminating to Sean.  A recording is not admissible if "the inaudible parts are so substantial as to render the remainder more misleading than probative." *United States v. Bryant*, 480 F.2d 785 (2d Cir. 1973).  Fed. R. Evid. 403 counsels against "speculation rather than reasoned deduction from the evidence." *United States v. Zayac*, 765 F.3d 112, 118 (2d Cir. 2014).

Because the statement is so prejudicial, Sean Stewart respectfully requests that, in the event that the court determines that it will defer decision on admissibility of the "silver platter" statement, that the court adopt the approach approved by the Second Circuit, and direct the government "not to refer to the record[ings] . . . directly or indirectly, when making its opening statement to the jury" and further direct the government "to elicit and place before the jury all the evidence it will rely upon to satisfy all prerequisites of admissibility . . . before those declarations are placed before the jury." *Saneaux*, 365 F. Supp. 2d at 504.  Proceeding with appropriate caution, the court in *Saneaux* was "not willing to have the jury hear the . . . declarations early in the government's case and then, if the requisite proof on admissibility is not forthcoming thereafter, having to choose between instructing the jury to forget rather dramatic statements that

they heard several days earlier or declare a mistrial." *Id.* We submit that, for the same reason, a similar approach would be appropriate in this case if the court is not prepared to exclude it at this time.

## CONCLUSION

For the foregoing reasons, Sean Stewart respectfully requests that this court grant his motion *in limine* to exclude evidence relating to Robert Stewart's double hearsay statement.

Dated:   New York, New York
            July 26, 2019

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP

By: _____ */s/ Steven M. Witzel* _____
                   Steven M. Witzel

Steven M. Witzel
Lawrence Gerschwer
R. David Gallo
Leigh G. Rome
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
steven.witzel@friedfrank.com

*Attorneys for Defendant Sean Stewart*