UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                  :

UNITED STATES OF AMERICA       :

                                                  :       S1 15 Cr. 287 (JSR)

         - v. -                    :

SEAN STEWART,                      :

                        Defendant.   :

-------------------------------------------------------x


# THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE CERTAIN PROPOSED EXPERT TESTIMONY


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
*Attorney for the United States of America*

Richard Cooper
Samson Enzer
Assistant United States Attorneys
   - *Of Counsel* -

**PRELIMINARY STATEMENT**

On August 15, 2019, defendant Sean Stewart ("Stewart" or the "defendant") provided notice of his intent to call Professor Karen Hopper Wruck ("Wruck") as an expert witness at trial (Dkt. No. 335, hereinafter the "Report"). As set forth below, the defendant intends to elicit proposed "expert" opinions that do not require specialized knowledge, speculate about the knowledge or intent of others in making trading decisions, draw unreliable conclusions based on incorrect assumptions, and invade the province of the jury. The Court should reject this thinly veiled attempt to have Professor Wruck essentially deliver from the witness stand key portions of the defense summation. Because most of the purported opinions in the Report (the "Proposed Expert Testimony") fail to satisfy the threshold for admitting expert testimony under the Federal Rules of Evidence, the Government respectfully files this motion *in limine* to preclude those portions of Professor Wruck's proposed testimony as set forth below.[1]

**RELEVANT BACKGROUND**

**I. Factual Background**

The Indictment charges that, from in or about February 2011 through in or about April 2015, Stewart, while working as an investment banker first at J.P. Morgan Chase & Co. ("J.P. Morgan") and then at Perella Weinberg Partners L.P. ("Perella"), tipped his father, Robert Stewart ("Robert"), with material, non-public information ("MNPI") about acquisitions of five publicly traded healthcare companies (the "Acquisitions"), in breach of Stewart's duties of trust

---

[1] This motion is filed pursuant to the Court's August 1, 2019 expert testimony scheduling order. After receiving Dr. Wruck's Report on August 15, 2019, the Government on August 17, 2019 made various requests to defense counsel for additional disclosures relating to the Report pursuant to Federal Rules of Criminal Procedure 16(b)(1)(C) and 26.2. The defendant has objected to all but one of these requests, and the parties are in the process of conferring to resolve those objections. To the extent the parties are unable to do so, the Government respectfully requests the opportunity to make an application to the Court for relief.

1

and confidence to J.P. Morgan and Perella and to their clients. The Indictment charges that Stewart did so with the understanding that Robert and co-conspirators would execute securities transactions based on the information. Robert himself traded in certain of the securities of the five acquisition targets, and also provided the MNPI to two other individuals (Richard Cunniffe and Mark Boccia, collectively with Robert, the "Traders"), who executed profitable trades on behalf of themselves and Robert.

For three of those transactions, relating to the acquisitions of Kendle International, Inc. ("Kendle"), Gen-Probe Inc. ("Gen-Probe"), and CareFusion Corp. ("CareFusion"), Stewart was a primary member of the investment banking team advising the bank's client on the transaction. For the transaction involving Kinetic Concepts, Inc. ("KCI"), Stewart served as a "staffer" who was not a member of the investment banking team, but instead was responsible for assigning junior bankers to work on the deal. For the transaction involving Lincare Holdings, Inc. ("Lincare"), Stewart likewise was not a primary member of the investment banking team but instead provided limited assistance to the team.

At the prior trial in this matter, Stewart testified that he shared MNPI with Robert about all five transactions charged in the Indictment, including the names of the acquisition targets and for one of the deals certain information about the expected timing of the deal announcement. *See, e.g.*, Prior Trial Tr. ("Tr.") 1186-87 (acknowledging, for Kendle transaction, that Stewart told his father about the Kendle transaction and "the timing of this announcement"); Tr. 1247-48 (acknowledging that Stewart told his father that JP Morgan was advising KCI regarding a potential transaction); Tr. 1250 (acknowledging that Stewart told his father that Lincare was an acquisition target); Tr. 1252 (acknowledging that Stewart told his father that Gen-Probe was an acquisition target); Tr. 1255 (acknowledging that Stewart "must have" told his father that CareFusion was an acquisition target). Stewart denied that he shared information about the

2

proposed acquisition prices or announcement timing, or that he provided the MNPI with the understanding that Robert or others would trade.

