UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

SEAN STEWART,

Defendant.

1:15-cr-00287-JSR

**DEFENDANT SEAN STEWART'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE CERTAIN EXPERT TESTIMONY**

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP

Steven M. Witzel
Lawrence Gerschwer
R. David Gallo
Leigh G. Rome
One New York Plaza
New York, New York 10004-1980
(212) 859-8000

*Attorneys for Defendant Sean Stewart*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

RELEVANT BACKGROUND ........ 2

ARGUMENT ........ 3

I. Dr. Wruck's Testimony is Relevant ........ 4

II. Dr. Wruck's Testimony is Admissible ........ 5

A. Dr. Wruck's Testimony is Based on Reliable Methodology ........ 5

B. Dr. Wruck's Discussion of the Facts in this Case is Appropriate ........ 6

C. Dr. Wruck's Testimony Does Not Invade the Province of the Jury ........ 7

III. Dr. Wruck is Qualified to Testify ........ 9

CONCLUSION ........ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Borawick v. Shay*,
68 F.3d 597 (2d Cir. 1995)....................4

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993)....................3, 5

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y 2016)....................7

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994)....................9

*United States v. Khan*,
787 F.2d 28 (2d Cir. 1986)....................3, 4

*United States v. Locascio*,
6 F.3d 924 (2d Cir. 1993)....................4

*United States v. Lumpkin*,
192 F.3d 280 (2d Cir. 1999)....................7

*United States v. Mermelstein*,
487 F. Supp. 2d 242 (E.D.N.Y. 2007)....................7

*United States v. Newkirk*,
No. 14-cr-00534 (JSR), 2016 U.S. Dist. LEXIS 54112 (S.D.N.Y. Apr. 19, 2016)....................4

*United States v. Onumonu*,
967 F.2d 782 (2d Cir. 1992)....................3

*Washington v. Texas*,
388 U.S. 14 (1967)....................4

**Rules**

Federal Rule of Evidence 401....................8

Federal Rule of Evidence 702....................3

Federal Rule of Evidence 704....................8

Defendant Sean Stewart respectfully submits this opposition to the government's motion to preclude certain testimony of Dr. Karen Hopper Wruck ("Dr. Wruck") at trial. Gov. Mot. To Preclude Certain Expert Testimony, ECF No. 337 (Aug. 22, 2019) ("Motion").

## INTRODUCTION

Dr. Wruck's proffered testimony will help the jury to understand a central yet unfamiliar issue in this case: the nature and operation of trading securities in, and the movement of markets related to, a publicly-listed company in the lead up to an announcement about merger activity involving that company.

The government concedes that a significant portion of Dr. Wruck's proposed testimony—related to mergers and acquisitions, call options, strike prices, and maturity dates—is appropriate and helpful to the jury, which will likely have little or no background knowledge or understanding of such financial issues. The government's arguments to exclude the remainder of Dr. Wruck's testimony are unavailing and contrary to the law in this Circuit. The government's objections reflect a fundamental misunderstanding of Dr. Wruck's proposed testimony. The government moves to exclude conclusions that Dr. Wruck does not offer and even expressly disclaims. The government's remaining attempts to exclude Dr. Wruck's testimony all go to the weight and not the admissibility of her testimony, and the government will be free to cross examine her on her opinions at trial. The Motion should be denied.[1]

---

[1] The government stated that, on August 17, 2019, it "made various requests to defense counsel for additional disclosures relating to the Report pursuant to Federal Rules of Criminal Procedure 16(b)(1)(C) and 26.2" and that "the parties are in the process of conferring to resolve [Defendant's] objections" to these requests. Motion at 1. In fact, prior to the government's filing of the Motion, Defendant informed the government that its overbroad requests were beyond what is it provided for by any applicable rules, including the Rules cited by the government. At that time, and again more recently, Defendant requested that the government provide support for its requests in order for Defendant to reconsider his position and has not yet heard back from the government.

