UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :

  - v. -                          :           S1 15 Cr. 287 (JSR)

SEAN STEWART,               :

                Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**<u>THE GOVERNMENT'S SENTENCING SUBMISSION</u>**

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
*Attorney for the United States of America*

Samson A. Enzer
Richard A. Cooper
Assistant United States Attorneys
   *- Of Counsel -*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

    I. The Insider Trading Scheme Involving Sean and Robert Stewart ...........................2

        A. Stewart Was Fully Aware of the Illegality of His Conduct.............................3

        B. Stewart Tipped his Father about Acquisitions of Kendle and KCI...................4

        C. Stewart Lied in Response to a FINRA Inquiry about his Father's Kendle
            Trades ............................................................................................6

        D. Stewart Tipped his Father about Acquisitions of Gen-Probe and Lincare ........9

        E. Stewart's Father Lied in Response to an SEC Inquiry about his Kendle Trades
            .........................................................................................................10

        F. Stewart Tipped His Father About the Acquisition of CareFusion ..................12

        G. Stewart's "Silver Platter" Statement was Recounted by his Father on Tape...12

    II. Stewart Breached his Court-Ordered Bail Conditions and Promises to the
        Court ...............................................................................................13

    III. Stewart Committed Perjury at his First Trial .........................................................14

ARGUMENT ....................................................................................................................19

    I.     The Guidelines Calculation.............................................................................19

        A.    The Court Should Reject Stewart's Gain Arguments...............................19

        B.    The Court Should Apply the Two-Point Enhancement for Obstruction ..22

    II.    A 36-Month Prison Sentence Is Reasonable and Appropriate........................24

CONCLUSION .................................................................................................................29

## **PRELIMINARY STATEMENT**

The Government respectfully files this submission in connection with the sentencing of defendant Sean Stewart ("Stewart"), who has been convicted of insider trading crimes in this case by two separate juries:  first, at a four-week trial in 2016 before United States District Judge Laura Taylor Swain, and then again, at an eight-day retrial in September 2019 before this Court.

As a senior investment banker at two prestigious investment banks on Wall Street, Stewart was well aware of his fiduciary duties to maintain inside information in strict confidence.  Nevertheless, Stewart repeatedly and persistently betrayed his employers and clients, on at least five separate occasions over the course of four years, by stealing valuable secrets that they entrusted to him and feeding them to his father, anticipating that his father would use that inside information to trade securities for profit.  Stewart did so with impunity and without remorse, working to cover his tracks with a carefully crafted web of lies — to an employer that nearly exposed his crimes, to the Financial Industry Regulatory Authority ("FINRA"), to the United States Securities and Exchange Commission ("SEC"), and, finally, to the jury at Stewart's first trial before Judge Swain.  Stewart's criminal insider trading conduct was brazen, as were his many acts of deception to avoid being held responsible for his crimes.

Under the proper application of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), the advisory Guidelines sentencing range for Stewart's criminal conduct is 63 to 78 months of imprisonment.  After becoming familiar with Stewart's crimes, history and characteristics from presiding over Stewart's first trial, observing Stewart commit perjury in her courtroom during that trial, and reviewing all the materials submitted to her in connection with Stewart's first sentencing, Judge Swain sentenced Stewart to 36 months in prison.  Judge Swain did so based on findings that such a sentence was sufficient, but not greater than

necessary, to meet the goals of sentencing enumerated by Congress in Title 18, United States Code, Section 3553(a). Judge Swain's sentencing determination was fair and reasonable, and there has been no intervening change of circumstances that would warrant giving Stewart a different sentence now that he has been retried and convicted again.[1]

For these reasons and those set forth below, the Government respectfully submits that a sentence of 36 months of imprisonment is appropriate for Stewart.[2]

## STATEMENT OF FACTS

### I.  The Insider Trading Scheme Involving Sean and Robert Stewart

On September 23, 2019, following an eight-day retrial before this Court, Stewart was convicted by a jury on all nine counts of Indictment S1 15 Cr. 287 (JSR) (the "Indictment") charging Stewart with various fraud and fraud conspiracy counts for his participation in a long-running scheme with his father to commit insider trading.

The evidence at Stewart's retrial showed that from at least February 2011 through April 2015, Stewart repeatedly abused his position as an investment banker in Manhattan, first at J.P. Morgan Chase & Co. ("J.P. Morgan") and then at Perella Weinberg Partners L.P. ("Perella"), by tipping his father, Robert Stewart ("Robert"), on at least five separate times, with material, non-public information about five acquisitions of publicly traded healthcare companies.

---

[1]  Stewart served about 13 months in prison on the 36-month prison sentence imposed by Judge Swain, from June 6, 2017 until June 28, 2018, when Stewart was released on bail pending the resolution of his direct appeal from his first trial conviction. He has remained on bail since then.

[2]  "Dkt. [Number]" refers to a docket entry on the Court's Electronic Case Filing system in this case; "Prior Tr." refers to the transcript of Stewart's first trial; "Tr." refers to the transcript of Stewart's retrial; "GX [Number]" refers to a Government exhibit admitted at Stewart's retrial; "Ex. A" refers to a transcript of Richard Cunniffe's covertly recorded meeting with Robert Stewart on March 24, 2015 that is attached as Exhibit A; "Ex. B" refers to the transcript of Stewart's testimony at his first trial that is attached as Exhibit B; "Ex. C" refers to the transcript of Stewart's sentencing before Judge Swain that is attached as Exhibit C.

Stewart was well aware that it was illegal to share inside information with his father, but Stewart did so anyway because he thought that he was above the law and too clever to get caught breaking it. Stewart viewed his persistent thefts of inside information as a costless way to ease his father's financial worries. To make effective use of Stewart's illegal tips, Robert enlisted a colleague and co-conspirator, Richard Cunniffe — who subsequently became a cooperating Government witness — to assist in trading. Over the course of this insider trading scheme, Robert generated a total of approximately $1.15 million in gross trading profits for himself and Cunniffe based on illegal tips from Stewart.[3] Of those illicit profits, Cunniffe (who put up the capital for the trades) received about $1 million, and Robert (who provided the tips that he had received from his son) received about $150,000.

### A. Stewart Was Fully Aware of the Illegality of His Conduct

Stewart was well aware that insider trading was a crime. In addition to holding a Series 7 license, Stewart received extensive compliance trainings at both J.P. Morgan and Perella on his duties of confidentiality and on the criminal laws against insider trading, and signed certifications in which he (falsely) affirmed that he was in compliance with the codes of conduct and rules governing his duties of confidentiality over inside information. (*See* Tr. 99-112, 115-38, 501-38, 1185.) For example, Stewart received an interactive, computerized compliance training at Perella in January 2013 in which he had to review a hypothetical scenario in which an investment banker son tips his father with inside information, and then respond to questions about whether the son was "guilty of insider trading," the correct answer

---

[3] For his role in the charged insider trading scheme, Cunniffe pled guilty on May 12, 2015, pursuant to a cooperation agreement with the Government, to fraud and fraud conspiracy counts. Cunniffe testified in August 2017 at Stewart's first trial before Judge Swain. On November 6, 2017, Judge Swain sentenced Cunniffe to one year of probation and ordered Cunniffe to forfeit $900,000 to the United States Government, representing the insider trading proceeds that he personally obtained. Cunniffe successfully completed his term of probation without incident, has made over $100,000 in payments toward his forfeiture obligation to date, and testified again at Stewart's retrial before this Court in September 2019.

to which was "Yes[.]"  (*See* Tr. 528-32; GX 5000).  He also received periodic alerts about a variety of criminal insider trading prosecutions before and during his insider trading scheme in this case.  (*See, e.g.*, GX 3072; GX 1003-E; GX 1015).