The Traders purchased either common stock, call options, or both types of securities of the acquisition targets in certain of the transactions.

## II. Proposed Expert Testimony

Stewart proposes that Professor Wruck provide expert testimony that (a) the stock price movements of the five acquisition targets exhibit a pattern typical of firms that are acquisition targets; (b) in general, the purchase of call options that expire prior to a deal announcement is "inconsistent with an investment strategy designed to profit from non-public information"; (c) many of the trades executed by Robert, Cunniffe, and Boccia "do not appear to reflect knowledge about the timing of deal announcements and the financial performance of target firms that was known by parties to the deal, and actually or potentially known by Sean Stewart." (Dkt. No. 335 at 3-4).

## ARGUMENT

### I. APPLICABLE LAW

#### A. Rule 702

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (B) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of expert testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). The District Court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See General Elec. Co. v.*

3

*Joiner*, 522 U.S. 136, 142 (1997).

Moreover, the party seeking admission of expert testimony must demonstrate that the testimony is based on the witness's specialized knowledge. *See United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) (district court erred in allowing expert testimony "about matters that required no specialized knowledge"). Expert testimony is plainly inadmissible when it merely addresses "lay matters [that] the jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter Railroad Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

The trial court must also find that proposed expert testimony is both relevant and reliable prior to admitting it into evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *see Kumho Tire Company, Inc. v. Carmichael*, 526 U.S. 137, 141 (1999). Specifically, in *Daubert*, the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "*Daubert* applies to both defense and government experts." *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003), *overruled on other grounds,* 750 F.3d 254, 261 (2d Cir.2014); *accord United States v. Kwong,* 69 F.3d 663, 668 (2d Cir.1995), *cited with approval by Yousef*, 327 F.3d at 148.

In *Joiner*, the Supreme Court explained that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." 522 U.S. at 146. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Applying Rule 702, the District Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Kumho Tire Co.*, 526 U.S. at 148-49. The fact that an expert may generally possess "specialized knowledge" does not

4

automatically render his opinions in this case reliable. *See SEC v. Lipson*, 46 F. Supp. 2d 758, 762-63 (N.D. Ill. 1998) (fact that witness is a certified public accountant, generally possessing the "specialized knowledge" to qualify as an expert witness, does not automatically render his opinions reliable).

### B. Rule 703

Rule 703 of the Federal Rules of Evidence precludes an expert from disclosing to the jury "facts or data [that] would otherwise be inadmissible" unless the court determines that their probative value substantially outweighs their prejudicial effect, and the facts or data must be of a type that "experts in the particular field would reasonably rely . . . in forming an opinion on the subject." Experts cannot be used as a substitute to calling witnesses to the events or facts at issue. For example, in *United States v. Zafar*, 291 Fed. Appx. 425, 427 (2d Cir. 2008) (summary order), the Second Circuit affirmed the district court's exclusion of the defendant's proposed expert testimony about the use of stock-selection software found on the defendant's computer in a securities fraud case. There was no evidence that the defendant actually used that software for stock trading at the time of the charged offenses. *Id*. The Circuit affirmed because the defense expert was not trying "to show the jury how the software worked but to insinuate what had happened with respect to the relevant stock trades, a subject on which [the expert] was not a competent witness." *Id*.

### C. Rule 704

Rule 704(b) of the Federal Rules of Evidence states that "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Moreover, a district court must exclude expert testimony that "expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).

In *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987), the Second Circuit expressed discomfort with the "uncontrolled" use of expert testimony that might "have the effect of providing . . . an additional summation by having the expert interpret the evidence." The Circuit stated that the district court must be vigilant to prevent an expert from coming "dangerously close to usurping the jury's function." *Id*.

### D.  Rules 401 through 403

Rules 401 through 403 of the Federal Rules of Evidence provide that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but it may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quoting authority omitted).