## RELEVANT BACKGROUND

At trial in 2016, Defendant Sean Stewart ("Sean") admitted that he had violated his employers' policies and procedures by mentioning the names of certain companies during conversations with his father, Robert Stewart ("Robert"). As Robert has repeatedly acknowledged, Robert then shared the names of those companies with associates unknown to Sean. *See, e.g.,* ECF No. 310, Ex. D (Transcript of Robert Stewart's May 14, 2015 Post-Arrest Interview) at 10:15-22. Robert and those associates, Richard Cunniffe ("Cunniffe") and Mark Boccia ("Boccia"), purchased stock and options in these companies in advance of public announcements involving the companies.

Over four years, Robert, Cunniffe, and Boccia made more than <u>100</u> distinct purchases of the at-issue securities and most of these purchases were of call options. In total, they accumulated more than 1,800 options contracts. Unlike with stock, the profit one realizes on call options is a complex function of the price of the option, the exercise or "strike" price of the option, the price of the underlying stock, and the expiration or "maturity" date after which the option becomes worthless.

At trial, the government advanced the narrative that Sean contacted Robert at certain moments for the purpose of sharing fundamental and incremental information about the deals that Sean or his colleagues were working on and that, as a result, Robert and Robert's associates were able to update and refine their trading positions and increase their profits. *See, e.g.*, Ex. A, Tr. at 1407:24-1408:1 (arguing that "every date that Bob Stewart traded Kendle coincided with a key point in the merger negotiations"). To support this conjectural narrative, the government identified certain events in the confidential negotiations of the deals and then cherry-picked certain trades, asking the jury to infer that there had been a fluid passage of detailed confidential information from Sean that allowed the traders to react in real time as confidential negotiations

progressed. *See, e.g.*, Ex. A, Tr. at 1410:6-9 ("on the 22nd [of February 2011], Bob Stewart bought more Kendle. Why? Because his son knew how things were going to proceed. The big management meeting was about to happen and everyone was very positive about the deal."); 1411:8-11 ("So you look at what's happening behind the scenes, and you look at Bob Stewart's well-timed trade, and you know the defendant is picking his moments to tell his dad how to trade."); 1411:18-20 ("That level of information, that specificity, that certainty can only have come from an insider like the defendant, who was deliberately tipping."); 1438:7-8 ("The trading in CareFusion was exceptionally well-timed").

However, as Dr. Wruck would testify, a disinterested analysis of all of Robert, Cunniffe, and Boccia's trading in at-issue securities, based on well-accepted trading and market principles, reveals that many trades were not "well-timed." Something very different was happening than the real-time alignment of trades and inside information portrayed in the government's narrative. *See* ECF No. 335 (Expert Report of Karen Hopper Wruck, Ph.D. ("Report")) at ¶ 10. Rather, Robert, Cunniffe, and Boccia made a host of trading decisions that were not economically consistent with the real-time progression of the various deal negotiations. Absent Dr. Wruck's testimony, there is a high likelihood that this jury will not fully understand how Robert, Cunniffe, and Boccia made a number of profit-*decreasing* trading decisions.

**ARGUMENT**

Testimony by a qualified expert is generally admissible under Federal Rule of Evidence 702 if it reflects "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." This standard is a "liberal one." *Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 587 (1993). So long as the testimony is "minimal[ly] relevan[t]" to a disputed issue, and provides explanation or information that a lay juror would find useful, the "testimony should normally be admitted." *United States v. Onumonu*, 967 F.2d 782, 786 (2d Cir.

1992); *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986). Expert testimony is not limited to "scientific" or "technical" topics, but may address any issue in the case on which an "untrained layman" might benefit from "enlightenment from those having a specialized understanding of the subject." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993). The Second Circuit has admonished that, when considering expert testimony, courts should apply "a presumption of admissibility." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). That presumption has even greater force in the criminal context. *See Washington v. Texas*, 388 U.S. 14, 23 (1967).