**B.   Stewart Tipped his Father about Acquisitions of Kendle and KCI**

The evidence showed that the charged insider trading scheme spanned from at least February 2011 through April 2015.  The first of the illegal tips related to the acquisition in 2011 of a pharmaceutical research company called Kendle International Inc. by INC Research LLC. (*See* Tr. 226-44, 248-62, 267-69, 730-39, 758-90, 906-07; GX 6A-6C).  Stewart, who was then at J.P. Morgan, represented Kendle in confidential negotiations toward the acquisition.  (*See* Tr. 168-69, 179-94, 201-11).  In breach of the duties of trust and confidence that Stewart owed to his client and to his employer, Stewart tipped his father about the acquisition in early February 2011, long before the deal was publicly announced on May 4, 2011.  (*See* Tr. 115-38, 168-69, 179-94, 201-11, 226-44, 248-62, 267-69, 730-39, 758-90, 906-07; GX 6A-6C). Stewart first did so over a weekend (February 5 to 6, 2011) that he spent with his parents.  (*See* GX 511).  Based on that initial tip from Stewart, Robert immediately started buying Kendle shares on the next trading day. Shortly thereafter, Robert had his colleague, Mark Boccia, purchase call options for Kendle stock for him (and Boccia also purchased Kendle shares and call options for himself).  (*See* Tr. 226-44, 248-62, 267-69, 730-39, 758-90, 906-07; GX 6A, 6C).  Boccia, in turn, tipped Cunniffe, who purchased Kendle call options for himself.  (*See* Tr. 226-44, 248-62, 267-69, 730-39, 758-90, 906-07; GX 6B).  After the Kendle acquisition deal was publicly announced on May 4, 2011, Robert sold his Kendle shares for a total of about $50,000 in gross proceeds (earning net profits of close to $8,000); Boccia sold his Kendle shares and options for a total of about $38,000 (earning net profits of close to $9,000), a portion of which he shared with Robert; and Cunniffe sold his Kendle options for a total of about

$7,600 in gross proceeds (earning net profits of about $7,100).  (*See* Tr. 226-44, 248-62, 267-69, 730-39, 758-81, 906-07; GX 6A-6C).

Before the Kendle deal was announced, Stewart began tipping Robert about another confidential deal that J.P. Morgan was working on:  the acquisition of a medical device company called Kinetic Concepts, Inc. ("KCI") by Apax Partners.  (*See* Tr. 41-81, 226-44, 248-62, 267-69, 449-73, 730-39, 758-95, 906-07; GX 7A-7C).  Although Stewart was not on the deal team of J.P. Morgan bankers who represented KCI in the negotiations, Stewart was responsible for staffing the team and thus was privy to material, non-public information about the deal.  (*See* Tr. 41-81).  Using inside information that he received from Stewart about the impending deal, Robert bought KCI stock in his own account, and caused Boccia to purchase call options for KCI stock for him.  (*See* Tr. 226-44, 248-62, 267-69; GX 7A, 7C).  Robert also approached Cunniffe, whom he would come to rely on to trade on the inside information supplied by Stewart over the years to come, and asked Cunniffe to buy KCI call options for him in Cunniffe's personal trading account because he was "too close to the source of the information that he was getting," a reference to Stewart.  (*See* Tr. 730-39, 758-95, 906-07).  Cunniffe agreed to buy KCI call options on behalf of Robert, and also bought some for himself.  (*See* Tr. 730-39, 758-95, 906-07; GX 7B).  Ultimately, following the July 13, 2011 public announcement of the KCI deal, Cunniffe sold the KCI options for a total of over $114,000, yielding over $102,000 in profits for Robert and himself, and he subsequently paid Robert's share of the profits by giving Robert a series of cash-filled envelopes.  (*See* Tr. 730-39, 758-95, 906-07; GX 7B).[4]

---

[4]  The KCI deal took longer than expected to announce.  (*See* Tr. 41-81, 468).  Boccia lost confidence and sold or let his KCI options expire without purchasing another round of them, sustaining a net loss of about $10,000.  (*See* Tr. 258-62; GX 7-C).  Robert also sold his KCI stock before the deal announcement, but not out of lack of confidence that the deal would go through.  (*See* GX 7A).  Rather, Robert needed the sale proceeds to cover a variety of significant expenses, including expenses related to Stewart's upcoming wedding.

### C.   Stewart Lied in Response to a FINRA Inquiry about his Father's Kendle Trades

Meanwhile, on May 25, 2011, Stewart was made aware that FINRA was investigating individuals who had engaged in suspicious trading in Kendle securities ahead of the public announcement that Kendle was being acquired.  (*See* Tr. 314-19, 399-400).  In connection with that FINRA inquiry, a list assembled by FINRA of such Kendle traders was circulated to professionals at J.P. Morgan who were privy to material, non-public information about the Kendle acquisition, including Stewart, and they were asked if they recognized any of the names on the list.  (*See* Tr. 302-24, 372-84; GX 1803; GX 1003-O).  The list included Stewart's father by his name "Robert Stewart" and residence in "North Merrick, NY," where Stewart's parents lived.  (*See* Tr. 302-24, 372-84; GX 1803; GX 1003-O).  Ryan Christine Hickey — an in-house attorney at J.P. Morgan who had previously worked for FINRA — emailed the FINRA list to Stewart on July 26 and again on August 2, 2011, and asked him both times if he recognized anyone on the list.  (*See* Tr. 302-29; GX 1003-O).  Although Stewart noticed his father's name and home address on the list, Stewart replied on August 2, 2011 with an email in which he falsely denied recognizing anyone on the list and J.P. Morgan conveyed that false information to FINRA on August 23, 2011.  (*See* Tr. 325-32, 372-91; GX 1003-O; GX-1812).  As Robert later admitted in a meeting with Cunniffe that Cunniffe covertly recorded at the direction of the Federal Bureau of Investigation ("FBI"), it was because Stewart saw Robert's name on the FINRA list that Stewart falsely denied recognizing anyone on the list.[5]

---

[5]  The evidence at Stewart's retrial showed that in this recorded meeting, during a discussion about Robert's trading in Kendle securities based on inside information from Stewart that Kendle was going to be acquired, Robert told Cunniffe that at an earlier point in time, "Sean had gotten a call from FINRA . . . [b]ecause they always said do you know anybody on this list" of people "[w]ho bought and sold" ahead of an acquisition announcement and Robert's "name was on it" (GX 1209-R at 1; Tr. 889-95).  Robert further stated:  "But *because* I was on the list, he [*i.e.*, Sean Stewart] said he didn't know anybody on the list, he wasn't looking.  He just said, 'no, I don't know anybody on it.'"  (GX 1209-R at 2 (emphasis added); Tr. 889-95).  This statement by Robert reveals that Stewart recognized his father's name on the list, but deliberately claimed otherwise, in the hopes that J.P. Morgan and FINRA would not detect the insider trading scheme.  According to Robert, in response to that false response from Stewart,