## II.   DISCUSSION

As an initial matter, the Government has no objection to Professor Wruck testifying, based on her study of equities markets and the available literature: (a) that the stock price movements of the five acquisition targets exhibit a pattern typical of firms that are acquisition targets, (Report ¶ 10); and (b) regarding, generally, how options are priced. In addition, the Government has no objection to Professor Wruck testifying, based on her review of options trading data, whether certain types of options were available in the market during the time periods when the Traders were purchasing options. However, the remainder of the Proposed Expert Testimony—including her assertion that the purchase of call options that expire prior to a deal announcement is "inconsistent with an investment strategy designed to profit from non-

6

public information," and more specifically that many of the trades executed by the Traders "do not appear to reflect knowledge about the timing of deal announcements and the financial performance of target firms that was known by parties to the deal, and actually or potentially known by Sean Stewart" (Report ¶ 10)—is impermissible and should be precluded.

### A. The Proposed Expert Testimony Is Not Based on Reliable Principles or Methods, and the Proposed Expert Does Not Have Sufficient Relevant Experience

As a threshold matter, Professor Wruck has no apparent expertise, has no reported trading experience, has published no papers, has given no presentations, has taught no classes, and cites no peer-reviewed studies (or any studies at all) about securities trading patterns or behavior of individuals who possess and attempt to profit from the use of MNPI. The CV attached to Professor Wruck's report reveals *no* materials that she has published regarding this area of proposed expert testimony, and Professor Wruck's prior expert experience (Report at 10) reflects no relevant prior expert experience in this area, or even prior expert experience regarding equity or options markets at all.

When Stewart proposes an expert to opine about whether particular trades were made while in possession of MNPI, one would expect that the expert would cite to controlled studies regarding the trading behavior of individuals who are in possession of MNPI. The Report cites not a single such study, which is an indication that there *is* no expert basis for such opinions. Professor Wruck offers no methodology to support her ability to speculate about what Robert, Cunniffe, and Boccia knew at any particular point in time. Moreover, it is telling that Stewart proposes that the expert testify about whether the Trades were consistent with "possession and utilization" of detailed deal information. (*See, e.g.*, Report ¶¶ 44, 51, 59). Professor Wruck implicitly concedes, by using this formulation, that there is a difference between a trader *knowing* that a particular development might occur in a deal, and that same trader *utilizing* the information in placing a trade. The difference between the two concepts—ignored by Professor

7

Wruck—is vitally important in analyzing the trading patterns of participants in a criminal insider trading conspiracy. A trader might know certain inside information but decline to use it for fear of getting detected or caught by securities market regulators or criminal authorities (which Professor Wruck acknowledges in a footnote was Cunniffe's strategy in this case, *see* Report at 28 n.63), but Professor Wruck assigns no weight to this probability in speculating about the Traders' knowledge. To the contrary, all of Professor Wruck's so-called "opinions" about what the Traders knew at particular points in time rest on Professor Wruck's assumption that each of those Traders was at all times attempting to maximize the profits that they could earn from trading on MNPI (*see, e.g.*, Report at 3-4)—an assumption that is belied by Cunniffe's prior and anticipated testimony about measures that he and Robert took to reduce the profits from trades that they placed based upon MNPI, with the conscious aim of making it appear to regulators and authorities that they knew less than they actually did.

Because of Professor Wruck's lack of relevant experience and failure to provide a reliable methodology for her speculative opinions about what the Traders did or did not know, as a threshold matter under Rule 702, the Proposed Expert Testimony is not based on "reliable principles and methods" and should be precluded. *See United States v. Whitman*, No. 12 Cr. 125 (JSR), Dkt. 142 (Trial Tr.) at 2719, 2756, 2761 (S.D.N.Y. 2012) (absent rigorous methodological foundation, precluding expert from testifying that charged trading was "consistent" with uncharged trading in other securities), *aff'd*, 555 F. App'x 98, 102 (2d Cir. 2014) ("The district court reasonably concluded that Mayer lacked a sufficient basis to jump from modest similarities between trades to a conclusion that the allegedly illegal trades resulted from sound research rather than inside information.").