## I. Dr. Wruck's Testimony is Relevant

The testimony of Dr. Wruck challenged by the government is highly relevant to the claims and defenses in this case. Testimony concerning the trades at issue in this case, the call options form that the majority of those trades took, and the circumstances under which those trades were executed in the weeks and months prior to expected M&A activity is undoubtedly more than "minimal[ly] relevan[t]" to the charges against Sean. *Khan*, 787 F.2d at 34. The government will offer the jury undisputed evidence that Robert, Cunniffe, and Boccia made 112 different purchases of the securities at issue, accumulating 1,890 options contracts with dozens of different strike prices and maturities. Dr. Wruck's testimony is relevant in that it will "help the trier of fact to understand" that a trader possessing complete inside information about the pricing and timing of the announcement of a targets' acquisition could have executed these 112 purchases in a range of ways and realized a range of profits. Dr. Wruck's testimony is likewise appropriate to help the jury understand how far, if at all, the observed trading deviated from a strategy based solely on knowledge about impending transactions both in terms of the identity of the targets and the pricing and timing of the announcements. *See United States v. Newkirk*, No. 14-cr-00534 (JSR), 2016 U.S. Dist. LEXIS 54112, *9 n.1 (S.D.N.Y. Apr. 19, 2016) (recognizing, in the context of expert testimony, "the meaningful distinction" between "complex securities"

and "common equities and bonds") (quoting *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015)). For its part, the jury can interpret that evidence and draw whatever inferences it believes appropriate.

**II. Dr. Wruck's Testimony is Admissible**

The government concedes that Dr. Wruck should be allowed to testify with regard to (a) "the stock price movements of the five acquisition targets" (b) "generally, how options are priced," (c) "whether certain types of options were available in the market during the time periods when the Traders we repurchasing options." Motion at 10 n.2. However, the government insists that Dr. Wruck must be precluded from discussing "the actual options that the Traders purchased" and "compar[ing] those trades with the hypothetical trades that the Traders *could* have made." *Id.* (emphasis in original). The government's arguments are based on a series of fundamental misunderstandings about Dr. Wruck's proposed testimony and the law.

*A. Dr. Wruck's Testimony is Based on Reliable Methodology*

The overarching purpose of the Rule 702 inquiry is "reliability [] of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at 595. The focus "must be solely on principles and methodology, not on the conclusions they generate." *Id.* The government's motion focuses on Dr. Wruck's conclusions and fails to test Dr. Wruck's sound methodology.

Dr. Wruck begins by citing academic studies that have documented the significant increase in target stock prices upon the announcement of an acquisition. Dr. Wruck also presents the results of an empirical analysis that shows that targets in the healthcare sector were acquired for significant premiums. *See,* Report at ¶¶ 13-15. Dr. Wruck then analyzes 112 purchases of securities, constituting 1,890 call options contracts, to determine the extent to which the observed trading decisions align with a trading strategy characterized by (i) knowledge of inside information regarding the identity of a potential target; (ii) knowledge of inside information

regarding the pricing and timing of the announcement of a transaction involving the identified target; and (iii) utilization of that information to generate profits. *See, e.g.*, Report at ¶¶ 44, 51.

To identify the inside information against which to measure the trading decisions, Dr. Wruck used public documents such as proxy statements, as well as emails, regulatory responses, and other documents produced by the government in this case. *See, e.g.*, Report at ¶ 34. To identify Robert, Cunniffe, and Boccia's trades in the securities at issue, Dr. Wruck used the trading account statements produced by the government in this case. *See, e.g.*, Report at Table 4 & n.47. As explained below, this analysis was conducted independently of the other factors that could animate trading decisions by real-world individuals in possession of MNPI, such as strategies to decrease profits in an effort to evade detection. After performing her analysis, Dr. Wruck concluded that some trading decisions aligned with a strategy based on detailed inside information regarding the transaction announcement while other trading decisions did not. *See, e.g.*, Report at ¶¶ 51-54. The government does not object to the reliability of this methodology.

Rather, the government objects to methodologies and conclusions that are <u>not</u> Dr. Wruck's. For example, the government asserts that Dr. Wruck "offers no methodology to support her ability to speculate about what Robert, Cunniffe, and Boccia knew at any particular point in time." *Id.* For good reason—Dr. Wruck neither does nor would engage in such speculation. Having ignored Dr. Wruck's actual, legitimate methodology, the government's objections to Dr. Wruck's methods should be denied.