Nevertheless, a FINRA analyst identified the family connection between Stewart and Robert, and on August 25, 2011 called J.P. Morgan in-house attorney Hickey to find out if Stewart had, in fact, denied recognizing his own father's name on the FINRA list.  (*See* Tr. 331-34, 340-43, 386-92; GX 1003-O).  Shortly thereafter, Hickey and her supervisor, Christina Dugger, a former federal prosecutor who at the time was an Executive Director in J.P. Morgan's legal department, called Stewart and asked him to take another look at the list.  (*See* Tr. 331-34, 340-43, 386-92; GX 1003-O).   With his back to the wall, Stewart finally acknowledged that the Robert Stewart on the FINRA list was his father, and he agreed to be interviewed by J.P. Morgan lawyers (Dugger and Hickey) and a J.P. Morgan compliance department executive the next day.  (Tr. 331-34, 340-43, 386-92; GX 581).  Two minutes later, Stewart called Robert.  (GX 1003-O; GX 30).  That night, Stewart met his father at the Yale Club in Manhattan and following the meeting, Robert emailed a detailed resume of his financial career to Stewart's personal email account.  (*See* Tr. 395-99; GX 3071; GX 580; GX 716).  The evidence showed that during this meeting at the Yale Club, Stewart and Robert spoke about the FINRA inquiry and Stewart's upcoming meeting at J.P. Morgan, and colluded about (among other things) what lies Stewart would tell J.P. Morgan officials to prevent them and FINRA from discovering the insider trading scheme that Stewart and Robert had been perpetrating.  (*See, e.g.*, GX 716; GX 1209-R at 1-2; *see also, e.g.*, Tr. 348-59; Tr. 889-95).

The next day, on August 26, 2011, Stewart was interviewed in his office by J.P. Morgan attorneys Dugger and Hickey and a compliance executive, and Stewart told a series of lies that fell into two categories:  (1) lies to create the false impression that he never divulged

---

J.P. Morgan Chase's in-house counsel said to Stewart, "'well, this guy and you have the same address'" because Stewart "hadn't changed his address out of [Robert]'s house" in North Merrick, New York into Stewart's new address in New York City.  (GX 1209-R at 2; Tr. 889-95).  Robert stated that as a result: "[I]t became a big deal.  You know, they had to go to Chase. Chase's attorneys got involved."  (GX 1209-R at 2; Tr. 889-95).

confidential information about his work to Robert, much less his work on Kendle's confidential

negotiations toward an acquisition, and (2) lies to create the false impression that Robert was

a sophisticated professional and investor who easily could have traded in Kendle stock on his

own initiative, without the benefit of inside information.  For example, with respect to the first

category of lies, Stewart made false statements claiming:  (a) that he never spoke with his father

about his work and did not visit his parent's house during the period from January through May

2011 when he was working on the secret Kendle deal negotiations (*see* Tr. 343-51; GX 1003-

P), when in fact, as shown above, he had begun tipping his father about the Kendle deal during

a visit to his parents' home in February 2011; and (b) that he had spent more time interacting

with his mother-in-law during that period than he had with his own father (*see* Tr. 343-51; GX

1003-P), when, in fact, "Sean [Stewart] and his parents" were "on an average of two to three

calls between Sean and his parents every day for the entire four-year period of this case"

according to his own counsel (*see* Tr. 29).

Hickey called the FINRA analyst on the date of that interview, and four days later,

Hickey sent the FINRA analyst a letter on behalf of J.P. Morgan dated August 30, 2011

conveying to FINRA the substance of Stewart's false interview statements.  (*See* Tr. 358-61,

390-92; GX 1808).  The letter stated in relevant part:

> As discussed on August 26, 2011, upon further review of the enclosure to
> FINRA's July 19, 2011 request, Sean Stewart recognized the name of his
> father, Robert Stewart.  Mr. Stewart overlooked his father's name when he
> first reviewed the enclosure.  Mr. Stewart reported that he did not discuss
> the transaction at issue with his father, and does not know of any
> circumstances under which any knowledge of the company's business
> activities would have been gained by his father.

(GX 1808 at 1).

In the short term, Stewart's lies seemed to work:  neither FINRA nor J.P. Morgan took

any action against Stewart.  (*See* Tr. 361).  A few months later, in October 2011, Stewart moved

to Perella.  (*See* Tr. 508, 578-79, 677-68, 1046-47).  There, as detailed below, Stewart's

employer at Perella and their clients continued to entrust Stewart with highly sensitive and confidential inside information, and he continued to betray that trust by tipping Robert.

After their close call with FINRA, Stewart and Robert made sure that Robert never again traded securities in his own name on inside information from Stewart.  For all of the subsequent insider trading tips that Stewart gave his father, Robert had Cunniffe trade based on the tips in Cunniffe's name.  However, unbeknownst to Stewart and his father, FINRA referred the matter to the SEC, which opened its own investigation.  (*See* Tr. 487-88).

### D.   Stewart Tipped his Father about Acquisitions of Gen-Probe and Lincare

In 2012, Stewart tipped his father with material, non-public information about two corporate acquisitions that Stewart learned through his employment at Perella: (1) the acquisition of a medical device company called Gen-Probe Inc. by Hologic, Inc. that was announced on April 30, 2012, and (2) the acquisition of a home healthcare company called Lincare Holdings, Inc. by Linde AG that was announced on July 1, 2012.  (*See* Tr. 547-66, 574-625; 732-38, 801-43; GX 1674; GX 8 and 9).  Neither Stewart nor Perella represented Gen-Probe and Lincare in these deals; rather, Stewart was on the Perella deal team advising Hologic in the confidential negotiations that led to its acquisition of Gen-Probe, and Stewart learned about the Lincare deal from colleagues at Perella who were representing Linde in the secret negotiations that led to Linde's tender offer to buy Lincare.  (*See* Tr. 547-66, 574-625; 732-38, 801-43).  Based on the illegal tips that Stewart provided, Robert had Cunniffe purchase Gen-Probe and Lincare call options ahead of the public announcements of their respective acquisitions.  (*See* Tr. 732-38, 801-43; GX 8 and 9).  After the deals were announced, Cunniffe made profits for himself and Robert of over $181,000 on the Gen-Probe options and close to $414,000 on the Lincare options.  (*See* Tr. 732-38, 801-43; GX 8 and 9).

**E.   Stewart's Father Lied in Response to an SEC Inquiry about his Kendle Trades**

For the rest of 2012 and into early 2013, Stewart did not work on any confidential negotiations at Perella that resulted in announced acquisitions of publicly traded companies. (*See* GX 1674). As a result, Robert and Cunniffe did not trade on any inside information during that period. (*See* Tr.842-43). Not coincidentally, Stewart and his father had a serious disagreement over money around this time. Robert, who was often anxious about his financial situation, asked Stewart for a short-term loan of $35,000 in the fall of 2012. (*See* Tr. 1033-41). Stewart obliged, wiring $35,000 on behalf of his father to an entity that Robert had designated. (*See id.*) When Robert failed to promptly repay the loan, Stewart became enraged. (*See* Tr. 1041-46; GX 2170, 2179). Stewart threatened to have his lawyers at Simpson, Thacher & Bartlett LLP sue his father and refused to attend an important family event unless his father repaid the money in advance. (*See id.*). Eventually, Robert paid back at least part of the money in December 2012. (*See* Tr. 1043-46).