### B. The Court Should Preclude "Expert" Opinion Testimony Regarding Whether Trading Is Consistent With Possession of Detailed MNPI

The Court should preclude Professor Wruck from opining that certain trading is "not illustrative of knowledge of an impending negative earnings announcement" (Report at 19 (Kendle)), and appears "inconsistent" with possession and utilization of detailed information regarding the timing of the likely announcement date of an acquisition (Report at 22 (KCI)), (Report at 27 (Gen-Probe)), (Report at 31 (Lincare)), (Report at 36 (CareFusion)). This category of opinion should be precluded because it (a) requires speculation, without basis in expert methodology, about what members of the conspiracy knew at particular points in time; (b) invades the province of the jury; and (c) improperly smuggles in arguments about the *defendant's* knowledge and intent through the guise of an expert.

*First*, Stewart's proposal that Professor Wruck opine about what Robert, Cunniffe, and Boccia knew at the points in time when they placed certain trades, (*see, e.g.*, Report at ¶¶ 59, 68), is merely factual evidence coming from a witness with no firsthand knowledge. It is not an area of expertise but instead is a question for fact witnesses with knowledge of the Traders' activities during the relevant time period. Stewart may not use a proposed expert to introduce purely lay assertions. *See United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) (lay opinion testimony is unhelpful where the jury is in as good a position to assess the facts as the testifying witness).

*Second*, it would be completely improper for Professor Wruck to opine from the witness stand that Cunniffe's and Boccia's trading strategies were "inconsistent" with "possession and utilization" of detailed MNPI because it is not the role of an expert to assume counsel's responsibility to make arguments or to assume the jury's function by drawing inferences from the evidence. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) ("[E]xperts should not be permitted to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." (internal quotation marks omitted)).

9

The Government has no objection to the defense calling a summary witness, who is not qualified as an expert, to present charts graphically illustrating how many of the Traders' options trades expired out-of-the-money before relevant deal announcements or were less profitable than other options with expiration dates closer to the deal announcements, but it is for counsel to argue the significance of such data and for the jury to determine its weight. *See Nersesian*, 824 F.2d at 1308 (disapproving of the use of expert testimony as an "additional summation by having the expert interpret the evidence"). *Cf. Kidder, Peabody & Co. v. IAG Int'l Acceptance Group*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) ("Whether a party acted with objective reasonableness is a quintessential common law jury question. By the same token, juries traditionally decide whether an individual acted knowingly, or willfully, or maliciously, or with specific intent, or with any other relevant state of mind. Thus, this case will present to the jury no new or more demanding task than what juries have always done."). But given the "added aura of reliability that necessarily surrounds expert testimony," *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999), it would be inappropriate to have a purported expert present such summary evidence, which requires no specialized knowledge, training or experience, *see United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (district court should not admit testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help").[2]

---

[2] As noted above (at p. 6), the Government has no objection to Professor Wruck testifying (a) that the stock price movements of the five acquisition targets exhibit a pattern typical of firms that are acquisition targets, (b) regarding, generally, how options are priced, and (c) whether certain types of options were available in the market during the time periods when the Traders we repurchasing options. However, the additional step of having Professor Wruck qualified as an expert to present a summary chart of the actual options that the Traders purchased, and then to compare those trades with the hypothetical trades that the Traders *could* have made, is impermissible because it provides an expert's imprimatur on a summary chart and a defense summation. *See Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*, No. 98 Cv. 5101 (SHS), 2005 WL 22865, at *2 (S.D.N.Y. Jan. 5,

If supported by the evidence, Stewart's counsel can of course argue to the jury that the nature of the trading exhibited by the Traders did not reflect that they possessed detailed MNPI about the Acquisitions insofar as that is relevant to whether Stewart is guilty of the charged offenses, but cloaking that argument in the guise of expert "opinion" usurps the jury's role by drawing inferences that would be apparent to a layperson. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) ("[E]xperts should not be permitted to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." (internal quotation marks omitted)).

Indeed, in *United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994), the Second Circuit noted that "[w]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Id.* (internal citations omitted). Here, Stewart seeks to have his expert decide for the jury whether Stewart tipped his father, who in turn tipped Cunniffe and Boccia, under the guise of "expert" opinion testimony that Stewart's father, Cunniffe and Boccia traded in a manner that was inconsistent with them receiving detailed MNPI from Stewart. Although the issue of whether Cunniffe, Stewart, and Boccia possessed "detailed information," as compared with knowledge that a particular company is an acquisition target, is not dispositive of the defendant's guilt, it is certainly a question the jury will likely consider in determining the defendant's guilt. Having an expert determine that issue for them far exceeds an expert's "limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination." *Duncan*, 42 F.3d at 101 (internal citations omitted).