### *B. Dr. Wruck's Discussion of the Facts in this Case is Appropriate*

The Government has no objection to the defense calling a witness "to present charts graphically illustrating how many of the Traders' options trades expired out-of-the-money before relevant deal announcements or were less profitable than other options with expiration dates closer to the deal announcements . . . ." Motion at 10. However, the government erroneously

argues that it would be inappropriate for Dr. Wruck to "present such summary evidence." *Id.* First, Dr. Wruck's discussions regarding the observed trading are the result of expert analysis, not summary. *See* Sec. II.A, *supra*. Second, even if the Court were to conclude that some of Dr. Wruck's testimony is akin to a summary, that would not warrant exclusion of that testimony. *See United States v. Mermelstein*, 487 F. Supp. 2d 242, 266 (E.D.N.Y. 2007) (permitting expert to use summary evidence under Fed. R. Evid. 1006 because the expert's "expertise was required to . . . extract the data relevant to [the expert's] testimony"); *Scott v. Chipotle Mexican Grill, Inc*., 315 F.R.D. 33, 45 (S.D.N.Y 2016) (expert testimony is "admissible where it 'synthesizes' or 'summarizes' data in a manner that 'streamline[s] the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.'") (quoting *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp*., 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015)).

Like any other expert, Dr. Wruck may, and must, discuss how her expertise and opinions relate to the facts at hand. *Scott*, 315 F.R.D. at 45 (explaining that, in order for the expert to "place [the facts of the case] within a larger context of industry norms . . . of course, he must lay a foundation that necessarily requires restating facts in evidence."). Then, as the government correctly states, it is for "counsel to argue the significance of such data and for the jury to determine its weight." Motion at 10.[2]

*C. Dr. Wruck's Testimony Does Not Invade the Province of the Jury*

In deciding whether to permit expert testimony, the Court must determine whether the testimony "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999). Dr. Wruck's proposed testimony would do neither. Among

[2] For this same reason, the Court should also deny the government's request to preclude Dr. Wruck from discussing the facts of the five acquisition transactions at issue. *See* Motion at 12.

the most puzzling of the government's assertions is the charge that "Stewart seeks to have his expert decide for the jury whether Stewart tipped his father." Motion at 11; *see also* Motion at 12 (characterizing Dr. Wruck's proposed testimony as a "veiled attempt to smuggle in arguments about Stewart's knowledge and intent."). Of course, in making the claim that Dr. Wruck's testimony would run afoul of Federal Rule of Evidence 704(b), the government does not cite to Dr. Wruck's report. In fact, the government elsewhere concedes that Dr. Wruck's testimony does not touch the ultimate issue in this case. *See* Motion at 11. The government appears simply to take issue with the very definition of relevant evidence. If, based on the evidence, the jury believes that Robert, Cunniffe, and Boccia did not trade based on detailed inside information, that evidence would also have the "tendency to make a [Sean's criminal intent] . . . less probable than it would be without the evidence." Fed. R. Evid. 401. That is no basis to exclude expert testimony.[3]

The government also insists that Dr. Wruck would invade the province of the jury by purporting to determine whether Robert, Cunniffe, and Boccia actually were in possession of detailed MNPI. *See* Motion at 9. However, as Dr. Wruck expressly stated in her report: "<u>I have not been asked to assess, nor do I have any opinion regarding, whether Robert Stewart, Cunniffe, and Boccia were actually in possession of any confidential information at any particular time</u>." Report at ¶ 7 (emphasis added). This disclaimer, which the government repeatedly sidesteps, means exactly what it says. For the purposes of Dr. Wruck's conclusions, Robert, Cunniffe, and Boccia could have had up-to-the-minute inside information about each of the deals at issue.

---

[3] The government also misunderstands Dr. Wruck's reference to "MNPI 'that was known by parties to the deal, and actually or potentially known by Sean Stewart.'" Motion at 12 (citing Report at 4). This has nothing to do with Sean's knowledge and intent as it relates to the government's allegations of insider trading. Dr. Wruck is merely pointing out what the government will also vigorously argue to the jury: that Sean was often in possession of MNPI.