On May 15, 2013, an investigator with the SEC's Atlanta Regional Office called Robert's home at approximately 2:48PM and left a voicemail message for Robert in which he identified himself as a representative of the SEC and stated, in substance, "Mr. [Robert] Stewart, the reason for my call is we want to talk with you and discuss trading activity in Kendle," so "please give me a call" back. (*See* Tr. 488-90, 492; GX 31). At some point later that day, Robert retrieved the message — likely either directly from the home answering machine or from his wife. (*See* GX 203 at 1161). Shortly thereafter, Robert spoke three times with Stewart:   first, during a call from Robert's cellphone to Stewart's cellphone at approximately 4:36PM on May 15, 2013 that lasted about four minutes and fifteen seconds; second, during a call from Stewart's office at Perella to Robert's cellphone at approximately 11:36AM on May 16, 2013 that lasted about one minute and thirty-four seconds; and third, during a call from Robert's cellphone to Stewart's office at approximately 11:41AM that lasted

about two minutes and twenty-four seconds.  (*See* GX 31).  Robert then spoke with the SEC

investigator, on a 37-minute telephone call at about 2:46PM on May 16, 2013 in which Robert

told a series of lies that matched the lies that Stewart had told J.P. Morgan back in August 2011.

(*See* Tr. 489-96; GX 31).  For example, Robert claimed that his Kendle trades had been based

on his own research (*see* Tr. 494), and he also claimed that "he had not had any conversations

with his son about any work-related activity, nor had he had any conversation with his son

specifically about the potential merger between Kendle and INC" (Tr. 495-96).

The SEC's Atlanta Regional Office closed its investigation.[6]  But Robert, who did not

know about the closure, was concerned.  As Robert would later report to Cunniffe, during an

in-person meeting with Cunniffe that Cunniffe covertly recorded at the FBI's direction, Robert

declined for some time to invest in tips that Stewart continued to provide.  (Ex. A at 5-6).[7]

When Stewart chastised Robert for failing to trade on the tips, chiding that "I handed you this

---

[6]  One of the reasons that the SEC's Atlanta Regional Office closed its investigation was because it learned that the SEC's Market Abuse Unit had opened its own investigation of Robert's trading activities.

[7]  Exhibit A is a transcript of the recording of the in-person meeting between Robert and Cunniffe in which Robert recounted the "silver platter" comment by Stewart that has been described at length in prior proceedings before this Court.  Although the Court precluded the Government from introducing this recording into evidence at Stewart's retrial based primarily on the Court's finding that it was inadmissible hearsay (*see* Dkt. 342 at 1-3), the Court may consider and rely on the recording for purposes of fashioning an appropriate sentence for Stewart.  A sentencing court "court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial" (U.S.S.G. § 6A1.3(a)).  *Accord* Fed. R. Evid. 1101(d)(3) (rules of evidence inapplicable at sentencing).  "The sentencing court's discretion is largely unlimited either as to the kind of information it may consider, or the source from which it may come," which means that a "sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal in determining sentence." *United States* v. *Gomez*, 580 F.3d 94, 105 (2d Cir. 2009) (quotation marks omitted); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 6A1.3(a) cmt. ("In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial." (collecting authorities)).

on a silver platter and you didn't invest in this" (Ex. A at 6), Robert asked, "Sean, did you ever get a call from the SEC[?], like I'm gonna actually do this." (*Id.*)

### F.   Stewart Tipped His Father About the Acquisition of CareFusion

Robert's greed eventually overcame his caution.  In the summer of 2014, a medical device company called CareFusion Corp. retained Perella to assist in confidential negotiations toward its acquisition by Becton, Dickinson & Co.  (*See* Tr. 585, 626-63; GX 1674).  Stewart was on the deal team (*see id.*), and on August 16, 2014 (just as the deal seemed likely to go through) he tipped Robert about the CareFusion acquisition.  (*See* Tr. 639-57, 849-55; GX 5A, 10, 336A, 710-711, 2031, 2037, 2058, 2063, 2263, 2305).  At Robert's urging, Cunniffe started buying CareFusion call options on August 19, 2014. (*See* Tr. 849-63; GX 5A, 10, 710-711).  When the deal was announced on October 5, 2014, Cunniffe's well-timed trades generated over $442,000 in profits for Robert and himself.  (*See* Tr. 862-63; GX 10).

### G.   Stewart's "Silver Platter" Statement was Recounted by his Father on Tape

Unbeknownst to Robert at the time, FBI agents approached Cunniffe at his home in March 2015, Cunniffe decided to cooperate with the FBI, and Cunniffe subsequently had several conversations with Robert that Cunniffe covertly recorded at the FBI's direction.  (*See* Tr. 867-901, 1012-17; Ex. A; GX 1209-R, 1211-R).

On March 24, 2015, while Cunniffe was cooperating but before Robert knew as much, Cunniffe met with Robert at a diner in Manhattan so that Cunniffe could provide a cash payment of $2,500 to Robert, representing the remainder of his portion of the proceeds of their insider trading in CareFusion.  (*See* Tr. 877-79).  During the relevant portion of this meeting, which Cunniffe secretly recorded at the FBI's direction, Cunniffe handed Robert his money. (*See* Ex. A at 2).  Cunniffe then asked Robert about his son, Sean Stewart, and Robert confided uneasiness stemming from the "call" from "two years ago" (*id.* at 2-3) — a reference to the call Robert had received from the SEC in May 2013.  Robert said, "I always have this strange

feeling that . . . they're like . . . trying to tie things together." (*Id.* at 3). Robert then recalled

that he "got nailed" with respect to "the very first thing" (*id.* at 3-4) — a reference to the Kendle

deal. Robert also noted that "Sean got nailed by FINRA. Got nailed. Questioned on it. It was

a big deal." (*Id.* at 4). Robert explained that the issue "kind of washed away," but reared up

"about a year later [when] I got a call" from the SEC. (*Id.* at 4). When Cunniffe remarked that

a call like the one Robert had received from the SEC "[w]ould scare the shit out of me" (*id.* at

6), Robert replied:

> Yeah.  I mean I still, I still remember being [indiscernible] years ago.  Sean
> would always say, ah I can't believe you [indiscernible].  Said I can't believe it.
> I handed you this on a silver platter and you didn't invest in this, and you know.
> I said, Sean, did you ever get a call from the SEC, like I'm gonna actually do
> this . . . .

(*Id.* at 6.)

During a subsequent meeting with Robert on April 16, 2015 that Cunniffe covertly

recorded (*see* Tr. 879-901; GX 1209-R), Robert initially made statements inculpating Stewart

in the insider trading scheme at issue (*see* GX 1209-R at 1-3), but after Cunniffe asked pointed

questions about Stewart's awareness of and role in the scheme, Robert began making false

statements purporting to exculpate his son (*see* GX 1209-R at 2-4).  As would later become

apparent from statements made by Robert on a recorded phone call with Cunniffe on May 4,

2015, that part of the April 16, 2015 questioning from Cunniffe made Robert suspect that

Cunniffe was working with law enforcement.  (*See* Tr. 884-88, 899-901; GX 1211-R at 3-4).