---

2005) ("This is not an opinion that will be helpful to the jury, but rather the provision of a purported expert's imprimatur on facts regarding which he has no personal knowledge and which can be presented to the jury by those with knowledge of the facts.").

11

*Third*, it is clear that Stewart intends to use the Proposed Expert Testimony argue to the jury that it is unlikely that the Traders had detailed information about the Acquisitions, and therefore that Stewart did not provide such information to the Traders. This is a thinly—if at all—veiled attempt to smuggle in arguments about Stewart's knowledge and intent through speculative testimony about the knowledge and intent of the Traders. The thin reed on which this proposed testimony lays is further highlighted by Professor's Wruck proposal to testify that certain trades do not appear to reflect knowledge of certain MNPI "that was known by parties to the deal, and *actually or potentially* known by Sean Stewart." (Report at 4 (emphasis added)). It is not for Professor Wruck to testify what knowledge Stewart did or did not have, and she concedes that she cannot testify with certainty whether Stewart was aware of particular facts. This is yet another reason why the Proposed Expert Testimony is clearly prohibited. *See United States v. Abdel Rahman*, 189 F.3d 88, 136 *(2d Cir. 1999) (affirming exclusion of expert testimony that "constituted an effort to tell the jury the defendant's intentions through the mouths of witnesses other than himself").

    C. **The Court Should Preclude Professor Wruck From Providing the Jury With "Transaction Summaries" and Speculating About the Defendant's Knowledge**

It is impermissible for Professor Wruck to give so-called "transaction summaries" of when "JPMorgan" and/or "Sean Stewart" knew of certain developments in the Acquisitions. (*See, e.g.*, Report ¶¶ 34-36, 41-42, 49, 55-57, 64), about which she has no first-hand knowledge, or for her to offer opinions about whether the defendant or other insiders involved in those deals knew about certain deal developments at particular points in time. The jury will learn about those developments from the first-hand testimony of witnesses such as investment bankers and corporate executives who were involved in those deals and contemporaneous email communications and documents, and needs no assistance in that regard from Professor Wruck, who lacks any personal knowledge of those developments. Nor is there any justification for

having Professor Wruck offer opinions to the jury about what the defendant or other insiders who worked on those deals knew at given points in time. For example, Professor Wruck opines that one of the Traders' options trades ahead of the announcement of Gen-Probe's acquisition was inconsistent with what was "known by individuals working on the deal, including by those at Perella Weinberg" (Report ¶ 51), the investment bank where the defendant was employed at the time. The jury is perfectly capable of determining what insiders such as the defendant knew or did not know from first-hand witness testimony and contemporaneous email communications without the assistance of Professor Wruck.[3]  This area of proposed testimony is a classic example of an expert giving a closing argument from the stand by suggesting the jury draw inferences from the evidence, and it should be precluded.

---

3 Furthermore, it is misleading and confusing for Professor Wruck to opine on what was known generally among insiders at given points in time. The jury will be tasked with deciding whether or not the defendant knew MNPI about an impending deal, and whether he tipped his father with that MNPI with the expectation that his father would trade on it. It is inappropriate and misleading for Professor Wruck to imply that the Traders' securities trading patterns were inconsistent with MNPI known to the defendant by pointing only to what was known to a collective of unspecified insiders. *See, e.g.*, Report at 27 ("[I]n the time frame during which these purchases [of Gen-Probe call options by Cunniffe] occurred, the approximate announcement date [of Gen-Probe's expected acquisition] was known by individuals working on the deal, including those at Perella Weinberg").

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the defendant be precluded from offering the proposed opinions and testimony of Dr. Wruck as described above.

Dated: New York, New York
August 22, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:    /s/
Richard Cooper / Samson Enzer
Assistant United States Attorneys
Tel. (212) 637-1027 / -2342