Additionally, trading designed to make profits is a central assumption of Dr. Wruck's analysis. But this assumption is not, as the government misapprehends, an attempt to minimize or ignore the possibility that Robert, Cunniffe, and Boccia possessed detailed information and deliberately "masked" their trades and avoided higher profits in the hopes of evading detection by authorities. *See* Motion at 8. Rather, that someone with inside information will seek to profit from their trading operates as a *baseline assumption* in Dr. Wruck's methodology. This assumption ensures that Dr. Wruck does *not* invade the province of the jury. That is, Dr. Wruck's analysis deliberately avoids speculation regarding variables that concern the unknown discussions and motivations of individuals whom she has not met.

However, Dr. Wruck's testimony undoubtedly will help the jury understand the *economic* implications of the voluminous trading data. This "groundwork in the form of an opinion [will] enable the jury to make its own informed determination," *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994), as to whether it is more likely that (i) Robert, Cunniffe, and Boccia had detailed information and chose to use it selectively or (ii) that they simply did not possess that detailed information. Dr. Wruck plans to offer no opinion as to which of these two inferences is most reasonable. The government is free to explore in its own case and with its own witnesses, or in its cross examination of Dr. Wruck, the reasons *why* Robert, Cunniffe, and Boccia made those profit-decreasing decisions.

## III. Dr. Wruck is Qualified to Testify

Contrary to the government's insistence, Dr. Wruck is qualified to offer the proposed testimony described above and in her report. The proposed testimony is well-within Dr. Wruck's expertise and is based on accepted principles and methodologies familiar to Dr. Wruck and those in her field. In her over 30 years in academia, Dr. Wruck has taught numerous relevant classes, largely at the graduate level, including Principles of Finance, Principles of Accounting, Applied

Managerial Economics, Organizational Economics and a variety of advanced finance electives. The topics covered in those classes include: mergers and acquisitions and their impact on stock prices, merger arbitrage and the potential for run-ups in stock price prior to announcement due to trading on non-public information, the fundamentals of option pricing and applications of option pricing, corporate governance, the role of the board of directors and their duties including the role of maintaining confidentiality, inside information and prohibitions against insider trading, and ethical issues in business and finance, including confidentiality and insider trading.

Additionally, Dr. Wruck's published research in leading peer reviewed academic journals focuses on how markets respond to the announcement of value-relevant information in the context of a variety of financial transactions and how financial transactions affect firm value around their announcement. Dr. Wruck's scholarship also includes case studies that, like the proposed testimony, do a deep dive into specific situations with the objective of demonstrating how theory applies to practice.[4]

**CONCLUSION**

For the foregoing reasons, Mr. Stewart respectfully requests that the Court deny the government's motion to preclude certain expert testimony.

[4] Dr. Wruck's relevant published articles include: Warner, Jerold B., Ross L. Watts, and Karen H. Wruck, 1988, Stock Prices and Top Management Changes, *Journal of Financial Economics*, Vol. 20, pp. 461-492. (*Journal of Financial Economics* "All-Star" paper based on top two papers per volume in terms of citations for papers published between 1974 and 1995); Wruck, Karen Hopper, 1989, Equity Ownership Concentration and Firm Value: Evidence From Private Equity Financings, *Journal of Financial Economics*, Vol. 23, pp. 3-28. (Journal of Financial Economics "All-Star" paper based on top two papers per volume in terms of citations for papers published between 1974 and 1995); Kaplan, Steven N., Mark L. Mitchell, and Karen H. Wruck, 2000, A Clinical Exploration of Value Creation and Destruction in Acquisitions: Organization Design, Incentives and Internal Capital Markets, Productivity of Mergers and Acquisitions, Steven Kaplan, ed., National Bureau of Economic Research, Conference Volume; Baker, George P., and Karen H. Wruck, 1989, Organizational Changes and Value Creation in Leveraged Buyouts: The Case of O.M. Scott & Sons Company, *Journal of Financial Economics*, Vol. 25, pp.163-190.

Dated: New York, New York
August 29, 2019

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP

By: *\/s/ Steven M. Witzel*
Steven M. Witzel

Steven M. Witzel
Lawrence Gerschwer
R. David Gallo
Leigh G. Rome
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
steven.witzel@friedfrank.com

*Attorneys for Defendant Sean Stewart*