## II.  Stewart Breached his Court-Ordered Bail Conditions and Promises to the Court

In May 2015, shortly after Stewart and his father were arrested by the FBI on a criminal

insider trading complaint in this case, United States District Judge Alison J. Nathan of this

Court ordered that Stewart be released on bail on a $1 million bond secured by $250,000 in

cash or property.  (Dkt. 9; Dkt. 10, Dkt. 62; Dkt. 234 at 12).  The security that Stewart agreed

to post was $250,000 in cash residing in an account with UBS.  (*Id.*)  In doing so, Stewart

signed a bond agreement filed with this Court in which he declared under penalty of perjury that he "will not sell the property" securing this appearance bond, and will not "allow further claims to be made against it, or do anything to reduce its value while this appearance bond is in effect."  (Dkt. 10 at 2).  Rather than honor his sworn commitment to keep those funds inviolate, Stewart chose to liquidate them for his own benefit in mid- or late 2015.  (*See* Dkt. 62; Dkt. 234 at 12; Prior Tr. 1315-16).  When he was later confronted under oath about his willful violation of the terms of his Court-ordered release, Stewart offered as an excuse that he believed his "case was going to be dismissed" because he "had done nothing wrong" and "was innocent" of the charged insider trading crimes — beliefs that, in his mind, gave him license to take matters into his own hands in breach of the Court's order.  (*See* Prior Tr. 1315-16, 1366; Dkt. 234 at 12).  Stewart also initially claimed during his testimony at his first trial that "at the time" he violated his bail conditions by liquidating the relevant funds — that is, in roughly mid- or late 2015 — he told his former attorney, Tai Park, Esq., that he was doing so.  (*See* Tr. 1315-16, 1366).  In fact, as Mr. Park explained to the Government in bringing the violation to the Government's attention in January 2016, it was not until then that he learned of the liquidation.  (*See* Dkt. 234 at 12 n.6).

## III.  Stewart Committed Perjury at his First Trial

Just as Stewart had lied to J.P. Morgan compliance officials in 2011 in an attempt to avoid being caught for his insider trading crimes, Stewart repeatedly lied under oath at his first trial in the hopes of deceiving the jury into acquitting him.  His perjured testimony centered on his implausible claim that he inadvertently divulged extremely valuable, inside information to his father on five separate occasions, through casual conversation, without any intention or expectation that his father would trade securities on the information.  The lies included the following, among many others:

*First*, Stewart falsely claimed that he did not act with criminal intent in divulging inside information to his father.  This lie was carefully crafted.  From hearing the Government's opening statement and the evidence and witnesses presented during its case-in-chief at his first trial, Stewart was well aware of the elements of the Government's case that were too strong to contest and where the Government's case was not as strong.  (*See* Prior Tr. 1328-30, 34-37, 1348-49).  Stewart therefore admitted what he could not deny:  that, in breach of his duties of confidence to his clients and employers, he had repeatedly leaked material, non-public information about upcoming acquisitions to his father.  But Stewart knew that he had to deny that he acted with criminal intent to secure an acquittal, and that he had at least some wiggle room to do so in light of the inherently circumstantial nature of any inquiry into a defendant's criminal intent.  So Stewart falsely denied was that he had acted with criminal intent.  (*See, e.g.*, Prior Tr. 1128-29 ("I'm innocent. . . .  I never gave my father any information so that he could trade on it.")).  Stewart claimed that his father was actually to blame here, because his father had allegedly "used" him by misappropriating inside information from him that he had purportedly confided in his father with innocent intentions.  (*See* Prior Tr.  1327).  Stewart made these ridiculous claims, even though the evidence in this case, common sense and logic all overwhelmingly showed that after the close call that Stewart and Robert had with FINRA in August 2011, there is no way a savvy, Yale educated, sophisticated Wall Street investment banker like Stewart would have continued divulging inside information to his father about confidential deals (as Stewart did three more times) unless he was doing so deliberately.

*Second*, Stewart gave false testimony to try to explain away the five episodes in which he passed material, non-public information to his father.  In doing so, Stewart admitted that he spoke with his father about his work, but offered various purportedly innocent rationales with surface-appeal for having done so or claimed a complete lack of recollection.  (*See* Prior Tr. 1249-53, 1255-56).  For example, he claimed that he had divulged material, non-public

information to his father about certain acquisitions of healthcare companies simply because he "liked discussing what some of our clients were doing to impact patients' lives" (Prior Tr. 1184), notwithstanding that the evidence that many of the illegal tips that he provided to his father concerned inside information about acquisition targets that his firm was not even representing in confidential deal negotiations (namely, Gen-Probe and Lincare) or deals that he was not working on (such as the KCI and Lincare acquisitions).

*Third*, in a similar vein, Stewart gave false testimony to try to soften the blow of the Government's evidence of his illegal tip concerning Kendle.  Stewart claimed that he spoke to his parents and his then-wife about the Kendle acquisition before it was announced.  (*See* Prior Tr. 1184-88).   The principal reason he did so, Stewart claimed, was because "the expected time line of the transaction coincided directly with [his] marriage and subsequent honeymoon." (Prior Tr. 1186).   Stewart so testified even though the transaction was, as long planned, announced on May 4, 2011, a month *before* Stewart's wedding on June 4, 2011.  In February 2011, when Stewart first tipped Robert about Kendle, Robert directed Boccia to buy May 2011 Kendle call options that would have expired worthless had the announcement of the deal coincided with Stewart's wedding or honeymoon.  (*See* Prior Tr. 362, 370).

*Fourth*, Stewart gave false testimony to downplay the significance of his efforts to obstruct the FINRA inquiry into his father's Kendle trades and what that obstructive conduct showed about his consciousness of guilt.  Stewart testified that he had no idea his father would trade on the Kendle information, and learned of that trading only after J.P. Morgan asked him to take a second look at the FINRA Kendle list, on August 25, 2011 (*see* Prior Tr. 1233-34), notwithstanding the evidence (summarized at length above) showing that Stewart had seen his father's name on the list weeks earlier and falsely claimed otherwise, in a deliberate attempt to prevent J.P. Morgan and FINRA from discovering his insider trading crimes.   According to Stewart, during his meeting with Robert on the evening of August 25, 2011 at the Yale Club,

the two spoke for the very first time about Robert's Kendle trading, and Robert supposedly lied, saying he "had seen a news article about a potential rumor including a sale of Kendle, and that's why he had invested." (Prior Tr. 1235). Stewart testified that he did not believe this lie — that he was "confused, ashamed, taken aback," and "wanted to know why [Robert] would do something so foolish, so stupid." (*Id.*; *see also* Prior Tr. 1340). "A couple of days later," Stewart purportedly called his father and "told him never to do that again, and he promised that he would not." (Prior Tr. 1237). Stewart claimed that he continued after the FINRA incident to discuss his work with his father, and was "not as careful as [he] should have been" (Prior Tr. 1247), because of the supposed promise his father had made not to trade again (Prior Tr. 1251). Coming from someone as sophisticated as Stewart, this claim of gullibility rings false — because it is.

*Fifth*, to address some of the most damning evidence against him, Stewart simply feigned a lack of recollection. For example, when Stewart was asked why his father had sent the above-described August 25, 2011 email to his personal email account, right after their meeting at the Yale Club, containing Robert's detailed resume, Stewart claimed "I don't recall" (Prior Tr. 1238). Stewart so swore even though, as shown above, Stewart had recited detailed information from the email nearly verbatim to J.P. Morgan legal and compliance officials the next day as part of his effort to prevent J.P. Morgan and FINRA from discovering his insider trading crimes. Similarly, when Stewart was initially asked to recount the lies that he had told to those J.P. Morgan officials, he again claimed "I don't recall" (Prior Tr. 1236), even though he had just a few days earlier been present in court when J.P. Morgan attorney Hickey read her notes of those lies to the jury.

*Sixth*, Stewart falsely denied having spoken to his father ever again about Kendle before his arrest, including in May 2013, when the SEC called Robert (*see* Prior Tr. 1237, 1307-08), even though (as shown above) telephone records show that Robert spoke several times with

Stewart before calling the SEC back and telling the SEC a series of lies mirroring the false statements that Stewart had told J.P. Morgan officials two years earlier.

*Finally*, Stewart gave false testimony to attempt to mitigate his father's surreptitiously recorded report to Cunniffe that Stewart had chided Robert for failing to trade on illegal tips after the May 2013 call from the SEC, saying, "I handed you this on a silver platter and you didn't invest in this." (*See* Ex. A at 6). Asked by his counsel, "Did you ever say to your father that you handed him tips on a silver platter?" Stewart claimed, "No, I've never said anything like that." (Prior Tr. 1328). In reality, Robert would never have recounted his son's silver platter comment unless his son had actually uttered it (which he did), and Robert had no reason to say anything but the truth to Cunniffe when he relayed the remark to Cunniffe (whom Robert believed at the time was still a trusted confederate in the charged insider trading conspiracy). Tellingly, although Stewart's father has repeatedly demonstrated his willingness to utter lies to protect his son and himself from potential criminal exposure, even Stewart's father could not bring himself to categorically deny that his son had made that "silver platter" comment. (*See* Dkt. 328 at 6-7, 10-12). When FBI agents questioned Robert about his son's "silver platter" statement during Robert's post-arrest interview with the FBI, Robert did not deny the existence of the conversation in which son had made the silver platter comment. (*See id.*). Rather, Robert sought to cast the comment in a more favorable light by recounting it somewhat differently. (*See id.*) If Robert had truly made up the silver platter comment, as Stewart falsely suggested in his trial testimony, one would expect Robert to have had no qualms about saying so to protect his son. Robert did not, because Stewart in fact made the comment, just as Robert has previously explained on tape when he thought he was confiding in a trusted co-conspirator.

The jury that heard Stewart's false claims rejected them in 2016, finding him guilty beyond any reasonable doubt on all counts. In doing so, the jury necessarily rejected Stewart's

testimony that he did not anticipate that his father would trade on the inside information that he shared concerning any of the deals.

## ARGUMENT

### I.      The Guidelines Calculation

In connection with Stewart's original sentencing, Judge Swain correctly found that the Guidelines, as properly calculated to account for the reasonably foreseeable consequences of Stewart's breaches of fiduciary duty, his abuse of a position of trust, and the perjury he committed at his first trial, yield an advisory sentencing range of 63 to 78 months' imprisonment. (*See* Ex. C at 8-13, 31). Those calculations, which this Court should also adopt, are as follows.

The base offense level is eight, pursuant to U.S.S.G. § 2B1.4(a). To that base, 14 levels are added because the offense generated gains of no less than $550,000 and no more than $1,500,000. *See* U.S.S.G. §§ 2B1.1(b)(1)(H), 2B1.4(b)(1). Next, two more levels are added, pursuant to U.S.S.G. § 3B1.3, because Stewart abused a position of trust in committing his crimes. Specifically, he was employed "in a position that involved regular participation or professional assistance in" securities transactions. U.S.S.G. § 2B1.4, cmt. n.2; *see also id.* (contrasting defendant who is "a clerical worker in an investment firm," to whom enhancement would not apply). Finally, two additional levels are added to reflect Stewart's perjury at his first trial in this matter, pursuant to U.S.S.G. § 3C1.1. This yields a total offense level of 26. Because he is in criminal history category I, the applicable Guidelines range is therefore 63 to 78 months' imprisonment.

### A.      The Court Should Reject Stewart's Gain Arguments

In connection with Stewart's first sentencing, Judge Swain considered and rejected arguments by Stewart that he is not responsible for the total amount of profits generated by his

tips — that is, approximately $1.15 million.  (*See* Ex. C at 8-11, 31).  This Court should reach the same conclusion.

Gain, for these purposes, is defined as "the total increase in value realized through trading in securities by the defendant *and persons acting in concert with the defendant or to whom the defendant provided inside information*."  U.S.S.G. § 2B1.4, cmt. background (emphasis added).  The Government conservatively assumes, for present purposes, that gains are capped at those which were "reasonably foreseeable" to the defendant.  *But see United States* v. *Kluger*, 722 F.3d 549, 558-59 (3d Cir. 2013) (holding that this limitation does not apply).

Stewart was acting in concert with, and certainly provided inside information to, his father, Robert.  Robert initially used the tips to trade stocks under his own name.  As Stewart was well aware, however, Robert could not continue trading under his own name and avoid appearing on a FINRA list.  Robert had to have others trade on his behalf.  Stewart knew this — the circumstantial evidence at his retrial overwhelmingly demonstrated that he discussed this problem with Robert at or after their meeting at the Yale Club, and that the two agreed Robert would trade under someone else's name going forward.  Indeed, even if the two had never discussed the matter, Robert's exploitation of the information using another's name and account would have been obvious to Stewart, who (as the retrial jury found) anticipated that his father would trade on his tips even after the FINRA inquiry into Kendle, and never saw his father's name on another FINRA list.  Stewart would also necessarily have foreseen that whoever was agreeing to place Robert's trades likely also exploited the tips for his own benefit.  Accordingly, Stewart "provided inside information" not just to Robert, but to Cunniffe as well.  U.S.S.G. § 2B1.4, cmt. background.  Both Robert's and Cunniffe's profits are therefore attributable to Stewart's breaches — even if one assumes that Robert never explicitly discussed Cunniffe's role in the scheme with Stewart.  *See United States* v. *Riley*, 638 F. App'x 56, 64

(2d Cir. 2016) (affirming district court's attribution to insider defendant of tens of millions of dollars in insider trading gains to hedge fund that tippee relayed information to, where, on a preponderance of the evidence, court could infer that insider knew tippee would pass information to fund); *United States* v. *Martoma*, 48 F. Supp. 3d 555, 564-65 (S.D.N.Y. 2014) (holding tipper defendant liable for profits generated by fund which was not alleged conspirator of defendant but to which defendant's tippee foreseeably passed inside information).

Moreover, it was certainly foreseeable to Stewart that profits of at least $1.15 million would be generated by trading on tips of the kind he was giving his father.  The information here was not just earnings or sales figures, but forecasts of deals that would ensure a jump in the target company's stock price upon public announcement.  As Stewart himself observed, these were sure bets, handed to Robert "on a silver platter."  And Stewart gave these tips not just once or twice, but five times.  He knew that his father had some financial sophistication — indeed, he successfully paraded his father's resume before J.P. Morgan compliance officials to persuade them that Robert had the requisite savvy to identify Kendle as a good investment.  It was reasonably foreseeable to Stewart that Robert, either alone or in concert with whoever he was using to place his trades, would exploit the tips he was getting to generate substantial profits.

Against this backdrop, it simply does not matter whether Stewart knew Cunniffe's identity, or knew that Robert was using Cunniffe, in particular, to exploit the tips.  Because it was reasonably foreseeable to Stewart that Robert, acting alone or concert with others, would generate gains of approximately $1.15 million by trading on the valuable inside information that Stewart provided to his father, Stewart's offense generated gains of no less than $550,000 and no more than $1,500,000 for purposes of U.S.S.G. § 2B1.4(b)(1).

### B.      The Court Should Apply the Two-Point Enhancement for Obstruction

After hearing the evidence at Stewart's first trial and observing him give materially false testimony in her courtroom in his defense during the trial, Judge Swain correctly found during Stewart's original sentencing that a two-point enhancement for obstruction of justice is warranted under U.S.S.G. § 3C1.1.  (*See* Ex. C at 11-12).  This Court should make the same finding here.

Guidelines Section 3C1.1 provides for a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" (U.S.S.G. § 3C1.1(1)) by, for example, "committing, suborning, or attempting to suborn perjury" (U.S.S.G. § 3C1.1 cmt. application note 4(b)).  The "enhancement applies not only to [false] testimony given at the instant trial, but to any perjurious testimony proffered by a defendant that obstructs 'the administration of justice' with respect to the instant offense." *Skowronski* v. *United States*, No. 95 Civ. 2635 (RWS), 1995 WL 622456, at *2 (S.D.N.Y. Oct. 24, 1995) (citing *United States* v. *Valdez,* 16 F.3d 1324, 1335 (2d Cir. 1994)).   "The commission of perjury at any stage of the investigation, prosecution, or sentencing of a defendant warrants the application of [U.S.S.G.] § 3C1.1." *Skowronski*, 1995 WL 622456 at *2.  Accordingly, courts have applied Section 3C1.1's obstruction enhancement in sentencing criminal defendants like Stewart who were convicted at a retrial at which they did not testify based on their commission of perjury at a prior trial in the case.  *See, e.g*., *United States* v. *Glover*, 101 F.3d 1183, 1185, 1192-93 (7th Cir. 1996) (district court correctly applied obstruction of justice enhancement based on defendant's perjury at his first trial in sentencing him following his conviction at a retrial in which he did not testify); *Skowronski*, 1995 WL 622456 at *2-3 (same).  The sentencing court should impose the obstruction enhancement "if the court independently finds that the testimony in question, based upon a preponderance of

the evidence, comports with the definition of perjury" that the Supreme Court has set out in the federal perjury statute, codified at 18 U.S.C. § 1621. *See Skowronski*, 1995 WL 622456 at *2-3 (citing *United States* v. *Dunnigan*, 507 U.S. 87, 95 (1993)).

These elements are satisfied here beyond any reasonable doubt, and certainly (at a minimum) by a preponderance of the evidence. The record in this case plainly shows that Stewart engaged in a "willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition [the Supreme Court has] set out" (*Dunnigan*, 507 U.S. at 95). More specifically, the record shows that while "testifying under oath or affirmation," Stewart gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* at 94 (discussing elements of the federal criminal perjury statute, 18 U.S.C. § 1621).

As shown at length above, Stewart took the witness stand at his first trial and lied deliberately and repeatedly about his interactions with his father. He denied ever having provided material, non-public information to Robert with the expectation that that information would be used to trade. Stewart claimed instead that he conveyed information about Kendle because he and his family needed to plan his wedding and honeymoon. (*See* Prior Tr. 1186). This was demonstrably false, because the Kendle transaction was, as long planned, announced a month before Stewart's wedding.

To try to explain the other tips, Stewart asserted that his father had promised him not to trade again. (*See* Prior Tr. 1237). Even Robert, in his post-arrest statement to the FBI, would not support this patent lie; he made no mention of any supposed promise, and the jury at Stewart's first trial necessarily rejected Stewart's story about it. Stewart also offered the jury other bogus explanations for his tipping, asserting that he somehow let identities of acquisition targets to slip out as part of general discussions about "Obamacare" (*see* Prior Tr. 1249-50) or in "discussing what some of our clients were doing to impact patients' lives" (*see* Prior Tr.

1184).  Stewart even falsely denied having made the comment that Robert — as captured on tape —reported to Cunniffe he had made:  "I handed you this on a silver platter and you didn't invest in this."  (Ex. A at 6).  Asked by his counsel, "Did you ever say to your father that you handed him tips on a silver platter?," Stewart responded, "No, I've never said anything like that."  (*See* Prior Tr. 1328).

Stewart's testimony, like the lies he told J.P. Morgan and FINRA in 2011, and the lies he coached his father to tell the SEC in 2013, were calculated and intricate.  They were certainly willful, and, because they went to the heart of the charges at issue, they were obviously material.  The obstruction enhancement is warranted.

## II.  A 36-Month Prison Sentence Is Reasonable and Appropriate

Judge Swain's decision to impose a 36-month prison sentence on Stewart after his first trial conviction was reasonable in light of the goals of sentencing enumerated in Title 18, United States Code, Section 3553(a).  There has been no change of circumstances since that would justify giving Stewart a different sentence now that he has been retried and convicted again.[8]  The relevant Section 3553(a) factors here include the need for the sentence imposed to reflect the seriousness of Stewart's criminal conduct (*see* 18 U.S.C. § 3553(a)(2)(A)), the disturbing nature and circumstances of his offense conduct and his history and characteristics (*id.* § 3553(a)(1)), the need to provide just punishment and promote respect for the law (*id.* § 3553(a)(2)(A)), and the need to adequately deter others from emulating Stewart's criminal

---

[8]  In the Probation Department's Presentence Report filed in connection with Stewart's original sentencing before Judge Swain, Probation recommended a sentence of 41 months of imprisonment to punish Stewart for his crimes in this case.  (*See* Dkt. 230 at 31).  In its Presentence Report filed today for Stewart's sentencing before this Court for the same offense conduct, Probation is now recommending a sentence of time already served in prison.  (*See* Dkt. 362 at 27).  For the reasons set forth below, the Government respectfully submits that a time-served sentence would be woefully inadequate to meet the goals of sentencing that courts must consider under Section 3553(a), and that this Court should not follow Probation's new recommendation.  As such, Probation's change of heart does not warrant a deviation from Judge Swain's decision that a 36-month prison sentence is reasonable and appropriate for Stewart.

behavior (*id.* § 3553(a)(2)(C)).  As Judge Swain correctly found, a 36-month prison sentence is fair and reasonable in light of these considerations.  (*See* Ex. C at 30-41).

*First*, such a prison sentence is warranted to reflect the seriousness of Stewart's crimes and in light of the troubling nature and circumstances of his offense conduct.  By virtue of his privileged position as a senior investment banker at two prestigious investment banks on Wall Street, Stewart was privy to valuable secrets and was well aware of his duties to maintain such inside information in confidence and of the possibility of criminal prosecution for breaching those duties.  Nevertheless, Stewart repeatedly and persistently betrayed the trust of his employers and clients by stealing confidential deal information that was not his share, and tipping his father with that extremely valuable inside information so that his father could exploit those stolen secrets to make easy money through well-placed securities trades.  Stewart did so over and over again (at least five times), over an extended period of time (over the course of four years).  In the first year of this four-year-long criminal scheme, Stewart learned that a securities industry regulator and compliance officials at J.P. Morgan had questions about one of his father's suspicious securities trades (which, in fact, were based on an illegal tip from Stewart).  That was a stern wake up call that should have prompted Stewart to stop the scheme.  But Stewart chose to double down by continuing to feed his father with inside information at least three more times over the course of the next three years.

While Stewart's serial betrayals of his employers' and clients' trust to benefit his own interests is troubling in and of itself, the disturbing nature of his criminal conduct is compounded by Stewart's repeated use of calculated lies to cover up his crimes.  The first time that Stewart was almost caught — when in-house attorneys and compliance officials at J.P. Morgan questioned him about his father's suspicious trading activity — Stewart colluded with his father about what lies to tell those bank officials, and then proceeded to tell a series of carefully crafted lies during a lengthy interview by the officials that deceived them and the

bank into taking no disciplinary action against him.  Later, after Stewart had heard the Government's evidence at his first trial, Stewart took the witness stand in his defense and repeatedly lied under oath to the jury with a cleverly fabricated narrative designed to dupe the jury into letting him off the hook for his brazen insider trading crimes.

In light of the extremely serious and troubling nature of Stewart's abuses of trust and deceptions in service of the long-running insider trading scheme that he and his father committed, a prison sentence of 36 months is reasonable.

*Second*, such a sentence is also supported by Stewart's history and characteristics. Unlike many criminal defendants who appear before this Court, Stewart did not commit his crimes out of any pressing financial need.  Stewart had the privilege of being raised in a stable home in Long Island by loving parents who nurtured and provided for him financially and emotionally, being educated at Yale University at his parents' expense, and going on to a lucrative and successful career in investment banking on Wall Street.  Stewart was extremely well compensated (earning $750,000 per year in salary and bonus compensation as a managing director at a prominent investment bank toward the end of his insider trading scheme), and he had more than enough financial resources to ease his father's financial stresses.  But rather than reach into his own pocket to lessen his father's financial worries, Stewart chose to steal valuable secrets entrusted to him by his employers and clients and pass them to his father to monetize.  As the evidence showed at Stewart's retrial, Stewart did so because he presumed that he was above the law and would never get caught doing so, and thus stealing his clients' secrets was, in his mind, a costless way to subsidize his father's income.  All of the foregoing is part of Stewart's history and characteristics, and none of it counsels in favor of sentencing leniency.

The criminal conduct at issue was also not a brief aberration for Stewart, and thus the true nature of his history and characteristics are reflected in his sustained, multi-year scheme.

That history and those characteristics are also reflected in the ease and careful calculation with which Stewart lied to cover his tracks in the first year of the scheme, as described above. Moreover, having employed these lies with success, Stewart then persisted in disclosing his clients' and employer's confidences for several years afterward. His disregard of the duties he owed and his contempt for the law are captured in the communications he had with his father, as relayed by Robert to Cunniffe: Stewart pressed Robert to trade on tips even after they were almost caught by a regulator, and chided him when he failed to take advantage of inside information that Stewart had handed to him "on a silver platter."

Stewart's history and characteristics are also reflected in actions other than the offense conduct. For example, as discussed above, Stewart openly flouted a court order requiring him to maintain $250,000 in security for his bond. He did so not because of a mistake or accident or even desperation, but because, as he stated during his testimony at his first trial, he thought it was his right, given his (purported) belief that he was innocent of the crimes charged. And Stewart perjured himself at his first trial, under oath, at great length.

In light of the above, the history and characteristics of Stewart also support the imposition of a 36-month prison sentence.

*Third*, such a sentence is warranted to promote respect for the law and provide just punishment. Stewart was well aware of the laws against insider trading and of his duties of confidentiality to his employers and clients, and he nonetheless chose over and over again to violate those laws and obligations, over an extended period of time, and fabricated a web of lies to prevent a regulator and bank compliance officials from discovering his criminal insider trading scheme. His conduct thus reflects a flagrant disregard of the law that cries out for a substantial prison sentence. Judge Swain appropriately determined that a 36-month prison sentence was a just punishment under all of the circumstances present in this case. Adhering

to Judge Swain's sentencing determination would promote respect for the law and provide just punishment here.

  *Fourth*, a 36-month-prison sentence for Stewart is warranted to deter others from engaging in similar crimes. "Insider trading is an easy crime to commit but a difficult crime to catch." *United States* v. *Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (Rakoff, J.), *aff'd*, 747 F.3d 111 (2d Cir. 2014). "Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." *Gupta*, 904 F. Supp. at 355. The "only meaningful deterrent to insider trading is prison time." *United States* v. *Sebastian Pinto-Thomaz*, 18 Cr. 579 (JSR), Sent'g Tr. at 42 (S.D.N.Y. July 29, 2019).

  In view of Stewart's prior flouting of the insider trading laws in general and of a court order applicable to him personally, a lenient sentence for him would send the wrong message to any Wall Street professionals or others contemplating insider trading. They would see that even if they were caught committing insider trading (which they might not be), a sustained course of such criminal conduct, propped up by lies and perjury, would likely yield little by way of punishment. Given the enormous potential profits to be earned through insider trading, they would come to the view that the benefits of doing so outweigh the potential downside risk of getting caught (and if so, getting a light punishment). A substantial prison sentence is necessary to send a clear message to anyone thinking about embarking on an insider trading scheme that this type of fraud will not be tolerated and will be met with a punishment severe enough to outweigh any possible profits to be earned from such criminal conduct.

  *Finally*, this Court should reject any argument by Stewart that imposing a 36-month prison sentence would result in an unwarranted sentencing disparity as to his father. Judge Swain sentenced Robert to a term of probation for reasons particular to Robert's situation. Unlike Stewart, who committed perjury in his defense at his first trial, Robert accepted responsibility for his crimes by pleading guilty. And Robert was the sole caregiver for his wife

of nearly 40 nearly years, who suffered from a number of life-threatening health conditions, and other family members were not available to provide regular or even urgent assistance to her.  (*See* Ex. C at 28-29).  Judge Swain explained that "But for Mrs. Stewart's urgent medical and personal care needs, [Robert] Stewart's deliberate and prolonged fraudulent conduct would warrant a custodial term of significant length," but "in consideration of his unique caregiving role, his acceptance of responsibility, his sincere demonstration of remorse, and his responsible community conduct," Judge Swain determined that a probationary sentence was necessary to achieve the goals of sentencing.  (Ex. C at 31-32).  Those factors do not apply to Stewart.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a sentence of 36 months of imprisonment is warranted for defendant Sean Stewart's insider trading crimes in this case.

Dated: New York, New York
       November 26, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


By:             /s/
        Samson A. Enzer
        Richard A. Cooper
        Assistant United States Attorneys
        Tel.: (212) 637-2342 / -1027